# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### May 5, 2010 Session

## STATE OF TENNESSEE v. H.R. HESTER

**Automatic Appeal from the Court of Criminal Appeals**
**Circuit Court for McMinn County**
No. 00-115-117    Allen Wallace, Sr. Judge

---

**No. E2006-01904-SC-DDT-DD - Filed October 5, 2010**

---

This appeal involves a defendant who bound up two victims, doused them with kerosene, and then set them on fire because one of the victims had refused to loan him ten dollars to buy beer. One of the victims lost his life in the ensuing fire. A McMinn County grand jury indicted the defendant for first degree murder, attempted first degree murder, and aggravated arson. A jury found the defendant guilty on all counts. During the sentencing phase of the trial, the jury, finding the existence of the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(5) and (14) (Supp. 1999), sentenced the defendant to death for the murder of the victim who died in the fire. Thereafter, the trial court sentenced the defendant to consecutive sentences of twenty-five years for attempted first degree murder and twenty years for aggravated arson. The Court of Criminal Appeals affirmed the defendant's convictions but reduced his twenty-five year sentence for attempted first degree murder to twenty years because the trial court had considered improper enhancing factors. The Court of Criminal Appeals also determined that the trial court had erred by excluding mitigating evidence offered by the defendant during the sentencing phase of the trial but that this error was harmless. After conducting its own comparative proportionality review, the Court of Criminal Appeals concluded that the defendant's sentence of death was proportionate to punishments imposed in similar cases. *State v. Hester*, No. E2006-01904-CCA-R3-DD, 2009 WL 275760 (Tenn. Crim. App. Feb. 5, 2009).

We hold as follows: (1) the manner in which the district attorney general gave notice of the State's intention to pursue the death penalty was not improper; (2) the defendant was not denied his right of self-representation; (3) the trial court did not err by denying the defendant's request for a continuance filed eight days before the trial; (4) the defendant failed to establish a prima facie case that the process used to select the jury venire deprived him of his right to select a jury from a fair cross-section of the community; (5) the defendant failed to make the necessary pretrial objections to raise an argument that the jury selection procedures violated Tenn. Code Ann. § 22-2-304(e) (1994) and has failed to demonstrate any prejudice that he suffered from any violations thereof; (6) the trial court did not err by denying the defendant's request to retain an expert statistician; (7) even assuming two of

McMinn County's jury commissioners were not statutorily qualified for their positions, Mr. Hester suffered no resulting prejudice; (8) the trial court did not commit reversible error with regard to its decisions relating to the admission or exclusion of evidence; (9) the trial court did not improperly comment on the evidence; (10) the trial court's instruction on reasonable doubt was not erroneous; (11) the trial court did not err when it replaced a juror during the sentencing phase of the trial; (12) the record contains sufficient evidence of premeditation; (13) the defendant's due process rights were not infringed by the denial of compulsory process, the trial judge's failure to recuse himself sua sponte, or the manner in which the trial court considered his motion for new trial; (14) the defendant is not entitled to a reversal of his conviction and sentence because of the cumulative effect of errors during the entire proceeding; and (15) the defendant's multiple challenges to Tennessee's death penalty statutes and the procedures and the protocol for carrying out the death penalty are without merit.

Finally, in accordance with our obligation under Tenn. Code Ann. § 39-13-206 (2006), we have thoroughly reviewed the record and have determined: (1) that the defendant's sentence of death was not imposed in an arbitrary fashion; (2) that the evidence fully supports the jury's finding of the existence of the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(5) and (14); (3) that the evidence supports the jury's finding that these aggravating circumstances outweigh the mitigating circumstances presented by the defendant; and (4) that the defendant's death sentence, taking into consideration the nature of the offense and the defendant himself, is neither excessive nor disproportionate to the penalty imposed in similar cases. We have also independently determined that the defendant should receive two twenty-year sentences for his convictions for attempted first degree murder and aggravated arson and that these sentences should be served consecutively with each other and with the defendant's death sentence. In all other respects, the judgment of the Court of Criminal Appeals, as modified by this opinion, is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1) (2006); Judgment of the Court of Criminal Appeals Affirmed and Remanded**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and SHARON G. LEE, JJ., joined.

Rich Heinsman and Lee Davis, Chattanooga, Tennessee, for the appellant, H.R. Hester.

Robert E. Cooper, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Senior Counsel; and James E. Gaylord, Assistant Attorney General; R. Steven Bebb (on appeal) and Jerry N. Estes (at trial), District Attorneys General; and William W. Reedy, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I.
### THE CRIMES

Dora Mae Hester and Harold Roy Hester[1] married in 1992. The marriage ended by mutual agreement after only six months following a particularly violent domestic abuse incident. They had no children. Even though their marriage was dissolved, Ms. Hester and Mr. Hester remained in contact with each other and continued an on-again-off-again relationship.

Ms. Hester met Charles Mitchell Haney, a 74-year-old widower, in 1996. They became friends, and Ms. Hester began to stop by Mr. Haney's apartment to assist him with the household work. In 1997, Ms. Hester agreed to help Mr. Haney care for himself and to maintain his apartment on a more regular basis. In 1998, when Mr. Haney became concerned about being required to move into a nursing home, Ms. Hester and Mr. Haney decided to change their living arrangements in order to enable Ms. Hester to become Mr. Haney's full-time caregiver.

Ms. Hester owned a tract of land and was living in a camper on that property. She had also permitted one of her daughters to place her mobile home on the same property. Mr. Haney purchased a two-bedroom mobile home and had it placed on Ms. Hester's property, approximately twenty-five feet from the other mobile home. He moved into one of the bedrooms, and Ms. Hester moved from the camper into the other bedroom which was on the opposite end of the mobile home.

Ms. Hester used Mr. Haney's automobile for their errands, for Mr. Haney's appointments, and for any of her other personal needs. They also pooled their financial resources,[2] and Ms. Hester became Mr. Haney's live-in caregiver. Ms. Hester cooked Mr. Haney's meals, washed his clothes, assisted him with bathing, and drove him for errands and appointments with doctors. Mr. Haney's mobility was limited, and he was required to use a walker. Accordingly, Ms. Hester also helped Mr. Haney move about the mobile home.

After Ms. Hester moved into Mr. Haney's mobile home, Mr. Hester expressed an interest in purchasing her camper. Ms. Hester permitted Mr. Hester to live in the camper while he was deciding whether to purchase it. After the camper was destroyed by fire, Mr.

---

[1] The official documents in the record and the parties' briefs frequently refer to Mr. Hester as "H.R. Hester."

[2] Mr. Haney was receiving his social security income and a military veteran's pension. Ms. Hester drew disability benefits.

Hester moved into an apartment. However, he was forced to move out of the apartment when he could not afford to pay the rent. Because Mr. Hester was faced with imminent homelessness, Mr. Haney and Ms. Hester invited him to stay with them in the mobile home.

Thus, beginning in 1999, Mr. Hester moved into the mobile home with Mr. Haney and Ms. Hester. He slept in Ms. Hester's bedroom and, on occasion, had sexual relations with Ms. Hester. Mr. Haney and Ms. Hester paid for Mr. Hester's food and cigarettes, and Ms. Hester washed Mr. Hester's clothes. Mr. Hester earned some income by doing odd jobs, but he used most of his earnings to purchase alcohol. Mr. Hester drank heavily quite often with the amount varying depending on his mood.

The relationship between Mr. Haney and Ms. Hester was never romantic; it was more like that of a father and daughter. Nevertheless, because he was becoming increasingly frail with age, Mr. Haney suggested to Ms. Hester that they should marry in order to enable her to continue receiving his pension and other benefits following his death. Mr. Hester did not like the idea.

By December 1999, Mr. Hester had been living in the mobile home with Mr. Haney and Ms. Hester for approximately four months. On December 14, 1999, Mr. Hester began drinking beer around 11:00 a.m. He left briefly to clear a fence row for a neighbor, and when he returned to the mobile home, Ms. Hester asked him to watch Mr. Haney while she took one of her daughters shopping. Ms. Hester returned to the mobile home around 3:00 p.m. Mr. Hester, who had been drinking "quite a bit," insisted that he wanted more beer. Ms. Hester tried to convince him to sleep instead. Ms. Hester left the mobile home again around 5:00 p.m. to take her daughter on another shopping trip.

Around 5:30 p.m., Tim Lynn, Ms. Hester's son-in-law, and Johnny Curtis talked with Mr. Hester at Mr. Curtis's garage, which was only a short distance from Mr. Haney's mobile home. Mr. Hester was drinking a 32-ounce beer. He asked to borrow a chain saw and for assistance in moving some wood. He also tried to borrow ten dollars, but both men refused to loan him money. Mr. Lynn offered to drive Mr. Hester back to the mobile home. On the way back to the mobile home, Mr. Hester suggested to Mr. Lynn that they should kill their wives so that they would not have to listen to their "bitching" any more. Mr. Lynn did not believe that Mr. Hester was serious.

Ms. Hester returned to the mobile home approximately one-half hour after Mr. Hester returned from Mr. Curtis's garage. She prepared hot dogs for dinner, but Mr. Hester stated that he wanted more beer, not hot dogs. Ms. Hester locked the door behind Mr. Hester when he left the mobile home. She allowed Mr. Hester back in the mobile home after he knocked on both the front door and the back door. When Mr. Hester asked Ms. Hester for ten dollars to purchase more beer, she declined to loan him the money because "he had drank enough

-4-

that day and he didn't need any more beer." After Mr. Hester left the trailer again, Ms. Hester went back to Mr. Haney's bedroom to tell him that Mr. Hester was angry with her for not lending him ten dollars to buy more beer.

Mr. Hester re-entered the mobile home while Ms. Hester was in Mr. Haney's bedroom. He was carrying a small knife and was very intoxicated. He ordered Mr. Haney and Ms. Hester into the front room and directed Mr. Haney to sit on his recliner and Ms. Hester to sit on the love seat. Using his walker, Mr. Haney was able to get to the recliner.

Mr. Hester told them "that he was tired of the way he was treated, things were going to change . . . ." He then walked up to Mr. Haney, held the knife about six inches from Mr. Haney's throat and said, "[Y]ou old bastard . . . . I've a good mind to cut your throat." Mr. Haney looked straight ahead and did not respond. While Mr. Hester was "cussing and carrying on," Mr. Haney remained absolutely silent.

While Mr. Hester was threatening Mr. Haney, Ms. Hester screamed to get her daughter's attention and tried to escape through the mobile home's back door. Mr. Hester "jerked" her back and threw her behind the love seat. He then held the knife to her throat, saying that he "was of a good mind to cut [her] throat." After Ms. Hester begged Mr. Hester not to cut her throat, he told her to sit on the love seat and be quiet.

Mr. Hester then obtained a roll of duct tape from a cabinet and ordered Mr. Haney to lie face down on the floor with his hands high in the air behind his back. Mr. Haney complied, and Mr. Hester duct-taped Mr. Haney's hands, ankles, and mouth. He then did the same to Ms. Hester. All the while, Mr. Hester "kept fussing, saying [they were] all going to die that night, and [that] he was going to go tell the law what he . . . was doing." Mr. Haney and Ms. Hester continued to lie face down with their bound hands in the air behind their backs. Mr. Hester paced around the trailer, talking about how the three of them were going to die and how he was going to tell the police. Eventually, he sat at the dining table for approximately five minutes before leaving the mobile home.

When Mr. Hester returned, he was carrying a large jug of kerosene. He walked past Mr. Haney and Ms. Hester and began pouring kerosene in and around Mr. Haney's bedroom. After he poured kerosene throughout the mobile home, Mr. Hester poured kerosene on Mr. Haney's face and the rest of his body. He then poured kerosene all over Ms. Hester. It took Mr. Hester approximately five minutes to pour out the kerosene. Mr. Hester disconnected all the smoke alarms in the mobile home, and he moved a carrier containing a miniature Dachshund outside the mobile home. In the process, Mr. Hester commented, "You little bastard. You haven't done anything."

After completing his grisly preparations, Mr. Hester sat down at the dining table and smoked a cigarette. He continued to tell Mr. Haney and Ms. Hester that he was going to kill them and then tell the police what he had done. Mr. Hester first attempted to light the kerosene with matches, and then with his cigarette, but failed. Finally, Mr. Hester rolled up some newspaper, lighted it on fire, and then placed the burning newspaper next to the counter. This time the kerosene ignited. Mr. Hester left the mobile home, leaving Mr. Haney and Ms. Hester behind in the burning mobile home with their ankles and hands bound with duct tape.

Even though her mouth was covered with duct tape, Ms. Hester tried to tell Mr. Haney that she loved him and that she appreciated Mr. Haney for being so good to her. She told Mr. Haney that she hoped to see him again in Heaven, and then she began to pray. As the mobile home filled with smoke, Ms. Hester tried to "scoot" towards the door to escape. Somehow, Ms. Hester was able to escape from the burning mobile home.

Neighbors and family members found Ms. Hester, her clothes on fire, on the steps outside the burning mobile home. Ms. Hester recalls someone touching her and saying, "[m]other, it's me. Don't be afraid. Roll, [m]other, roll, you're on fire." Once the duct tape was removed from her mouth, Ms. Hester blurted out that "H.R. done this to me." She also stated that she could not roll because her hands were duct-taped behind her back. The next thing that Ms. Hester remembered was a neighbor pulling off her jeans which were still burning and voices telling her that she would be okay.

Just after 7:00 p.m., Kathy Lynn, Ms. Hester's daughter, drove to Mr. Curtis's garage to find her husband. She had her children in the car, and she was hysterical. Ms. Lynn told her husband that Mr. Haney's mobile home was on fire, that someone was trapped inside, and that she was afraid that Mr. Hester was trying to kill them. Mr. Lynn called 9-1-1 and then drove his family back to the burning mobile home. He instructed his wife and children to remain in the car with the doors locked, and then he headed to the mobile home.

The mobile home's door had melted, and smoke and fire was billowing out of the doorway. Mr. Lynn saw a body inside and tried to enter the home. He retreated when a flash of fire burned his face. Mr. Lynn and another neighbor who had responded to the fire agreed that Mr. Haney was certainly dead and did not attempt to enter the mobile home while the fire was still raging.

Paramedics arrived at the scene. Ms. Hester was transported first by ambulance and then by helicopter to Erlanger Hospital's burn unit. She drifted in and out of consciousness, but she recalled the paramedics explaining to her everything that was happening. Ms. Hester sustained serious burns that led to a double amputation of her feet and lower legs. She received skin grafts on her arms and across her back and chest. Her burns caused a

significant amount of nerve damage and scarring. Because Ms. Hester's injuries were so extensive, she was hospitalized in various medical facilities from December 14, 1999 until March 28, 2000.

After leaving Ms. Hester and Mr. Haney to die in the burning mobile home, Mr. Hester walked to a neighbor's house and asked the neighbor to contact the police. He surrendered himself to the authorities at approximately 8:00 p.m. When the officers apprehended Mr. Hester, they noticed that Mr. Hester had fluid-filled blisters caused by the heat and fire on his left arm. Mr. Hester and his clothing smelled strongly of kerosene. At that time, the officers recovered from Mr. Hester the knife that he had used to threaten Ms. Hester and Mr. Haney.

An autopsy on Mr. Haney was performed on December 15, 1999. The medical examiner concluded that Mr. Haney died as a result of smoke inhalation and thermal burns and that the thermal burns were the predominant cause of death. The examination ascertained that the kerosene that Mr. Hester splashed across Mr. Haney's face had ignited and that Mr. Haney was alive when he started to burn to death. Mr. Haney died with his hands still tied behind his back, and his body fixed in that position.

## II.
### THE PROSECUTION AND TRIAL

On February 22, 2000, a McMinn County grand jury indicted Mr. Hester for aggravated arson, first degree murder, and attempted first degree murder. The State filed notice of its intent to seek the death penalty for the murder of Mr. Haney on November 13, 2001. The trial was conducted from March 8, 2005 through March 12, 2005. Following the guilt phase of the trial, the jury found Mr. Hester guilty of aggravated arson, first degree murder, and attempted first degree murder.

During the sentencing phase of the trial on March 11 and 12, 2005, the State sought the imposition of the death penalty based on three aggravating circumstances.[3] The jury heard and considered the testimony of a minister who had regularly visited Mr. Hester in prison, one of Mr. Hester's acquaintances, and Mr. Hester's mother, in addition to the testimony of the State's witnesses and the reading of three victim impact statements. After hearing and considering this evidence, the jury unanimously found that the State had proved

---

[3]The three aggravating circumstances included: Tenn. Code Ann. § 39-13-204(i)(3) (Supp. 1999) ("[t]he defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder"); Tenn. Code Ann. § 39-13-204(i)(5) ("[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death"); and Tenn. Code Ann. § 39-13-204(i)(14) ("[t]he victim of the murder was seventy (70) years of age or older").

the existence of two aggravating circumstances[4] and that the State had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the jury sentenced Mr. Hester to death for the murder of Mr. Haney.

Mr. Hester filed a motion for new trial on August 12, 2005.[5] On February 16, 2006, the trial court conducted a sentencing hearing with regard to Mr. Hester's convictions for attempted first degree murder and aggravated arson and a hearing on his motion for new trial with regard to his capital conviction and sentence. The trial court sentenced Mr. Hester to twenty-five years on his conviction for attempted first degree murder and to twenty years on his conviction for aggravated arson. The court also ordered that these sentences should be served consecutively. On May 22, 2006, the trial court filed an order denying Mr. Hester's motion for new trial.

Mr. Hester perfected a timely appeal to the Tennessee Court of Criminal Appeals, and that court handed down its opinion on February 5, 2009. *State v. Hester*, No. E2006-01904-CCA-R3-DD, 2009 WL 275760 (Tenn. Crim. App. Feb. 5, 2009). The Court of Criminal Appeals concluded that the trial court erred by enhancing Mr. Hester's sentence for attempted first degree murder based on factors neither admitted by Mr. Hester nor found by the jury. Accordingly, the Court of Criminal Appeals reduced Mr. Hester's twenty-five year sentence to the presumptive sentence of twenty years. The Court of Criminal Appeals also concluded that the trial court had erred by excluding certain testimony during the sentencing phase of the proceeding but found that this error was harmless. In all other respects, the Court of Criminal Appeals affirmed the judgments of the trial court. After conducting its own independent comparative proportionality review, the Court of Criminal Appeals concluded that Mr. Hester's sentence of death for the murder of Mr. Haney was proportionate to punishments imposed in similar cases.

In accordance with our obligation under Tenn. Code Ann. § 39-13-206 (2006), we have thoroughly reviewed the record and have determined: (1) that the defendant's sentence of death was not imposed in an arbitrary fashion; (2) that the evidence fully supports the jury's finding of the existence of the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(5) and (14); (3) that the evidence supports the jury's finding that these aggravating circumstances outweigh the mitigating circumstances presented by the defendant; and (4) that the defendant's death sentence, taking into consideration the nature of the offense and the defendant himself, is neither excessive nor disproportionate to the penalty imposed in similar cases. We have also independently determined that the defendant should receive two twenty-

---

[4]Tenn. Code Ann. § 39-13-204(i)(5), (14).

[5]Mr. Hester later filed four amendments to his original motion for new trial before the trial court conducted the hearing on the motion for new trial.

year sentences for his convictions for attempted first degree murder and aggravated arson and that these sentences should be served consecutively with each other and with the defendant's death sentence. In all other respects, we affirm the judgment of the Court of Criminal Appeals, as modified by this opinion. Accordingly, we affirm Mr. Hester's convictions and the imposition of a sentence of death.

## III.
### THE DECISION TO PURSUE THE DEATH PENALTY

Mr. Hester argued both in the trial court and before the Court of Criminal Appeals that the decision of the District Attorney General to pursue the death penalty for the murder of Mr. Haney violated his constitutional rights. He raised two arguments. First, he asserted that the broad discretion afforded Tennessee's prosecutors is unconstitutional. Second, he asserted that the twenty-two month delay between his indictment and the filing of the State's notice of intent to seek the death penalty rendered the District Attorney General's decision to seek the death penalty unconstitutional, when the only intervening change of circumstances was his decision not to plead guilty. Both the trial court and the Court of Criminal Appeals rejected these arguments. We also find that these arguments lack merit.

### A.

Mr. Hester asserts that the discretion with regard to seeking the death penalty reposed in Tennessee's thirty-one District Attorneys General is so broad and unfettered that it renders any decision to pursue the death penalty inherently unconstitutional. This is not the first time this argument has been made. For all the reasons set forth in detail in our decision in *State v. Banks*, 271 S.W.3d 90, 154-55 (Tenn. 2008), we have found that the application of the death penalty in Tennessee is not rendered unconstitutional solely because locally elected District Attorneys General make discretionary charging decisions within a statutory framework established by the Tennessee General Assembly. Mr. Hester has not offered a persuasive argument that warrants revisiting this decision.

### B.

Mr. Hester also insists that the application of the death penalty to him is unconstitutional because the State did not file its notice of intent to seek the death penalty until twenty-two months after his indictment and because the State decided to seek the death penalty only after he declined to plead guilty. Regrettably, Mr. Hester's account of the circumstances surrounding the State's decision to seek the death penalty in this case reflects a disturbingly inaccurate version of the facts in this record.

There is no dispute that a McMinn County grand jury indicted Mr. Hester on February 22, 2000. It is equally beyond dispute that the State filed its notice of intent to seek the death penalty on November 13, 2001. Accordingly, Mr. Hester's assertion that twenty-two months elapsed between his indictment and the filing of the State's notice of intent to seek the death penalty is numerically correct. What is patently incorrect is Mr. Hester's assertion that the only change in circumstances during the intervening twenty-two months was his decision not to plead guilty.

On March 13, 2000, approximately three weeks after a McMinn County grand jury handed down its three-count indictment against Mr. Hester, an assistant district attorney general informed Mr. Hester and the trial court that the State was considering pursuing the death penalty and that the District Attorney General would make this decision in the near future. Following this hearing, Mr. Hester's assistant public defender engaged in an active dialogue with the assistant district attorney general regarding the importance of having a psychological evaluation of Mr. Hester. Complications arose regarding the scheduling of Mr. Hester's psychological examination.[6] However, at a hearing held on August 7, 2000, Mr. Hester's assistant public defender stated that he and the assistant district attorney general agreed that the examination should be performed, and the assistant district attorney general stated that he would cooperate with the defense in seeking an acceptable mental health evaluator.

Various complications continued to cause delay in Mr. Hester's evaluation. At a hearing held on September 11, 2000, the trial court inquired whether or not the case would be a death penalty case. The assistant district attorney general stated that this decision was linked to the results of Mr. Hester's psychological evaluation.

Mr. Hester's first substantial mental health examination was finally conducted in December 2000 by Dr. William Bernet, the Director of Forensic Services at Vanderbilt University Medical Center. In his pretrial forensic psychiatric evaluation submitted on January 9, 2001, Dr. Bernet identified several areas of psychological concern that warranted further exploration. Mr. Hester's defense team desired to pursue these inquiries, and the State continued to cooperate with them.

During a hearing held on August 13, 2001, the State expressed a desire to explore Mr. Hester's intelligence quotient in addition to his mental health. On that occasion, the State noted that it would most likely be seeking the death penalty and, therefore, requested the trial

---

[6]There is little need to catalogue all the causes of these complications; however, one of the complications was Mr. Hester's objection to having the testing conducted at the Hiwassee Mental Health Center.

court to order that Mr. Hester's intelligence be tested before making a final decision.[7]  The trial court entered an order on August 17, 2001 directing that additional testing be performed to ascertain Mr. Hester's intelligence quotient.

The subject of a possible plea agreement was also broached during the same August 13, 2001 hearing.  When the defense counsel alluded to a plea offer, the assistant district attorney general immediately responded by stating:  "wait a minute.  It wasn't a plea offer. It was my willingness to go to my boss and say, 'Look, this is what I'd like to do.'"  It appears from the record that Mr. Hester had been asked whether he would be willing to plead guilty and was told that if he was, the assistant district attorney general would take up the matter with the District Attorney General.  As it turned out, Mr. Hester expressly refused to plead guilty to a crime that he had no recollection of committing.

Contrary to the assertions in Mr. Hester's brief, the record reflects that the State's filing of the notice of intent to seek the death penalty was not chiefly due to Mr. Hester's decision not to plead guilty to the murder of Mr. Haney.  The State's decision on this matter was delayed because of the months of delay associated with obtaining and completing the psychological evaluation and intelligence testing.  We find no basis to attribute these delays to any improper actions by the State.  We decline to fault the State for waiting until these evaluations had been completed and their results reported before making such a momentous decision as whether or not to seek the death penalty.

We hasten to add that the constitutionality of the State's decision to pursue the death penalty against Mr. Hester would not be undermined even if Mr. Hester had been able to demonstrate that the State decided to pursue the death penalty because Mr. Hester declined to plead guilty.  We have already held that District Attorneys General, when they are deciding whether or not to pursue the death penalty, may make a plea offer of a lesser penalty than

_____

[7]Specifically, the assistant district attorney general argued:

[T]he death penalty, as I recall the structure of the statute, there is incorporated in it a provision about if the individual's I.Q. is below a certain level, we cannot seek the death penalty, and maybe we need that as a threshold determination before we get all this other machinery started. If he doesn't . . . fit within the category of a person that we can seek it for, there's no sense in . . . probably we should get that done and then . . . schedule the rest of the case, depending on what it shows.

-11-

death and then may pursue the death penalty if the defendant rejects the plea offer. *State v. Mann*, 959 S.W.2d 503, 509-11 (Tenn. 1997).[8]

In *State v. Coffin*, 991 P.2d 477, 498 (N.M. 1999), the New Mexico Supreme Court was confronted by circumstances similar to the present case, where the possibility of the death penalty had been a constant backdrop of a case but where the State had not actually filed its notice of intent to seek the death penalty until the defendant rejected a plea agreement offer. The New Mexico Supreme Court explained its rationale for upholding the constitutionality of the State's decision to file a notice of intent to seek the death penalty after the defendant decided not to accept the State's plea offer as follows:

> [A]lthough the State delayed filing a notice of intent to seek the death penalty, the State repeatedly indicated to Coffin that it viewed this case as a potential death penalty case. The possibility of the State seeking the death penalty was a continuing reality in this case. Under these circumstances, we cannot accept Coffin's characterization of the State's filing of a notice of intent to seek the death penalty in this case as a change in prosecutorial action, subsequent to the defendant's exercise of a right, that would subject the prosecutor's conduct to scrutiny for possible retaliation. Therefore, we conclude that Coffin's claim of prosecutorial vindictiveness is without merit.

*State v. Coffin*, 991 P.2d at 498.

Under the circumstances of this case, we find no constitutional violation with regard to the State's filing of its notice of its decision to seek the death penalty. By the time the State filed its formal notice on November 13, 2001, it had been clear both to the trial court and to Mr. Hester for many months that the State viewed this case as one warranting the death penalty but that the State was awaiting the results of the psychological and intelligence quotient tests before making a final decision. Mr. Hester can hardly claim that he was

---

[8]We observed that

> [t]o hold, as the defendant urges, that the State can pursue no greater charge or seek no greater punishment than that offered during plea negotiations could effectively abolish the practice of plea bargaining in first degree murder cases. Prosecutors would rarely, if ever, be willing to make an offer of leniency in exchange for a guilty plea. We decline to adopt such a radical and far reaching principle.

*State v. Mann*, 959 S.W.2d at 510.

surprised when the State filed its notice. Nor can he claim prejudice in light of the fact that the State filed its notice approximately forty months before the trial.

## IV.
### THE ALLEGED DENIAL OF MR. HESTER'S RIGHT OF SELF-REPRESENTATION

Mr. Hester argued to the Court of Criminal Appeals that the trial court unconstitutionally denied his request for permission to represent himself. The Court of Criminal Appeals found that the trial court's actions did not violate Mr. Hester's right of self-representation because he had not "clearly and unequivocally asserted his right to proceed pro se." *State v. Hester*, 2009 WL 275760, at *23. The Court of Criminal Appeals also noted that "[t]he record does not reflect that the defendant objected to counsels' representation or reasserted his request to proceed pro se after Ms. Parton was permitted to withdraw" and instead reflects that he proceeded to trial with Rich Heinsman as lead counsel and Lee Davis as second chair. *State v. Hester*, 2009 WL 275760, at *23. While we do not subscribe to the basis for the Court of Criminal Appeals' decision, we concur that the trial court did not unconstitutionally interfere with Mr. Hester's right of self-representation in this case.[9]

## A.

Mr. Hester's assertion of his right to self-representation must be considered in the rather convoluted context of his relationship with the lawyers who represented him in this case. As early as September 2000, Mr. Hester asked the trial court to appoint him another lawyer because he lacked confidence in William Donaldson, the assistant district public defender who had been assigned to represent him. Mr. Hester believed that Mr. Donaldson had lied to him. The trial court told Mr. Hester that Mr. Donaldson had been appointed to represent him and that he should endeavor to work with Mr. Donaldson.

Following the State's decision to pursue the death penalty, the trial court appointed Mr. Heinsman, a Chattanooga lawyer, to represent Mr. Hester along with Mr. Donaldson. Three days later, the trial court designated Mr. Heinsman as Mr. Hester's lead counsel and Mr. Donaldson as co-counsel. On February 15, 2002, approximately two months following his appointment, Mr. Heinsman filed a "sealed motion" with the trial court requesting that

---

[9]This Court may affirm a judgment on different grounds than those relied upon by the lower courts when the lower courts have reached the correct result. *Cont'l Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986); *Hopkins v. Hopkins*, 572 S.W.2d 639, 641 (Tenn. 1978).

the Office of the Public Defender be removed from its representation of Mr. Hester.[10]  Mr. Donaldson took considerable offense.

At a hearing conducted on February 19, 2002, Mr. Donaldson asserted that Mr. Heinsman had filed the motion in order to have one of his friends appointed co-counsel rather than Mr. Donaldson.  Another public defender expressed concern that Mr. Heinsman had "poisoned" the Office of the Public Defender out of the case.  To complicate matters further, the public defenders and the State requested the trial court to remove Mr. Heinsman from the case because he had arranged a meeting between Mr. Hester and Ms. Hester without their knowledge and because of the complications resulting from that meeting.

The hearing resumed on February 25, 2002.  During that hearing, the trial court learned that two persons working with Mr. Heinsman[11] had talked with Ms. Hester about her life with Mr. Hester and their efforts "to keep [Mr. Hester] from getting the death penalty." In addition to making general offers of assistance with obtaining groceries or with transportation, they invited Ms. Hester to join them for dinner and then to accompany them to the McMinn County Justice Center to meet with Mr. Hester.  Mr. Heinsman later joined his colleagues, and they asked Ms. Hester to help them find out how much of the events of December 14, 1999 Mr. Hester could remember.  Ms. Hester accepted the dinner invitation and, following dinner, accompanied Mr. Heinsman and his two associates to the McMinn County Justice Center.  Mr. Heinsman arranged for this meeting without consulting Mr. Donaldson.[12]

By that time, the trial court had already decided to remove the Office of the Public Defender from the case.  Based on the evidence presented at the hearing regarding the meeting between Ms. Hester and Mr. Hester and on its in camera review of a transcript of the recorded statements made by Mr. Hester, the trial court decided that Mr. Heinsman should also be removed from the case.  The trial court's decision was based on the evidence that Mr. Heinsman had not consulted Mr. Donaldson about arranging for Ms. Hester to meet with Mr. Hester, the expressed concern that Mr. Hester's recorded statements which would not be protected by the attorney-client privilege, included inculpatory, as well as exculpatory, statements, and the possibility that Mr. Heinsman might be called to testify at trial.  The trial

_____

[10]Mr. Heinsman provided a complete copy of the motion to Mr. Donaldson but provided only a redacted copy to the Office of the District Attorney General.

[11]Ms. Hester identified these persons as Elaine Kelly and Dr. David Ross.

[12]The evidence regarding Ms. Hester's jailhouse meeting with Mr. Hester reflects that all did not proceed as Mr. Heinsman envisioned.  Even though Ms. Hester was informed that both sides of the conversation would be recorded, only Mr. Hester's side of the conversation was recorded.  In addition, one of Ms. Hester's daughters came to the jail unexpectedly when she found out that Ms. Hester was visiting Mr. Hester and vented her anger at Mr. Heinsman for arranging the meeting.

court concluded that Mr. Heinsman's decision to permit his client to engage in an uncontrolled dialogue with one of the victims that would not be protected by the attorney-client privilege had created too much of a risk of future complications to permit Mr. Heinsman to continue representing Mr. Hester.

Mr. Heinsman objected and sought permission to call Mr. Hester to testify regarding his desire to keep Mr. Heinsman as his lawyer. The trial court stated that Mr. Hester's testimony was not relevant and ruled from the bench on February 25, 2002 that Mr. Heinsman should be discharged as Mr. Hester's lawyer. On March 1, 2002, the court filed a written order removing Mr. Heinsman from the case.

Mr. Hester promptly contested Mr. Heinsman's removal by filing a Tenn. R. App. P. 10 extraordinary appeal with the Court of Criminal Appeals on March 7, 2002.[13] On March 14, 2002, the Court of Criminal Appeals entered an order staying proceedings in the trial court, including the removal of Mr. Heinsman. In an order entered on June 3, 2002, the Court of Criminal Appeals determined that the trial court had "improvidently" discharged Mr. Heinsman and ordered that Mr. Heinsman be reinstated as Mr. Hester's lead counsel. On July 8, 2002, the trial court appointed Kim Parton as co-counsel for Mr. Hester.

Little progress was made in the case over the course of the next year. During a June 9, 2003 hearing, the trial court expressed its disappointment with the performance of lead counsel for both the State and Mr. Hester. The trial court stated:

> I'm going to do a little talking here, . . . and I'm going to try to remain calm. But I want both of you gentlemen to know that you're very perilously close to trying the patience of the Court. There's been a lot of things, quite frankly, from both sides that I've not been very happy with that's been going on throughout the course of this trial. There are things I think each of you all have done to deliberately antagonize the other. None of that has helped this case, the progress of it under any way whatsoever. My main concern when I get a case is try to approach the case, and as rapidly as I can, [to] get this matter to trial, with both sides having the opportunity to do everything they need to do in order to properly prepare for the trial. I don't think that has happened in this case. And I understand at this point we've got -- everybody's finger-pointing, saying it's the other side's fault. "We're trying to do what we've got to do, but the other side won't do this and the other side won't do that."

---

[13]Mr. Hester did not take issue with the dismissal of the Office of the Public Defender.

I understand my job is not supposed to be easy, and I've never pretended it ought to be. But none of this kind of antics on either side helps . . . . I don't think it helps any of us for the kind of transactions that we've had from both sides and the animosity that I see developing over -- and I know cases are complex, and nothing that I say in any way is to try to mitigate what -- the kind of case that Mr. Hester is facing. He faces the ultimate punishment. We've not dealt much with his case since this case has come out of grand jury. We've dealt with everything else, and Mr. Hester has sort of been off to the side. We're not in some ways any closer to getting this matter to trial than we were the day it came out of grand jury. And I'm at the point of being flustered from both sides, and I want everybody to understand that.

The trial court requested the lawyers for both sides to work more professionally with each other. The trial court promised the parties that it would continue to be available to assist the lawyers in moving the case toward trial.

Circumstances had not improved by the time of a hearing held on July 4, 2003. Reflecting upon a motion for recusal and on dueling motions to remove the District Attorney General's Office and Mr. Heinsman, the trial court decided to withdraw from the case and to request the appointment of a special judge. The trial court explained:

I think the better procedure at this point is to get a judge who hasn't gone through all of this and be -- look at the case and listen to the facts on both sides . . . . I will call the administrative office and have a new judge appointed . . . . We may even try to call them today and explain the situation to them, have a judge appointed that can hear these things from a fresh standpoint. That may be what everybody needs. And certainly, if I've been any fault in moving this case, I apologize for that. But my interest from the beginning has been to move the case, and that hasn't happened.

On July 21, 2003, the Chief Justice appointed a senior judge to replace the original trial judge. Just over one year after his appointment, the replacement trial judge had grown weary of Mr. Heinsman's dilatory conduct. During an August 6, 2004 hearing, the judge, addressing Mr. Heinsman, stated: "I'm removing you from this case completely. You can't get ready for trial. You've drug your feet around here. I've set down a deadline for the case

and you haven't followed it." The court reiterated, "I've set down . . . a scheduling order that has not been followed. This case has got to get to trial."

The trial judge also permitted Mr. Hester to address the court regarding Mr. Heinsman's removal. Mr. Hester stated:

> I don't believe I can . . . get a fair trial without Mr. [Heinsman]. He's been on my case long enough to know what's going on. He's . . . worked with me. He's . . . let me know everything that's going on as it's went . . . . Mr. [Heinsman] in my opinion is a fine lawyer. He's . . . done . . . what he set out to do, told me he was going to do . . . .
>
> I think he'd only been on the case for two months when they took and fired him because he was out there actually working for me. If you fire him, that's exactly what the State's been wanting to do all along, is get rid of Mr. . . . Heinsman. Then . . . somebody else can take this . . . excuse . . . the way I put this, but put their finger up their rear end . . . .

At this juncture, the trial judge reconsidered removing Mr. Heinsman entirely from the case and suggested instead substituting Ms. Parton as lead counsel with Mr. Heinsman remaining as co-counsel. Ms. Parton and Mr. Heinsman conferred with Mr. Hester. They reported back to the court that "client and counsel aren't interested in swapping roles."

In response, the trial judge stated: "Mr. Hester is pleased with his lawyer, pleased with Mr. Heinsman. But it's not up to Mr. Hester. It's up to me. Sure, if Mr. Heinsman can drag this thing out for 10 more years, I'd be pleased with him too." The trial court expressed its concerns about Mr. Heinsman's flagrant violations of scheduling orders and his attempts to delay the proceedings. During this discussion in open court, Mr. Hester blurted out, "I don't think nobody would be more qualified than Mr. [Heinsman]." The court concluded that the case was never going to reach trial with Mr. Heinsman representing Mr. Hester. Accordingly, the court announced that Ms. Parton would take over as lead counsel and that he would take under advisement the issue of whether Mr. Heinsman would continue to represent Mr. Hester as second chair.

In a written opinion filed on September 9, 2004, the trial court expanded on its reasons for replacing Mr. Heinsman with Ms. Parton. Among Mr. Heinsman's actions that the court found troubling were Mr. Heinsman's disregard of the scheduling orders and the inconsistencies and potentially misleading omissions in Mr. Heinsman's justifications for his many requests for continuances and extensions of time. Even though the trial court gave Mr.

-17-

Heinsman numerous opportunities to address his concerns, Mr. Heinsman declined to respond. Eventually, and "with great reluctance," the court decided to permit Mr. Heinsman to remain as co-counsel to Ms. Parton because Mr. Hester "strongly wants Mr. Heinsman to stay on his case."

Mr. Hester disagreed with the trial court's decision to remove Mr. Heinsman as lead counsel and wrote a series of letters directly to the court. In the first of these letters, Mr. Hester wrote that "Mr. Heinsman did more for me in 6-8 weeks than [Mr.] Donaldson did in two years (more in two weeks, truth be known). [Mr. Heinsman] let me know every move[,] asked what I thought[,] explained the Whys + Why nots. He let me be involved in my case." He also wrote that Mr. Heinsman "sto[o]d by me. Three years of fight. Three years of mud-slinging, name calling . . . . I don't know how he got all the work done he did." Mr. Hester concluded, "[s]o if Mr. Rich Heinsman is not back on my case le[a]d attorney. I want to fire Mrs. Kim Parton. And represent myself. Because I believe Mrs. Parton is working with or for the DA's office . . . . I TRUST NO ONE but Rich Heinsman attorney at Law" and that Mr. Heinsman had been "the only one that's been stra[ight] up with me."

Mr. Hester wrote a second letter to the trial court in two installments.[14] In the first installment dated October 27, 2004, Mr. Hester praised Mr. Heinsman and requested his reinstatement as lead counsel.[15] In the second portion of the letter, a postscript dated November 10, 2004, Mr. Hester announced his decision to fire both Mr. Heinsman and Ms. Parton and to represent himself.[16] On November 23, 2004, the trial court informed Mr. Hester that it was improper to correspond directly with the court. The court informed Mr. Hester that it had forwarded his letter to his lawyers and that the court would respond only to motions filed in accordance with the rules of court. On December 13, 2004, Mr. Heinsman and Ms. Parton filed a motion for instructions regarding Mr. Hester's request to

---

[14]Even though the letter was dated October 27, 2004, Mr. Hester apparently did not mail it until after he wrote the November 10, 2004 postscript.

[15]Mr. Hester stated:

"I've written you, to please put Rich Heinsman back as le[a]d attorney twice before . . . ." I "since have found out Mr. Heinsman is back as co[-]counsel. This is not acceptable. Mrs. Parton, may be a great attorney. But I do not know. I do not know her[] very well or trust (Not with my life) at all. I do trust Rich to a point and have a good working relationship with him."

[16]Mr. Hester stated in the postscript that "[s]ince this letter was wrote I decided to represent myself and am sending a copy of the notarized + registered letter I'm sending to Mr. Heinsman and Mrs. Parton firing them." Mr. Hester added, "[i]f I got enough mind about me to stand this death penalty trial, and I do, the state paid enough to prove it. I've enough mind to say what I want to do and that[']s represent myself." Mr. Hester also added that he would need his full case file in order to represent himself and that the "longer it takes to get the file. The longer it[']s going to take me to be ready for trial."

-18-

represent himself, stating that they did "not join the defendant's motion in substance, but have been instructed to bring this matter before the Court."

During a January hearing on the motion for instructions, Mr. Hester explained that

> I've just found out within the last six months or . . . so that the past three years they've not took and worked this case as to try to win it or anything, just . . . trying to get the death penalty off from me, which . . . I feel they should not worry about that and work the case. I've . . . been told they wasn't going to waste their time trying to defend me, that they are fighting against the death penalty. Not keeping in touch, or answering letters. They have not let me know what's going on, like when you fired Mr. Heinsman I didn't know he was even hired back up . . . until a couple of days before after when we was suppose[d] to go to trial.

The trial court also had an extensive discussion with Mr. Hester regarding his education and his lack of understanding of legal proceedings and the law. The trial court explained to Mr. Hester the problems with a defendant representing himself or herself, particularly in a complicated legal proceeding such as a capital case. The trial court also discussed with Mr. Hester some of his own limitations that would create complications for self-representation. Ultimately, the trial court decided not to allow Mr. Hester to represent himself. The court explained its reasoning as follows: "It's obvious to the Court, I think it would be obvious to any judge that if this man were to represent himself it would be a catastrophe as far as his personal liberty is concerned, and so I'm going to leave the lawyers in the case."

On February 10, 2005, the trial court conducted a second hearing on the issue of Mr. Hester's request to represent himself. The trial court stated that it had decided to reconsider its earlier decision and that it desired to hear from Mr. Hester again. The court again talked with Mr. Hester about his level of education and lack of legal experience, the charges against him and the sentences that could be imposed, the complexities of substantive and procedural law in handling a capital case both at the guilt and sentencing phase, and his constitutional rights with regard to electing whether to testify and to be represented by an attorney.

The trial court informed Mr. Hester that he would be expected to proceed with the trial as of the scheduled trial date of March 8, 2005, less than one month away. In response, Mr. Hester stated that requiring him to be ready so quickly was unfair and improper. The trial court then inquired about Mr. Hester's desire to represent himself. This question prompted the following exchange:

THE COURT: Do you understand that you have a right to be represented by counsel, by Ms. Parton and Mr. Heinsman?

DEFENDANT HESTER: I'll not be represented by Ms. Parton. I'll represent myself.

THE COURT: And it's your, it's your desire to give up the assistance of counsel and proceed without counsel and represent yourself. That's what you want to do.

DEFENDANT HESTER: Unless I can get private counsel.

THE COURT: Sir?

DEFENDANT HESTER: Unless I can get private counsel between now and then.

. . .

THE COURT: Now you had indicated that, that you were going to represent yourself unless you could hire an attorney in the meantime.

DEFENDANT HESTER: Come up with a private attorney. I can't hire one, but if I can come up with a private attorney . . . .

DEFENDANT HESTER: I, I feel I have to represent myself, because I've had insufficient --

THE COURT: No, no, I don't, I don't care what you have to do --

DEFENDANT HESTER: -- counsel for all along I've been in jail.

. . .

THE COURT: I've told you this case is set for trial March 8th. Even going to trial on March 8th, you still want to represent yourself?

DEFENDANT HESTER: Might as well. I'm going to be screwed either way, so . . .

. . .

DEFENDANT HESTER: They've not took and -- they've went and spent three years fighting this death penalty, not trying to defend me. Ms. Parton says she will not, told me to my face, she would not waste her time trying to defend me. And that, in that ruling, I'll be better off representing myself, period. (Brief pause)

They're fighting the death penalty. I've told them from the day one, I'm not worried about a death penalty. If I'm guilty, I deserve it, but fight the case, work the case. They've worked, they've . . .

THE COURT: Well, now you've just told me that representing yourself, that you'd have a hard time fighting this, the facts of the initial phase of this case.

DEFENDANT HESTER: Right. I would.

THE COURT: Well, don't you think they're going to have the same problem?

DEFENDANT HESTER: Well, I've been in jail for five years. They've been on the streets. They could have took and done it. I mean, I ain't saying there's stuff out there. They may not have been able to, but they -- there's things I've took and suggested, this, that, and the other, "Can't be used in court." Great, it can't be used, but I've been told it can be used in a retrial. Then turns around, if it ain't used in, said in court, it can't be used in a retrial. That's contradicting itself.

THE COURT: Mr. Hester, Mr. Hester . . .

DEFENDANT HESTER: I'll rep --, I'll represent myself, sir.

THE COURT: You almost --

-21-

DEFENDANT HESTER: Unless I can get a private lawyer.

THE COURT: Well, are you, are you going to try to hire a private lawyer?

DEFENDANT HESTER: I don't know. I don't, I don't see how I can. I ain't got . . .

THE COURT: Well, why do you think you, why do you think you need a private lawyer?

DEFENDANT HESTER: I, I feel kind of strange that the State's paying somebody to represent me when the State's the one that's trying to kill me. It's sort of contradiction of, a contradiction of interest.

. . .

THE COURT: And it's your desire that I appoint what is known as elbow counsel, someone to sit next to you and advise you, in case I grant your motion?

DEFENDANT HESTER: According to what counsel it is.

THE COURT: Now there you go trying to dictate to the Court again what I'm supposed to do and cannot do.

DEFENDANT HESTER: You're asking me what I would like, yes or no. I'd like for Mr. Heinsman, if he wants to be my counsel, elbow counsel, yes. If it's Ms. Parton, I don't trust her. No. . . . Another attorney altogether would be fine too.

In ruling upon Mr. Hester's motion, the trial court stated the following:

Mr. Hester, it's almost a paradox for you to complain to the Court how long you've been on the case. Mr. Heinsman was your lead counsel, and every single time I tried to get you to trial, something would happen to frustrate that trial, and that's the reason Mr. Heinsman is not the lead counsel anymore. And then you come in here, and that's the only reason that you have filed this motion. You're upset because this Court relieved Mr.

-22-

Heinsman. But I could not get Mr. Heinsman to get you to trial. And now the lawyer that you thought so much of, that you're now complaining because he hasn't got you to trial. I had this case set for trial twice . . . before, and every time something would come up. One time, he even had you an appointment at Vanderbilt on the date the trial was due to start. And you went along with all that. You was in court and heard it all. You had no objections to enter that time, not at all. And it's almost paradoxical to come here now and complain about being in jail for five years and not having a trial. Now you're not going to dictate to this Court. That's what you think you're doing. I think . . . Mr. Hester, that . . . you're almost to the point of playing with the system, and I'm as serious as any judge, any person in the world about the death penalty. It's not something to play with. It's not something that any person that's got any humane feeling about them at all enjoys seeing, or wants. But you're trying to play with the system because you didn't get your way with Mr. Heinsman who kept frustrating this Court trying to get this case to trial. And that's the bottom line.

. . .

I was reading . . . some cases . . . , and I come across a case I thought . . . hit home. It came out of the Sixth Circuit Court of Appeals . . . similar situation that we have here, and Judge Engel wrote a concurring opinion, except he reemphasized Judge Jones's opinion.[17] It says, "In this, it seemed to me so," Judge Engel says, "from a careful review of the record that this was a case in which the defendant in this case McDowell sought not the protection of the constitutional guarantee of the right to counsel and to the right to represent oneself, but instead to manipulate a system designed for his own protection in order to gain advantage totally, from a totally unwarranted and unjust abuse of it." Mr. Hester didn't get his way with this -- he got rid of one lawyer. He continued to complain about him. Then he didn't get his way here with Mr. Heinsman, and I don't think this is a matter of waiving counsel. I don't think it's a matter of constitutional rights. Mr. Hester is just a spoiled brat and he

---

[17]The opinion the trial judge is referencing is Judge Engel's concurring opinion in *United States v. McDowell*, 814 F.2d 245, 252 (6th Cir. 1987) (Engel, J., concurring).

-23-

wants to come in here and play with this Court, and . . . just to frustrate the process of this Court.

That's all it is, Mr. Hester. You're not capable of representing yourself. You know that.

. . .

The medical records in this case all have already been made a part of this record, and bear out the fact that . . . . Mr. Hester has a problem communicating physically and mentally. He loses his train[] of thought. It would be an absolute miscarriage of justice in this case for this Court to grant your request . . . . I said a while ago the State didn't care. They do. If they get someone on death row, they want to try to get them on there right, not by default. And you're trying to get on death row by default. And I don't, me or no other person trained in the law that has any respect for the law or any respect for the Constitution is going to allow that to happen. And that's -- you're trying to frustrate the system. You're not getting your way. Tough. I'm not going to let you take advantage of the system. I don't think you're capable of representing yourself. I'm not going to accept your waiver.

On February 25, 2005, approximately two weeks after the trial court's denial of Mr. Hester's request to represent himself, an incident occurred between Mr. Hester and Ms. Parton that prompted Ms. Parton to request permission to withdraw from representing Mr. Hester. In her motion, Ms. Parton stated that Mr. Hester was upset by the trial court's decision to name her as lead counsel, that he had refused to cooperate with her, that he had continued to insist that Mr. Heinsman should be lead counsel, and that Mr. Hester had threatened to have her and her family killed. Based on this information, the trial court permitted Ms. Parton to withdraw and returned Mr. Heinsman to the lead counsel position. When the trial court gave him an opportunity to respond to this decision, Mr. Hester did not object to Ms. Parton's withdrawing from the case. He also did not renew his request to represent himself after Mr. Heinsman again became his lead counsel.

**B.**

Mr. Hester argued to the Court of Criminal Appeals that the trial court erred by denying his request to represent himself. While it found that Mr. Hester's request was timely, the Court of Criminal Appeals determined that the request was not clear or

unequivocal. The Court of Criminal Appeals did not directly address whether Mr. Hester's waiver of his right to counsel was knowing and voluntary; however, the court did conclude that the trial court's inquiries regarding Mr. Hester's lack of legal skills were relevant to his competency to waive his right to counsel. In this Court, Mr. Hester again insists that the trial court deprived him of his right of self-representation protected by the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Constitution of Tennessee.

The determination of whether a defendant has exercised his or her right of self-representation and has concurrently waived his or her right to counsel is a mixed question of law and fact. *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002); *United States v. Robinson*, 913 F.2d 712, 714 (9th Cir. 1990); *Spencer v. Ault*, 941 F. Supp. 832, 851 (N.D. Iowa 1996); *State v. Jordan*, 984 A.2d 1160, 1166 (Conn. App. Ct. 2009); 1 Kevin F. O'Malley et al., *Federal Jury Practice & Instructions* § 5:6 (6th ed. 2009). Tennessee appellate courts review "mixed questions of law and fact de novo, accompanied by a presumption that the trial court's findings of fact are correct." *State v. Holmes*, 302 S.W.3d 831, 837 (Tenn. 2010). An error in denying the exercise of the right to self-representation is a structural constitutional error not amenable to harmless error review and requires automatic reversal when it occurs. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008).

Article I, Section 9 of the Tennessee Constitution and the Sixth Amendment to the United States Constitution guarantee not only a right of the accused to be represented by counsel but also a right to self-representation. *State v. Small*, 988 S.W.2d 671, 673 (Tenn. 1999).[18] These two rights – the right to counsel and of self-representation – are alternatives, with a defendant being able to assert one or the other but not both. *Lovin v. State*, 286 S.W.3d 275, 284 (Tenn. 2009); *State v. Small*, 988 S.W.2d at 673. Respect for individual autonomy when one's liberty has been imperiled through the leveling of an accusation of criminal conduct has led to a general prohibition upon forcing an unwanted attorney on an unwilling client. *Lovin v. State*, 286 S.W.3d at 285; *see also Faretta v. California*, 422 U.S. 806, 834 (1975).

---

[18]The relevant language of the Tennessee Constitution differs from the United States Constitution. While Article I, Section 9 of the Constitution of Tennessee guarantees "[t]hat in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel[,]" the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." We have previously addressed the legal significance of the differences in the language of these two provisions. *See generally State v. Burkhart*, 541 S.W.2d 365, 368-72 (Tenn. 1976). In his briefing before this Court, Mr. Hester has not asserted that the Tennessee Constitution may address the circumstances of this case differently than the United States Constitution. Accordingly, absent briefing or argument on this issue, we decline to consider whether Article I, Section 9 might provide greater protection to Mr. Hester than the Sixth Amendment.

To exercise a constitutional right of self-representation, an individual must waive his or her constitutional right to counsel. *State v. Small*, 988 S.W.2d at 673; 3 Wayne R. LaFave et al., *Criminal Procedure* § 11.5(c), at 739 (3d ed. 2009) ("LaFave, *Criminal Procedure*"). "Just as the right to counsel extends through various stages in the criminal justice process, waiver of that right can occur at each of those stages. In some respects, what is required for a valid waiver will vary with the particular stage." 3 LaFave, *Criminal Procedure* § 11.3(a), at 678. When balancing the right of self-representation against the right to counsel at the trial stage of proceedings, the courts have assigned a constitutional primacy to the right to counsel over the right of self-representation. *See*, *e.g.*, *Martinez v. Court of Appeal of Cal.,* 528 U.S. 152, 161-62 (2000); *United States v. Mackovich*, 209 F.3d 1227, 1236-37 (10th Cir. 2000); *United States v. Singleton*, 107 F.3d 1091, 1102 (4th Cir. 1997). As stated by the United States Supreme Court, "it is clear that it is representation by counsel that is the standard, not the exception." *Martinez v. Court of Appeal of Cal.,* 528 U.S. at 161. In accordance therewith and given the mutually exclusive nature of the rights, we have observed that "[c]ourts should indulge every presumption against waiver of the right to counsel." *Lovin v. State*, 286 S.W.3d at 288 n.15.

For a defendant to exercise his or her right of self-representation at the trial stage of the proceedings, (1) a defendant must make the request in a timely manner, (2) the assertion of the right of self-representation must be clear and unequivocal, and (3) the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel. *State v. McCary*, 119 S.W.3d 226, 256 (Tenn. Crim. App. 2003); *State v. Herrod*, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988); *see also United States v. Bush*, 404 F.3d 263, 271 (4th Cir. 2005); *United States v. Mackovich*, 209 F.3d at 1236; W. Mark Ward, *Tennessee Criminal Trial Practice* § 8:4, at 220 (2009) ("Ward, *Tennessee Criminal Trial Practice*"). In accordance with Tenn. R. Crim. P. 44(b)(1)(A), before accepting a defendant's waiver of the right to counsel, the trial court must "advise the accused in open court of the right to the aid of counsel at every stage of the proceedings." The Court must also "determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters." Tenn. R. Crim. P. 44 (b)(1)(B). The defendant must waive his or her right to counsel in writing, Tenn R. Crim. P. 44(b)(2), and this writing must be included in the record, Tenn. R. Crim. P. 44(b)(3).

Even where the invocation of the right of self-representation meets these requirements, the effectiveness of the defendant's invocation and waiver is not necessarily a foregone conclusion. The right of self-representation is not absolute. *Indiana v. Edwards*, 554 U.S. 164, ___, 128 S. Ct. 2379, 2384 (2008). Among other limitations, the United States Supreme Court has recognized the absence of a right of self-representation when a defendant seeks to abuse the dignity of the courtroom or to engage in serious obstructionist misconduct. *Indiana v. Edwards*, 554 U.S. at ___, 128 S. Ct. at 2384. Defendants are "not entitled to use

the right of self-representation as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process." *United States v. Mosley*, 607 F.3d 555, 558 (8th Cir. 2010) (internal quotation omitted); *see also United States v. Frazier-El*, 204 F.3d 553, 560 (4th Cir. 2000).

The trial court's conclusion that Mr. Hester should not be permitted to exercise his right of self-representation based on its concern regarding Mr. Hester's lack of understanding of substantive and procedural law and on its belief that Mr. Hester would not be a competent or effective advocate was error. In general, "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." *Godinez v. Moran*, 509 U.S. 389, 399 (1993); *State v. Connor*, 973 A.2d 627, 646 (Conn. 2009); *State v. Campbell*, 983 So. 2d 810, 853 (La. 2008). The United States Supreme Court has declared that "a criminal defendant's ability to represent himself [or herself] has no bearing upon his [or her] competence to *choose* self-representation." *Godinez v. Moran*, 509 U.S. at 400.

The United States Supreme Court has recently carved out what at present is a narrow exception that "permits[19] States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Indiana v. Edwards*, 554 U.S. at ___, 128 S. Ct. at 2388 (footnote added).[20] However, in general, an accused's lack of capacity to present an effective defense is not a basis for denying the exercise of the right of self-representation. *See State v. Herrod*, 754 S.W.2d at 630; *see*, *e.g.*, *Faretta v. California*, 422 U.S. at 836; *Hirschfield v. Payne*, 420 F.3d 922, 928 (9th Cir. 2005); *State v. Black*, 223 S.W.3d 149, 155 (Mo. 2007); *Vanisi v. State*, 22 P.3d 1164, 1172 (Nev. 2001). A trial court may properly conclude that a defendant is likely to be incompetent and ineffective as an advocate in his or her own defense and that the defendant lacks important knowledge about substantive and procedural law; however, these conclusions, without more, do not render the defendant incompetent or unable to waive the right to counsel. Deficiencies in legal skills and legal knowledge do not deprive a person of his or her right to self-representation.

---

[19]*United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009) (addressing the *Indiana v. Edwards* decision, the Seventh Circuit noted that "[t]he Constitution *may* have allowed the trial judge to block [the defendant's] request to go it alone, but it certainly didn't require it."). The issue of whether the Tennessee Constitution would permit an exception from the right to self-representation for those "competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves" is not before the Court in the present case. *See Indiana v. Edwards*, 554 U.S. at ___, 128 S. Ct. at 2388.

[20]The United States Supreme Court "repeatedly cabined its holding with phrases like 'mental derangement,' 'gray-area defendant,' 'borderline-competent criminal defendant,' and, of course, 'severe mental illness.'" *United States v. Berry*, 565 F.3d at 391 (citations omitted).

Nor does the trial court's reliance upon the special circumstances of a capital proceeding alter this conclusion. While the trial court's added concern for assuring that Mr. Hester is competently represented in a capital case is understandable, it was error to prevent Mr. Hester from exercising his right to self-representation on this basis. A defendant does not lose his or her right to self-representation because he is being tried for a capital offense. *See, e.g., Sherwood v. State*, 717 N.E.2d 131, 135 (Ind. 1999); *State v. Mems*, 190 S.E.2d 164, 173 (N.C. 1972); *Commonwealth v. Davido*, 868 A.2d 431, 444 (Pa. 2005); *State v. Brewer*, 492 S.E.2d 97, 98-99 (S.C. 1997).

As for the trial court's concern about Mr. Hester's communication difficulties, there is "some authority to support a denial of self-representation where a mental or physical disability renders a defendant unable to communicate in an understandable manner." 3 Lafave, *Criminal Procedure* § 11.5(d), at 756-57; *see, e.g., Savage v. Estelle*, 924 F.2d 1459, 1464 (9th Cir. 1991); *People v. Watkins*, 8 Cal. Rptr. 2d 5, 7-8 (Ct. App. 1992). However, the correctness of these decisions is a matter of some dispute. Some have asserted that these decisions "rest on a misunderstanding of *Faretta*,[21] as they go far beyond assessing the character of defendant's waiver." 3 LaFave, *Criminal Procedure* § 11.5(d), at 757-58 (footnote added). Additionally, the United States Supreme Court declined the State of Indiana's invitation "to adopt, as a measure of a defendant's ability to conduct a trial, a more specific standard that would 'deny a criminal defendant the right to represent himself at trial where the defendant cannot communicate coherently with the court or a jury.'" *Indiana v. Edwards*, 554 U.S. at ___, 128 S. Ct. at 2388.

Similarly, we do not foreclose the possibility that a defendant's communication skills may be so limited or impaired that they cannot be appropriately accommodated using means less restrictive than declining to allow a defendant to exercise his or her right of self-representation. This case, however, does not present circumstances requiring serious consideration of this question.

The record lacks sufficiently detailed factual findings that might justify preventing Mr. Hester from exercising his right of self-representation. Mr. Hester was able to communicate using a voice amplifier that rendered his voice able to be heard. Furthermore, the record does not demonstrate that the limitations on Mr. Hester's ability to organize his thoughts and to communicate them is so impaired as to justify denying him his right of self-representation.

---

[21]"The seminal decision on the right to proceed in propria persona in criminal cases is *Faretta v. California* . . . ." Stephan Landsman, *The Growing Challenge of Pro Se Litigation*, 13 Lewis & Clark L. Rev. 439, 450 (2009).

Accordingly, the trial court's concerns about Mr. Hester's lack of knowledge of substantive and procedural law and Mr. Hester's lack of competence as a communicator and advocate do not support the trial court's denial of Mr. Hester's request to represent himself. However, the trial court cited one more ground for its decision. It found that Mr. Hester was trying to manipulate the judicial system in order to circumvent the trial court's order appointing Ms. Parton as his lead counsel. We understand the trial court's ruling as reflecting its conclusions that Mr. Hester was trying to manipulate the process to obtain a new lawyer or to have Mr. Heinsman reappointed as lead counsel and that Mr. Hester did not have a genuine desire or intent to represent himself at trial.

This reasoning presents a difficult quandary and a close issue. As previously noted, defendants are "not entitled to use the right of self-representation as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process." *See*, *e.g.*, *United States v. Mosley*, 607 F.3d at 558 (internal quotation omitted); *see also United States v. Frazier-El,* 204 F.3d at 560. Defendants, however, are free to seek to invoke a right of self-representation as an alternative should their request for the appointment of a different attorney be denied. *See*, *e.g.*, *State v. Blom*, 682 N.W.2d 578, 613 (Minn. 2004); *Gallego v. State*, 23 P.3d 227, 236 (Nev. 2001).

Disingenuous invocations of the right of self-representation that are designed to manipulate the judicial process constitute an improper tactic by a defendant and are not entitled to succeed. *United States v. Welty*, 674 F.2d 185, 187 (3d Cir. 1982). A court may deny a manipulative request for self-representation, distinguishing between a genuine desire to invoke a right of self-representation and a manipulative effort to frustrate the judicial process. *See United States v. Bush*, 404 F.3d at 271; *United States v. Frazier-El*, 204 F.3d at 560; *Edwards v. Commonwealth*, 644 S.E.2d 396, 400 (Va. Ct. App. 2007); *cf. People v. Marshall*, 931 P.2d 262, 272 (Cal. 1997) (noting that "one of the trial court's tasks when confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself").

Based on our review of the relevant portions of the record, we have concluded that the trial court did not commit constitutional error by denying Mr. Hester's request to represent himself after the trial court declined to reinstate Mr. Heinsman as his lead counsel. We base this decision on five conclusions. First, the record supports the trial court's finding that Mr. Hester was using his request to represent himself as a means to challenge the trial court's ruling that Ms. Parton, rather than Mr. Heinsman, would be his lead counsel. Second, the evidence does not preponderate against the trial court's conclusion that Mr. Hester did not have any genuine interest in exercising his right to self-representation and was instead requesting to represent himself as a manipulative and retaliatory tactic. Third, Mr. Hester stated during the February 10, 2005 hearing that he did not actually plan to represent himself at trial if he was able to find another private attorney to represent him. Fourth, Mr. Heinsman

eventually replaced Ms. Parton as Mr. Hester's lead counsel without any objection or further requests for self-representation by Mr. Hester. Fifth, we are wary of creating incentives for defendants to use a request for self-representation as a subterfuge when they lack a genuine desire or intent to represent themselves.

## V.
### THE DENIAL OF MR. HESTER'S REQUEST FOR A CONTINUANCE

Mr. Hester asserts that the trial court erred by denying his motion to continue the trial after the court permitted one of his two lawyers to withdraw from the case approximately one week before trial. Even though he conceded that the lawyer appointed to replace the withdrawn lawyer had done a "good job," Mr. Hester, stressing the importance of a second attorney in a capital case, insisted that a week was insufficient to enable the new lawyer to prepare for a capital proceeding. The Court of Criminal Appeals found that the trial court did not abuse its discretion by denying Mr. Hester's request for a continuance. We reach the same conclusion.

On September 9, 2004, the trial court removed Mr. Heinsman as Mr. Hester's lead counsel and replaced him with Ms. Parton who had been serving as co-counsel. At this point, Mr. Heinsman had been lead counsel for Mr. Hester for almost three years. Mr. Hester objected to this action and actively resisted this ruling, as discussed above, for the next five months.

A dispute existed between August 2004 and February 2005 regarding Mr. Heinsman's and Ms. Parton's respective roles on Mr. Hester's defense team. On February 25, 2005, Ms. Parton moved to withdraw as counsel for Mr. Hester based on advice she had received from the Board of Professional Responsibility.

On February 28, 2005, the trial court convened a hearing on Ms. Parton's motion. The State was not present at this hearing at the request of the defense. Ms. Parton revealed at this hearing that (1) Mr. Hester did not accept the trial court's decision to designate her rather than Mr. Heinsman as his lead counsel, (2) during a February 25, 2005 meeting with Mr. Hester without Mr. Heinsman being present, Mr. Hester intimidated her and made death threats against her family, (3) Mr. Hester had declined to work with her in any meaningful capacity, (4) Mr. Hester regularly cursed her, and (5) Mr. Hester had stomped out of meetings with her in fits of rage. Ms. Parton stated that she had been "mentally . . . affected by [Mr. Hester's] comments" threatening her family and that she believed that Mr. Hester blamed her for the trial court's decision to replace Mr. Heinsman as lead counsel. She concluded by observing that "realizing fully that we're a mere one week away from trial, [the threat to have her family killed] of course could be a ploy on Mr. Hester's part to finally and

-30-

decisively . . . be rid of me as counsel in his case. If so, . . . I have reached my point of no return. I have my limits, and they were reached . . . ."

In answer to the trial court's questions, Mr. Hester stated that he was "agreeing with . . . [Ms. Parton] to withdraw." For his part, Mr. Heinsman voiced no objection to Ms. Parton withdrawing as counsel for Mr. Hester. The trial court concluded that Mr. Hester's threats against Ms. Parton and her family were the result of the court's decision to replace Mr. Heinsman with Ms. Parton and were part of Mr. Hester's efforts to achieve his goal of having Mr. Heinsman as his lead counsel. Nevertheless, the trial court permitted Ms. Parton to withdraw and designated Mr. Heinsman as Mr. Hester's lead counsel. The trial court also reminded parties that trial was set to begin in eight days.

The trial court also determined that Mr. Hester had "waived his right to his second lawyer at a trial" based on his conduct with Ms. Parton. In response to Mr. Heinsman's request for yet another continuance, the trial court stated, "you've had . . . three years on this case, $150,000.00 plus attorney fees? You've got to be ready for trial next Tuesday, nine o'clock . . . . I'll give you an opportunity to recruit someone to assist you and . . . I'll approve it. But otherwise . . . let's . . . be ready to go at nine o'clock Tuesday morning." The trial court filed two orders on March 2, 2005 confirming its decision to permit Ms. Parton to withdraw, designating Mr. Heinsman as lead counsel, and appointing Lee Davis as co-counsel for Mr. Hester. As scheduled, the trial commenced with jury selection on March 8, 2005.

Decisions regarding a request for a continuance are discretionary ones. *State v. Thomas*, 158 S.W.3d 361, 392 (Tenn. 2005) (appendix); *State v. Robinson*, 146 S.W.3d 469, 517 (Tenn. 2004) (appendix); *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). Reviewing courts will not overturn these decisions in the absence of a finding of an abuse of discretion and proof that the denial of the continuance either deprived the defendant of a fair trial or caused an outcome that would not have occurred had the continuance been granted. *State v. Rimmer*, 250 S.W.3d 12, 40 (Tenn. 2008) (appendix); *State v. Odom*, 137 S.W.3d at 589. A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008).

Tenn. Sup. Ct. R. 13 § 3(b)(1) states that "[t]he court shall appoint two attorneys to represent a defendant at trial in a capital case." As valuable as two attorneys may be in a capital case, this is not a rule of constitutional dimension. Defendants facing the death penalty do not have a per se constitutional right to the assistance of two attorneys. *Bell v. Watkins*, 692 F.2d 999, 1009 (5th Cir. 1982); *Arrington v. State*, 687 S.E.2d 438, 448 (Ga.

2009); *Davis v. State*, 743 So. 2d 326, 340-41 (Miss. 1999). Mr. Hester has shown no constitutional basis that would require a second attorney in this particular case.

When Mr. Hester threatened the lives of Ms. Parton and her family, he engaged in serious misconduct on the eve of his long-delayed trial. The trial court found that Mr. Hester's actions were in response to its earlier decision to designate Ms. Parton as his lead counsel and were calculated to manipulate the judicial process to remove Ms. Parton as lead counsel and to replace her with Mr. Heinsman and to cause further delay.

When Mr. Heinsman moved for another continuance in order to find another lawyer and to enable this lawyer to prepare for trial, the trial court considered (1) that Mr. Heinsman had already served as Mr. Hester's lead counsel for approximately three years, (2) this case had already encountered lengthy delays, many of which were caused by the defense, (3) that the conduct immediately causing this request for continuance was Mr. Hester's intentionally disruptive conduct directed at Ms. Parton and her family, and (4) that Mr. Hester's conduct was directed at countermanding a court order through a threat of violence. In light of these circumstances, the non-constitutional nature of Mr. Hester's right to the assistance of a second lawyer at trial, and the dearth of evidence or authority presented by Mr. Hester requiring a different conclusion, we find no abuse of discretion by the trial court when it declined to grant Mr. Hester's request for a continuance.

## VI.
### MCMINN COUNTY'S USE OF A LIST OF ITS RESIDENTS POSSESSING DRIVER'S LICENSES AS THE SOURCE OF NAMES FOR ITS JURY VENIRES

Mr. Hester insists that Tenn. Code Ann. § 22-2-302(d) (1994) required McMinn County to combine its driver's license list with tax record lists in formulating a master jury list. After careful study of the parties' briefs on this issue, we are persuaded that the decision of the Court of Criminal Appeals on this issue should be affirmed. Moreover, because we find that the opinion of the Court of Criminal Appeals, *State v. Hester*, 2009 WL 275760, at *16, adequately states the facts and the law on this issue, we adopt this portion of the opinion as the opinion of this Court and include it as an appendix to this opinion.

## VII.
### MCMINN COUNTY'S PROCESS FOR SELECTING JURY VENIRES

Mr. Hester asserts that the process used by McMinn County to select jury venires resulted in systematic, unconstitutional exclusion of the elderly, African-Americans, and Hispanics. While the Court of Criminal Appeals recognized that Mr. Hester had the right to have his jury selected from a fair cross-section of the community, it determined that age groups do not qualify as constitutionally significant distinct groups within a community. It

-32-

also concluded that Mr. Hester failed to establish that the jury venire was not randomly selected or that either African-Americans or Hispanics were not fairly or reasonably represented on McMinn County's venires in relation to their number in the community. We conclude that Mr. Hester has failed to carry his burden of establishing a prima facie case of a violation of the Sixth Amendment's fair cross-section requirement.

## A.

We note at the outset that the trial court conducted the hearing regarding Mr. Hester's challenges to the process used by McMinn County to select jury venires on September 10, 2003 and that Mr. Hester's trial did not begin until March 8, 2005. Much of the evidence Mr. Hester presented at the September 10, 2003 hearing related to the venire that was ordered to report for jury service on June 9, 2003.[22] The jury that was actually seated for Mr. Hester's trial was not selected from this venire. Because of the length of the interval between the September 10, 2003 hearing and the trial, the jury for Mr. Hester's trial was selected from a venire that was called for jury service on December 2, 2003.

The trial court apprised Mr. Hester's defense team that the challenge to the selection of the jury venire was "premature on the jury that's [going to] try [Mr. Hester]." However, following the September 10, 2003 hearing, Mr. Hester's defense team did not attempt to obtain or present evidence regarding the process that McMinn County used to select the December 2, 2003 venire or to obtain a complete list of the persons summoned for this venire. Instead, the defense team waited until the afternoon before jury selection was scheduled to begin to challenge the process for selecting the December 2, 2003 venire.[23]

The September 10, 2003 hearing focused on the jury venire that was called for service on June 9, 2003. This venire was obtained from a list of names of persons holding driver's licenses using software provided to McMinn County by Local Government Data Processing Corporation and information provided by the Tennessee Department of Safety.

When an individual obtains a Tennessee driver's license or identification card, they receive a card with a distinctive number. The licenses and cards are issued in sequential numerical order. Thus, cards with lower numbers were issued before cards with higher numbers. When called upon to provide information to assist counties in selecting a jury venire, the Department of Safety uses these distinctive numbers to prepare a list of all drivers within a particular county who have a valid driver's license and who are eighteen years of

---

[22] In addition, much of the evidence presented at the September 10, 2003 hearing did not relate directly to the grand jury that indicted Mr. Hester in 1999.

[23] Mr. Hester concedes in his appellate brief that this challenge to the jury venire was "hastily filed . . . on the eve of trial."

age or older. Local Government Data Processing Corporation converts the data provided by the Department of Safety into a form that can be used by its software to electronically generate a jury venire.

McMinn County selects jury venires twice each year using the data obtained from the Department of Safety.[24] In this process, the county first excludes from consideration the individuals on the list with the two thousand lowest driver's license numbers.[25] Then the county determines the number of persons to be summoned to serve on the jury venire. Using these two numbers, the county's software then calculates the number that will be used as the increment for selecting names from the list.[26]

McMinn County determined that 700 persons would be summoned for jury service on the June 9, 2003 venire. Accordingly, the software divided the number of individuals on the county driver's license list, excluding the first two thousand names, by 700 and derived the number 47. The number 10 was then selected and subtracted from 47 producing the number 37 which was then used as the increment for selecting the potential jurors from the list. Accordingly, the software selected the jury venire to be summoned on June 9, 2003 by picking every thirty-seventh name from the list of McMinn County residents with a driver's license, excluding the first two thousand names. As a result of this process, not only were the names of the first two thousand persons on the driver's license list excluded from

_____

[24]Despite the evidence that McMinn County selects jury venires two times a year, there is no question that Mr. Hester's jury was selected from the venire that was chosen on December 2, 2003. The record contains no evidence regarding whether or how jury venires were selected in 2004 or why Mr. Hester's jury was chosen from the December 2, 2003 venire. This decision may well have been the result of the problems experienced with distributing the jury questionnaires that were prepared for this trial. In any event, the December 2, 2003 venire was validly available for use for two years after it was chosen. Tenn. Code Ann. § 22-2-302(a)(1), (3). This provision is currently codified at Tenn. Code Ann. § 22-2-301(b) (2009) (addressing master lists generated by automated means) and Tenn. Code Ann. § 22-2-302(2)(C) (2009) (addressing master lists generated by an alternate method).

[25]The practice of excluding the persons with the two thousand lowest driver's license numbers began when an earlier use of the software produced a jury venire exclusively comprised of persons over sixty-five years of age. The county decided to remedy this problem by excluding for consideration for jury service the persons with the two thousand lowest driver's license numbers. Because these persons possessed the lowest driver's license numbers, they presumably were older because they had possessed their driver's licenses for a longer period of time.

[26]The increment is derived in two steps. First, the software divides the number of the names remaining on the driver's license list after the first two thousand names have been excluded. Second, another number is subtracted from the result of the first calculation to produce the increment.

consideration, the last seven thousand names on the list were likewise excluded from consideration.[27]

Mr. Hester presented evidence that at the time the June 9, 2003 venire was chosen, 4.5% of McMinn County's population was African-American and 1.8% was Hispanic. He also presented evidence that the June 9, 2003 venire was chosen from a portion of McMinn County's driver's license list that was only 3.8% African-American and .38% Hispanic. In addition, he proved that the county's decision to skip the first two thousand persons on the list had the effect of excluding the oldest and whitest group of persons on the list.[28] Likewise, he proved that the second group that was skipped – the last seven thousand names on the list – included the youngest and most racially diverse residents in the county.[29]

Mr. Hester did not present evidence regarding the increment used to select the persons included on the December 2, 2003 jury venire. However, his evidence regarding the demographics of the persons on this venire highlighted differences between the makeup of the December 2, 2003 venire and the June 9, 2003 venire. The December 2, 2003 venire included 3.4% African-Americans and 0% Hispanics, and it included more young persons than the June 9, 2003 venire.[30] However, the percentage of African-Americans and Hispanics included on the December 2, 2003 venire was less than the percentage of these two groups on the June 9, 2003 venire.[31] The December 2, 2003 venire included only .3% of persons over the age of 75 despite the fact that 8.6% of the county's population and 7.3% of the persons on the county's driver's license list were over the age of 75.

In broad strokes, Mr. Hester asserts that the manner in which McMinn County selects its jury venires is flawed by "persistent structural defects" attributable to its jury commissioners and its use of the same "non-random methodology." Regrettably, his evidence with regard to both the June 9, 2003 venire and the December 2, 2003 venire is limited and incomplete. Based on the evidence presented at the September 2003 hearing, it

---

[27]McMinn County's list, excluding the first two thousand persons, contained approximately 32,900 names. The software was able to produce a list of 700 persons using the first 25,900 names on the list and, therefore, did not consider the remaining names on the list.

[28]These persons were 98% white, and their average age was 76.9.

[29]The persons in the second group included 4.2% African-Americans and 8.4% Hispanics, and their average age was 34.3.

[30]The June 9, 2003 venire included .7% of persons between the ages of 20 and 24; while the December 2, 2003 venire included 3.4%.

[31]The percentage of African-Americans had decreased from 3.8% to 3.4%, and the percentage of Hispanics had decreased from 1% to 0%.

appears that McMinn County may not be using a statistically proportionate drawing from its driver's license lists to select venires. However, the question before us now is whether Mr. Hester has made out a prima facie case that the methodology employed by McMinn County to select the jury venire from which his jury was drawn violated his constitutional right to a jury composed of a fair cross-section of the community.

**B.**

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." Interpreting this constitutional provision, the United States Supreme Court has held that "the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community" and "that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 527-28 (1975). The Court concluded that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor v. Louisiana*, 419 U.S. at 538. However, the Court expressly declared that defendants are not entitled to a jury of any particular composition because the fair cross-section requirement does not impose a requirement that the jury actually chosen mirror the community or reflect the various distinctive groups in the population. *Taylor v. Louisiana*, 419 U.S. at 538; 3 David S. Rudstein et al., *Criminal Constitutional Law* § 14.07[3], at 14-67 (2009) ("Rudstein, *Criminal Constitutional Law*").

For a defendant to establish a prima facie case of a violation of the fair cross-section requirement, he or she

> must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). Accordingly, "a defendant raising a cross section objection can prevail without showing purposeful discrimination." 6 LaFave, *Criminal Procedure* § 22.2(d), at 59. If the defendant establishes "a prima facie case of a fair cross-section violation, the burden shifts to the government to rebut that case." Rudstein, *Criminal Constitutional Law* § 14.07[3], at 14-78.

## C.

McMinn County excluded a disproportionate number of persons 75 years of age or older when it decided not to consider the first two thousand names on its driver's license list. While Mr. Hester concedes, as he must, that he "has found no authority identifying old age or youth as a 'distinctive group' for cross-section analysis purposes," he requests this Court to be more exacting in its review because McMinn County's jury selection formula was designed purposefully to exclude these older citizens. We conclude that the exclusion of persons age 75 or older in the present case is not of constitutional import for purposes of the fair cross-section requirement.

The record supports Mr. Hester's assertion that McMinn County was purposefully excluding older residents. The county's decision to skip the first two thousand names on the list was motivated by its desire to prevent the jury venires from being overwhelmingly or exclusively composed of senior citizens. Not all purposeful exclusion of individuals sharing a common trait is inherently unconstitutional or improper[32] nor is purposeful exclusion necessary to establish a violation of the fair cross-section requirement. However, we agree with Mr. Hester that evidence of purposeful exclusion of any group should prompt the courts to more closely inspect challenged jury selection procedures to make sure that they did not deprive a defendant of a jury composed of a fair cross-section of the community through unconstitutional systematic exclusion.[33]

---

[32]Purposeful exclusion based upon certain traits, such as race or gender, is per se unconstitutional. *See*, *e.g.*, *Lockhart v. McCree*, 476 U.S. 162, 175 (1986). However, wholesale purposeful exclusion based on other common traits may be entirely appropriate and warranted. For example, the State of Tennessee excludes from jury service those who are under the age of eighteen and non-citizens. Tenn. Code Ann. § 22-1-101 (2009). The purposeful wholesale exclusion of juveniles, *In re J.K.B.*, 552 N.W.2d 732, 733 (Minn. Ct. App. 1996), or non-citizens, *Foley v. Connelie*, 435 U.S. 291, 296 (1978); *see also* 3 Austin T. Fragomen et al., *Immigration Law & Business* § 8:11 (2010), does not constitute a violation of a defendant's right to a jury composed of a fair cross-section of the community, even though such groups may be sizeable in a given community.

[33]It is not necessary that purposeful discrimination be shown for a fair cross-section constitutional violation to be established. 6 LaFave, *Criminal Procedure* § 22.2(d), at 59. However, "[i]nstead of discriminatory intent, a party raising a fair cross-section claim must prove a causal connection between the under representation and the jury selection process. The under representation must be 'due to' the operation of the selection system, not happenstance." Robin E. Schulberg, *Katrina Juries*, *Fair Cross-Section Claims, and the Legacy of* Griggs v. Duke Power Co., 53 Loy. L. Rev. 1, 14-15 (2007) (footnotes omitted). Thus, for example, discrepancies resulting from the private choices of individuals to ignore jury summonses do not exemplify the type of constitutional infirmity contemplated in *Duren v. Missouri*. *United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006). Alternatively, purposeful wholesale exclusion of certain groups potentially raises greater concerns relating to the appearance of injustice, which is among the underlying foundations of the fair cross-section requirement. *See Lockhart v. McCree*, 476 U.S. at 175. Additionally,

(continued...)

In general, courts have concluded that under-representation or even total exclusion of certain age groups does not constitute a violation of the fair cross-section requirement because age categories are not considered to constitute a "distinctive group in the community." Accordingly, exclusion on this basis fails to satisfy the first prong of the fair cross-section test. *See State v. Blunt*, 708 S.W.2d 415, 417-18 (Tenn. Crim. App. 1985); *see, e.g.*, *Silagy v. Peters*, 905 F.2d 986, 1010-11 (7th Cir. 1990); *Stewart v. Carroll*, 154 P.3d 382, 385-86 (Ariz. Ct. App. 2007); *Ewing v. State*, 719 N.E.2d 1221, 1226 (Ind. 1999); *Commonwealth v. Evans*, 778 N.E.2d 885, 893 (Mass. 2002).

In endeavoring to ascertain what constitutes a constitutionally "distinctive group in the community" for purposes of the fair cross-section requirement, the United States Supreme Court has observed that "[c]ommunities differ at different times and places. What is a fair cross section at one time or place is not necessarily a fair cross section at another time or a different place." *Taylor v. Louisiana*, 419 U.S. at 537.[34] The Supreme Court, however, has declined to offer a definition of what constitutes a constitutionally significant distinctive group in the community for purposes of the fair cross-section requirement, and so the concept remains extremely elusive. James Gobert, *Jury Selection: The Law, Art and Science of Selecting a Jury* § 6:16 (2009) (hereinafter "Gobert, *Jury Selection*"). In *Thiel v. Southern Pacific Co.*, 328 U.S. at 220, the Supreme Court viewed the concept in terms of "economic, social, religious, racial, political and geographical groups of the community." Subsequently, the Court appeared to more closely associate the concept with national origin, race, and gender. *Lockhart v. McCree*, 476 U.S. at 175.

Perhaps the most comprehensive understandings of the concept have been offered by Justice Frankfurter in his dissenting opinion in *Thiel v. Southern Pacific Co.* and by the United States Court of Appeals for the Eleventh Circuit.[35] Justice Frankfurter cast the concept in terms of holding "a different social outlook," having "a different sense of justice," and maintaining "a different conception of a juror's responsibility." *Thiel v. Southern Pac. Co.*, 328 U.S. at 230 (Frankfurter, J., dissenting). The United States Court of Appeals for the Eleventh Circuit has defined the concept in terms of three critical components:

---

[33](...continued)
in one of the foundational cases on the fair cross-section requirement, the United States Supreme Court observed that a fair cross-section does not require that "every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community . . . . But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups." *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 220 (1946).

[34] An example of the United States Supreme Court's observation is perhaps well represented by the experiences of Lewis County with excluding members of "The Farm" from serving on juries. *See generally State v. Nelson,* 603 S.W.2d 158, 160-67 (Tenn. Crim. App. 1980).

[35] Gobert, *Jury Selection* § 6:16.

(1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex); (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

*Willis v. Zant*, 720 F.2d 1212, 1216 (11th Cir. 1983).

While an age-based exclusion could, in theory, constitute the exclusion of a constitutionally distinctive group in the community,[36] we find no support in this record for the conclusion that the disproportionate exclusion of persons over the age of 75 from McMinn County juries constituted the exclusion of a distinctive group in that community. The record in this case reflects that the jury venires include a proportionate number of persons between the ages of 60 and 74. Simply stated, there is no evidence to support the conclusion that the differences between persons aged 60 to 74 and those over the age of 75 is substantial in terms of "attitude, ideas, or experience" or that interests of the excluded group are left unrepresented. Additionally, there is no evidence that persons falling on opposite sides of this age divide are significantly different in their social outlook, their sense of justice, or their concept of a juror's responsibility. Accordingly, we find no basis for concluding that McMinn County's purposeful exclusion from the jury venire of persons over the age of 75 constituted the exclusion of a constitutionally significant distinctive group within the community for purposes of the Sixth Amendment's guarantee of a jury composed of a fair cross-section of the community.

## D.

We need not tarry long on whether African-Americans and Hispanics are "distinctive groups in the community" for the purpose of the fair cross-section requirement. Today, it is beyond reasoned debate that they are.[37] Rather, our task is to determine whether Mr. Hester has met the second and third prongs of the fair cross-section requirement. Thus, we must determine whether Mr. Hester has demonstrated that the representation of either Hispanics

---

[36]This Court has observed that it is theoretically possible to demonstrate that an age-based exclusion constituted the removal of a constitutionally significant distinct group within the community but has mandated an evidentiary showing to support such a contention. *See State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989). No such showing was made in the present case.

[37]*See, e.g.*, *United States v. Rodriguez-Lara*, 421 F.3d 932, 941 (9th Cir. 2005); *United States v. Wheeler*, 79 F. App'x 656, 661 (5th Cir. 2003); *United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001); *United States v. Phillips*, 239 F.3d 829, 842 (7th Cir. 2001).

or African-Americans "in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community" and whether the underrepresentation is "due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. at 364.

The Court of Criminal Appeals concluded that Mr. Hester failed to show that representation of Hispanics and African-Americans in the jury venire met the second prong of the fair cross-section requirement. It reasoned as follows:

> According to the 2000 U.S. Census Bureau Data of record, the makeup of McMinn County was 92.7% white, 4.5% black, and 1.8% Hispanic. The venire from which the defendant's jury was selected in December 2003 was 96.0% white, 3.4% black, and 0% Hispanic. Stated differently, of the 175 prospective jurors, six were black, none were Hispanic, one was "other," and the rest were white. In our view, the slight disparity between the numbers of prospective African American and Hispanic jurors in the venire in relation to their numbers in the community is statistically and legally insignificant, varying from just over one percent with respect to African Americans and just under two percent with respect to Hispanics. As this court has observed, "[n]either the jury roll nor the venire panel need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group in the community."

> On the record presented, we conclude that the defendant has failed to establish the second prong of the applicable test under *Duren* by showing that either African Americans or Hispanics were not fairly or reasonably represented in relation to their number in the community.

*State v. Hester*, 2009 WL 275760, at *13-14 (citation omitted).

The approach utilized by the Court of Criminal Appeals assessed the absolute disparity between African-Americans and Hispanics in the jury venire and the percentages of each group in the population as recorded in the census for McMinn County. "The absolute disparity is calculated by subtracting the percentage of the distinctive group on the venire from the percentage in the population. Thus, if a distinctive group is 12% of the population and 7% on the venire, the absolute disparity is 5%." 4 Joel Androphy, *White Collar Crime* § 41:46 (2d ed. 2010). Absolute disparity measures "the difference between the

underrepresented group's percentage in the jury-eligible population and the group's percentage in the actual jury venire." *People v. Anderson*, 22 P.3d 347, 361 n.6 (Cal. 2001).

Mr. Hester insists that the Court of Criminal Appeals should have considered comparative disparity of both Hispanics and African-Americans in the jury venire rather than absolute disparity. To determine comparative disparity, the absolute disparity figure is divided by the percentage of minority group members in the population. Sara Sun Beale et al., *Grand Jury Law and Practice* § 3:18 (2d ed. 2009). Comparative disparity provides an assessment of "the *percentage* by which the number of group members in the actual venire falls short of the number of group members one would expect from the overall 'eligible population' figures." *People v. Anderson*, 22 P.3d at 361 n.6.

In its recent decision in *Berghuis v. Smith*, 559 U.S. ___, 130 S. Ct. 1382 (2010), the United States Supreme Court was confronted with issues related to the proper way to determine whether small minority groups are fairly and reasonably represented in accordance with the second prong of the fair cross-section requirement. The United States Court of Appeals for the Sixth Circuit had concluded that the primary and essential way to address this issue is to analyze the comparative disparity of the small minority population on the jury venire. The Supreme Court disagreed and concluded that there was no clearly established law establishing the superiority of comparative disparity analysis for assessing the under-representation of small minority groups. *See Berghuis v. Smith*, 559 U.S. at ___, 130 S. Ct. at 1392-96. To the contrary, the Supreme Court observed that both the absolute and comparative disparity tests suffer from imperfections and are subject to being misleading in addressing small minority populations. *Berghuis v. Smith*, 559 U.S. at ___, 130 S. Ct. at 1393.

Rather than fully embracing, as Mr. Hester recommends, the comparative disparity approach for small minority populations, we find much to agree with in the approach adopted by the Michigan Supreme Court and referenced in *Berghuis v. Smith*. The Michigan Supreme Court observed that

> [w]e thus consider all these approaches to measuring whether representation was fair and reasonable, and conclude that no individual method should be used exclusive of the others. Accordingly, we adopt a case-by-case approach. Provided that the parties proffer sufficient evidence, courts should consider the results of all the tests in determining whether representation was fair and reasonable.

*People v. Smith*, 615 N.W.2d 1, 3 (Mich. 2000).[38]

We are not persuaded that Mr. Hester has made out a prima facie case that the number of African-Americans included on McMinn County's jury venires is "not fair and reasonable in relation to the number of such persons in the community." *Duren v. Missouri*, 439 U.S. at 364. The absolute disparity between the census figures and the representation of African-Americans on the jury venire from which Mr. Hester's jury was selected was only 1.1%, and the comparative disparity was only 24.4%. Out of the venire of 175 persons, it could be anticipated that approximately eight of the potential jurors would be African-American. The actual number was six. Given the relatively small size of the African-American community in McMinn County, we conclude that Mr. Hester has failed to make a prima facie showing that African-Americans were not fairly or reasonably represented for purposes of the fair cross-section requirement in relation to the number of African-Americans in the McMinn County community. *See*, *e.g.*, *United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Weaver*, 267 F.3d 231, 241-44 (3d Cir. 2001); *People v. Burgener*, 62 P.3d 1, 22-23 (Cal. 2003).

Similarly, we are not persuaded that Mr. Hester has made out a prima facie case that the under-representation of Hispanics on the jury venire was due to the systematic exclusion of that group from the jury selection process. *Duren v. Missouri*, 439 U.S. at 364. While Mr. Hester started to lay an evidentiary foundation for his claim that McMinn County, albeit inadvertently, was systematically excluding Hispanics from its jury venires, he ultimately failed to carry his burden.

Mr. Hester began to lay an evidentiary foundation for his systematic exclusion of Hispanics claim by presenting evidence that a significant concentration of Hispanics possess higher driver's license numbers and that the process used to select the June 2003 jury venire never considered a significant number of persons with higher driver's license numbers. However, he fell short by failing to present evidence relating to (1) the increment used to select the December 2, 2003 venire, (2) the impact of that increment on the percentage of Hispanics whose driver's license numbers could have been included in the venire, and (3) how the increment was determined.[39]

---

[38] While the absolute disparity approach alone is more easily applied and less complex than assessing the myriad of permutations of the comparative disparity test, relying on the absolute disparity test alone would have the functional effect of excluding the representation of small minority groups from the protections of the Sixth Amendment fair cross-section requirement. *See*, *e.g.*, *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998); *United States v. Rogers*, 73 F.3d 774, 776-77 (8th Cir. 1996).

[39] Mr. Hester failed to present evidence as to how the number used for subtraction was determined.

The record shows the increment used to draw names from the driver's license list changes when a new venire is selected. These changes have a significant effect on the drawing of names from the list. For example, when the increment is increased, a larger percentage of the persons on the master list will be considered for jury service. Conversely, when the increment is decreased, a smaller percentage of persons on the master list will be considered. Thus, assuming that McMinn County's Hispanic population generally is at the end of the list because Hispanics disproportionately have higher driver's license numbers, increasing the increment will diminish the possibility that Hispanics will be excluded from consideration. Alternatively, decreasing the increment will have a tendency to increase the possibility that Hispanics will not be considered for jury service.

Mr. Hester presented no evidence regarding the process that was used to determine the increment for selecting the December 2, 2003 venire. Thus, the record does not reveal the increment that was used by the software to select the persons who were called for jury duty on December 2, 2003. Without this evidence, the courts can only speculate about how McMinn County's use of a varying increment affected the representation of Hispanics on the county's jury venires. The burden to present evidence of a systematic under-representation of a distinct group within the community fell squarely on Mr. Hester. He has failed to carry his burden.

# VIII.
## COMPLIANCE WITH TENN. CODE ANN. § 22-2-304(e) (1994)

Mr. Hester also asserts that the manner in which the jury venire was selected did not comply with Tenn. Code Ann. § 22-2-304(e) (1994), which requires "that the selection of the regular panel of grand and petit jurors be made by mechanical or electronic means in such a manner as to assure proportionate distribution of names selected without opportunity for the intervention of any human agency to select a particular name."[40] The Court of Criminal Appeals did not agree. The Court of Criminal Appeals concluded McMinn County's jury selection system paralleled the approach approved by this Court in *State v. Mann*, 959 S.W.2d 503 (Tenn. 1997). The Court of Criminal Appeals also concluded that "the record in this case fails to demonstrate that the venire was not randomly selected and resulted in the systematic exclusion of certain groups of potential jurors on the basis of race or age." *State v. Hester*, 2009 WL 275760, at *16. The court's reliance on *State v. Mann* is misplaced.

The methodology employed to select the venire that was at issue in *State v. Mann* differed significantly from the methodology used by McMinn County in this case. In *State v. Mann*, the Circuit Court Clerk testified

---

[40]This provision is currently codified in a modified form at Tenn. Code Ann. § 22-2-304(a) (2009).

> that his office selects the jury venire from a list of licensed drivers in the county. Out of the total county population of 38,000 people, there are 28,000 licensed drivers. Members of [the Clerk's] office calculate the number of jurors required for a two year period, which in this case was approximately 3,000. They then divide the number of licensed drivers by the number of jurors needed. The quotient determines the number of names they will skip when they count down the alphabetical list of 28,000 licensed drivers to obtain 3,000 jurors.

*State v. Mann*, 959 S.W.2d at 535 (appendix).

The "quotient" in *State v. Mann* was determined by dividing the total number of names on the list by the number of jurors needed. This quotient served essentially the same purpose as the "increment" involved in this case. However, unlike the methodology used by McMinn County in this case, Dyer County drew its names from the entire driver's license list rather than skipping large sections of the list. Accordingly, we cannot concur with the Court of Criminal Appeals that the methodology utilized by McMinn County is the same methodology that was approved of by this Court in *State v. Mann*.

Nor can we concur in the Court of Criminal Appeals' conclusion that a violation of Tenn. Code Ann. § 22-2-304 requires a showing of systematic exclusion. A showing of systematic exclusion is an essential element of the constitutional test for showing a violation of the Sixth Amendment requirement that a jury venire be composed of a fair cross-section of the community. While Tenn. Code Ann. § 22-2-304(e)'s requirement of a "proportionate distribution of names" should prevent a violation of the Sixth Amendment's fair cross-section requirement, it sets a more rigorous standard than the constitutional minimum of avoiding systematic under-representation of distinct groups within the community.

The process employed by McMinn County did not violate Tenn. Code Ann. § 22-2-304(e)'s requirement that the jury venires be compiled "without opportunity for the intervention of any human agency to select a particular name." The numbers utilized in the process were reached through a formula that involved a random collection of names from the driver's license list rather than any human intervention in selecting particular names.

However, the formula utilized by McMinn County violates Tenn. Code Ann. § 22-2-304(e)'s requirement that the means utilized "assure proportionate distribution of names selected." At least with regard to the June 9, 2003 venire, McMinn County excluded large portions of the names on its master list. In doing so, it prevented a proportionate distribution of names from being selected from that list.

-44-

As a general matter, a criminal defendant can mount a successful challenge to an indictment or jury venire as a result of improper jury selection procedures only if the defendant can demonstrate that he or she was prejudiced or that the improper procedures resulted from purposeful discrimination or fraud. *State v. Stephens*, 264 S.W.3d 719, 731 (Tenn. Crim. App. 2007); *see also State v. Reid*, 91 S.W.3d 247, 291 (Tenn. 2002) (appendix) ("There is nothing in the record to show that any prejudice resulted to the Appellant by the manner of the selection process utilized.").

In this case, however, Mr. Hester has failed to present evidence regarding the increment that was actually used to obtain the venire in this case. Likewise, he failed to present evidence addressing (1) the impact the process actually used by McMinn County to select the jury venire had on the portion of the names on the master list that were considered for jury service or (2) the percentage of Hispanics among the group that was not considered for jury service. In the absence of proof of this sort, we are unable to ascertain either the process that McMinn County actually employed in this case or the impact that this process had on the composition of the jury venire in Mr. Hester's case. The burden was upon Mr. Hester to demonstrate any prejudice that he suffered as a result of the deviation from Tenn. Code Ann. § 22-2-304(e)'s requirement that the methodology employed utilize a procedure that assures a "proportionate distribution of names selected." He has failed to carry this burden.

Furthermore, Tenn. Code Ann. § 22-2-313 (1994) imposes a strict requirement that

> [i]n the absence of fraud, no irregularity with respect to the provisions of this part or the procedure thereunder shall affect the validity of any selection of any grand jury, or the validity of any verdict rendered by a trial jury unless such irregularity has been specially pointed out and exceptions taken thereto before the jury is sworn.[41]

We have carefully reviewed Mr. Hester's pre-trial motion related to the jury venire in his case. While he raised concerns regarding the representation of certain demographic groups, Mr. Hester failed to "specially point[] out" to the trial court and take exception to the methodology utilized by the trial court as being in violation of Tenn. Code Ann. § 22-2-304(e)'s requirement that a "proportionate distribution of names [be] selected." To the contrary, the focus of Mr. Hester's pre-trial motion was squarely upon the fair cross-section requirement. *See generally* 10 David L. Raybin, *Tennessee Practice: Criminal Practice and Procedure* § 25:14, at 434 (2008) (observing that fair cross-section constitutional argument

---

[41]This provision is currently codified in a modified form at Tenn. Code Ann. § 22-2-313 (2009).

is a separate type of challenge than the technical statutory based violation in jury selection procedures). Accordingly, we find that Mr. Hester is not entitled to relief upon this issue.

## IX.
### THE DENIAL OF MR. HESTER'S REQUEST TO RETAIN AN EXPERT STATISTICIAN

Mr. Hester takes issue with the trial court's denial of his request for funds to retain an expert in statistics and demographics to assist him in assembling "the required data to make a prima [facie] showing of unconstitutional composition, and then to testify concerning this data at an evidentiary hearing." The Court of Criminal Appeals concluded that "[b]ecause the defendant failed to show a particularized need for an expert statistician, the trial court did not abuse its discretion in denying the request." *State v. Hester*, 2009 WL 275760, at *18. Like the Court of Criminal Appeals, we have concluded that the trial court did not abuse its discretion in failing to allocate resources for a demographics and statistics expert.

Pursuant to Tenn. Code Ann. § 40-14-207(b) (1997),[42] "[i]n capital cases where the defendant has been found to be indigent . . . , [the] court . . . may, in its discretion, determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected." The trial court's rulings with regard to these expert services will not be overturned unless the trial court's decision constitutes an abuse of discretion. *State v. Smith*, 993 S.W.2d 6, 28 (Tenn. 1999) (appendix); *State v. Cazes*, 875 S.W.2d 253, 261 (Tenn. 1994).

To warrant reversal for failure of a trial court to allocate resources for expert assistance, a defendant must show the existence of a "particularized need" for the allocation of resources for expert assistance. *State v. Dellinger*, 79 S.W.3d 458, 469 (Tenn. 2002); *State v. Barnett*, 909 S.W.2d 423, 430 (Tenn.1995); *State v. Shepherd*, 902 S.W.2d 895, 904 (Tenn. 1995); *State v. Evans*, 838 S.W.2d 185, 192 (Tenn. 1992). In order to demonstrate a particularized need, a defendant must first establish that he or she will not have a fair trial without the requested expert assistance. *State v. Dellinger*, 79 S.W.3d at 469; *State v. Scott*, 33 S.W.3d 746, 753 (Tenn. 2000); *State v. Barnett*, 909 S.W.2d at 430-31. The defendant must also establish that there is a reasonable likelihood that the requested expert assistance will materially assist him or her in preparing or presenting his or her case. *State v. Dellinger*, 79 S.W.3d at 469; *State v. Scott*, 33 S.W.3d at 753; *State v. Barnett*, 909 S.W.2d at 430-31.

Defendants do not have an inherent statutory or constitutional right to a statistics or demographics expert to address issues related to determining whether a jury venire represents a fair cross-section of the community. Gobert, *Jury Selection* § 6:11. However, circumstances may arise in which a particularized need for a statistician or demographics

---

[42] A modified version of this provision remains codified at Tenn. Code Ann. § 40-14-207(b) (2006).

expert would require the appointment of such an expert. These circumstances have been limited to cases where there is a substantial disparity between the representation of constitutionally distinctive groups in the jury venire and the community.[43]

When Mr. Hester requested leave to retain a statistician, the evidence showed an absolute disparity of Hispanics of .8% and an absolute disparity of African-Americans of .7%. The comparative disparity for Hispanics was 44.4%, and the comparative disparity for African-Americans was 15.56%. In light of the relatively small size of these minority communities in McMinn County, these variances are simply insufficient to warrant a finding that the trial court abused its discretion by declining to permit Mr. Hester to retain a statistician. Our conclusion in this case is bolstered by the demonstrated familiarity and skill of Mr. Hester's lead counsel in presenting legal arguments based on statistical analysis. Accordingly, we decline to find that the trial court erred by failing to find a particularized need for the appointment of an expert statistician in this case.

## X.
### THE COMPETENCY AND CONDUCT OF THE JURY COMMISSIONERS

Mr. Hester's final argument with regard to the selection of the jury venire focuses on the competency and conduct of the McMinn County jury commissioners. He asserts that two of these commissioners were not qualified to perform their statutory duties under the law as it existed at all times relevant to this case.[44] The Court of Criminal Appeals rejected this claim on the ground that Mr. Hester failed to present evidence to establish it. *State v. Hester*, 2009 WL 275760, at *17. While we differ with the Court of Criminal Appeals' reasoning, we have concluded that Mr. Hester has failed to present any evidence that he was prejudiced by the composition or the conduct of the McMinn County jury commissioners.

---

[43] *See, e.g.*, *United States v. Rodriguez-Lara*, 421 F.3d at 941-48 (finding the trial court erred by failing to appoint an expert where the absolute disparity of Hispanics was 14.55%); *United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1982) (finding no error in failing to appoint a statistics expert where the absolute disparity of African-Americans was 2.8%, Hispanics was 7.7%, and Asians was 4.7% and rejecting defendant's argument that the percentages should be aggregated as a collective distinct non-white group); *United States v. Armstrong*, 621 F.2d 951, 956 (9th Cir. 1980) (concluding that under-representation of African-Americans by 2.83% did not constitute a sufficiently substantial absolute disparity to require the appointment of a statistical expert for an indigent defendant); *State v. Gladstone*, 628 P.2d 849, 851 (Wash. Ct. App. 1981) (finding no error by the trial court in failing to appoint an expert where the absolute disparity of Hispanic jurors was 2.2%); *see also State v. Brown*, 296 S.E.2d 839, 842 (N.C. Ct. App. 1982).

[44]The Tennessee General Assembly has now largely replaced jury commissioners with jury coordinators. See Act of May 21, 2008, ch. 1159, § 1, 2008 Tenn. Pub. Acts 976, 980-85 (codified at Tenn. Code Ann. §§ 22-2-201 through -305 (2009)).

On June 4, 2003, almost two years before Mr. Hester's trial, Mr. Heinsman caused subpoenas to be issued to each of McMinn County's three jury commissioners, directing them to appear at a hearing on June 9, 2003. Mr. Heinsman talked with each of the three commissioners on June 5, 2003, to explain the purpose of the subpoena and the hearing. On June 9, 2009, he filed a motion to dismiss the indictment and the jury venire on the ground that the Board of Jury Commissioners was "defective." He alleged in the motion that one of the jury commissioners, Mildred Adams, lacked the mental capacity to perform her duties and that another commissioner, Henry T. Webb, was not qualified to serve as a jury commissioner because he was also a member of the McMinn County Board of Equalization.[45] Mr. Heinsman also filed an "affidavit"[46] attempting to establish that Ms. Adams was "unavailable" because "someone [had] spirited [Ms.] Adams away in advance of the hearing."

The State responded on June 9, 2003, by filing a motion to quash the subpoenas to the McMinn County jury commissioners. Even though two of the three commissioners were in court on June 9, 2003, the trial court declined to consider the State's motion to quash the subpoenas. Instead, the court postponed the argument on the motions to a later date to give the parties more time to consider all the motions that had been filed on the day of the hearing, including the State's motion to quash.

On September 5, 2003, Mr. Hester again caused subpoenas to be issued to the McMinn County jury commissioners, directing them to appear at a hearing set for September 9, 2003. On the day of the hearing, the State again moved to quash these subpoenas on several different grounds. The trial court granted the State's motion to quash. In his motion for new trial, Mr. Hester again took issue with the competency and conduct of the McMinn County jury commissioners and supported his motion with documentary evidence regarding Mr. Webb's membership on the McMinn County Board of Equalization.

Mr. Hester renewed his challenge to the competency of the McMinn County jury commissioners in the Court of Criminal Appeals. The court rejected his arguments based on the following reasoning:

---

[45] At all relevant times, Tenn. Code Ann. § 22-2-201(b)(1) (Supp. 2003); Tenn. Code Ann. § 22-2-201(b) (1994), jury commissioners could not be state or county officers.

[46] The document that Mr. Heinsman filed was titled "affidavit," although it does not contain a signed notary's certification that the statements contained in the affidavit were prepared and sworn to by Mr. Heinsman.

Upon careful examination of the record, we conclude that the defendant has failed to establish his claim that the selection of the venire list was invalidated because two of the three McMinn County jury commissioners were disqualified to act. The record reflects that counsel filed a pre-trial motion to dismiss the indictment based on an allegedly defective jury commission. However, no hearing was held on the matter and the record is thus devoid of proof to support the defendant's claim with the exception of the aforementioned affidavit regarding Ms. Adams' "bad memory" and the 1998 document appearing to contain Mr. Webb's signature. We conclude that these documents do not establish that Ms. Adams was unfit to serve as a jury commissioner or that Mr. Webb was disqualified by his service on another county board when the venire list was prepared in 2000. In the absence of evidence that a majority of the jury commissioners were not qualified to act, "every presumption must be made in favor of their competency." *Turner v. State*, 111 Tenn. 593, 608 (1902). The defendant is not entitled to relief on this issue.

*State v. Hester*, 2009 WL 275760, at *17.

In its brief filed with this Court, the State dismisses Mr. Hester's arguments regarding the McMinn County jury commissioners by pointing out that the only evidence of Ms. Adams's lack of capacity to serve as a jury commissioner is Mr. Heinsman's "affidavit." Even though it concedes that the "McMinn County Board of Equalization document from 1998 . . . appears to have been signed by Mr. Webb," the State insists that "there is no other proof in the record regarding his [Mr. Webb's] alleged service on a county board of equalization." In addition, the State hastens to point out that even if one of the jury commissioners was disqualified, the acts of the remaining two commissioners would be valid.[47]

---

[47]Tenn. Code Ann. § 22-2-202(e) (1994), *repealed by* Act of May 21, 2008, ch. 1159, § 1, 2008 Tenn. Pub. Acts at 977, 980-81, provided that

> [i]n the event at any time a member of the board [of jury commissioners] cannot be in attendance because of sickness or for any other reason when a meeting is necessary, the two (2) remaining members shall constitute a quorum and discharge the duties of the board until the other member is able to resume board attendance.

In addition, this Court had held that a jury commission could continue to act when the service of one commissioner was contrary to statutory limitations, as long as the majority of the commissioners was

(continued...)

We cannot agree with the State that Mr. Hester's arguments regarding the two challenged jury commissioners can properly be dismissed because of the absence of proof. We find this proposition disturbingly Kafkaesque in light of Mr. Hester's efforts to obtain the evidence in a timely manner and the State's successful opposition to these efforts in the trial court.

**B.**

The citizen jury provides the foundation of this Nation's legal system. Encroachment on the right to trial by jury was among the chief complaints registered by the American colonists in the Declaration of Independence.[48] Alexander Hamilton considered the right to trial by jury to be "the very palladium of free government."[49] Thomas Jefferson believed it to be "the only anchor, ever yet imagined by man, by which government can be held to the principles of [the] Constitution."[50]

The right to trial by jury was held in equally "high estimation"[51] by the framers of Tennessee's constitutions. This Court has characterized the right as "an essential element of public liberty"[52] and as "vital . . . to the security of life, liberty, and property of the citizen."[53] Just thirty years after Tennessee became a state, this Court noted that

> [t]he right to a trial by jury . . . is too sacred to be intermeddled with by any power upon earth; too inseparable from human happiness to be submitted to the discretion of any human Legislature; it stands upon eternal foundations, and as time grows old it grows in veneration and stability.

---

[47](...continued)
competent. *Turner v. State*, 111 Tenn. 593, 608, 69 S.W. 774, 778 (1902). Neither Tenn. Code Ann. § 22-2-202(e) nor *Turner v. State* can be used to validate the acts of a board of jury commissioners in the absence of two competent commissioners.

[48] The Declaration of Independence para. 20 (U.S. 1776) ("For depriving us in many cases of the benefits of Trial by Jury.").

[49] *The Federalist No. 83*, at 560 (Alexander Hamilton) (Easton Press 1979).

[50] Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), in 15 *The Papers of Thomas Jefferson* 269 (Julian P. Boyd ed., 1958).

[51] *See Bank of the State v. Cooper*, 10 Tenn. (2 Yer.) 599, 621-22 (1831) (Kennedy, J.).

[52] *Riley v. Bussell*, 48 Tenn. (1 Heisk.) 294, 296 (1870).

[53] *McLain v. State*, 18 Tenn. (10 Yer.) 241, 241 (1837).

*Tipton v. Harris*, 7 Tenn. (1 Peck) 414, 419 (1824). Accordingly, Article I, Section 6 of the Tennessee Constitution, like the similar provisions that preceded it, preserves for all persons subject to Tennessee's laws the right to trial by jury as it existed at common law[54] when the federal government ceded to North Carolina the lands containing the territory that now comprises Tennessee. *State v. Dusina*, 764 S.W.2d 766, 768 (Tenn. 1989); *Willard v. State*, 174 Tenn. 642, 645, 130 S.W. 100 (1939).

This Court has also recognized that juries, like trial judges, must be disinterested and impartial. *Gribble v. Wilson*, 101 Tenn. 612, 615, 49 S.W. 736, 736 (1899); *Neely v. State*, 63 Tenn. 174, 183 (1874). Accordingly, the right to trial by jury necessarily includes the use of "methods . . . to secure independent and disinterested jurors." *Paducah, T. & A. R.R. v. Muzzell*, 95 Tenn. 200, 201, 31 S.W. 999, 999 (1895). As Justice Peck observed, "[w]ho is so dull as not to know that the persons to be called as jurors, the calling of them, the place they were to come from, their selection and oath, make parts in the trial by jury. Dispense with any one requisite, and where will we stop?" *Kirby v. State*, 15 Tenn. (7 Yer.) 259, 266 (1834) (Peck, J.).

The process for selecting jurors and impaneling juries takes on great significance in criminal cases because of the role that juries play as a vital check against the abuse of power by the government and its prosecutors. *See Powers v. Ohio*, 499 U.S. 400, 411 (1991); *Batson v. Kentucky*, 476 U.S. 79, 86 (1986); *State v. Bell*, 745 S.W.2d 858, 867-68 (Tenn. 1988). In order to properly fulfill this role, juries must be chosen from venires that reflect a fair cross-section of the community, and they must be "indifferently chosen" rather than selected with an impermissible purpose or design. *See Batson v. Kentucky*, 476 U.S. at 86-87 (quoting 4 William Blackstone, *Commentaries* *349-50).

## C.

Because of the central role that juries play in criminal proceedings, all those involved in the process of selecting jury venires and empaneling juries – including the jury commissioners and coordinators, court clerks, lawyers, and judges – must comply with the applicable constitutional and statutory requirements. *See State v. Coleman*, 865 S.W.2d 455, 458 (Tenn. 1993). In addition, to accomplish the goal that "the administration of justice should not only be chaste, but should not even be suspected,"[55] the process for generating

---

[54] The "essentials" of the right to trial by jury are described in detail in *Woods v. State*, 130 Tenn. 100, 106, 169 S.W. 558, 559 (1914).

[55] *Neely v. State*, 63 Tenn. at 183 (quoting 3 William Blackstone, *Commentaries* *383); *see also State v. Lynn*, 924 S.W.2d 892, 898 (Tenn. 1996) (noting that "[t]o promote public confidence in the fairness of the system and to preserve the system's integrity in the eyes of the litigants and the public, 'justice must

(continued...)

jury venires and juries should be open and transparent. The State may alleviate any concerns about transparency by voluntarily making available to defendants information regarding the process for generating lists of prospective jurors and for selecting jury venires in the county where the case will be tried.

Where, as in this case, the process for selecting the jury venire is more opaque than transparent, a defendant may seek judicial assistance, as Mr. Hester did, to obtain the information. However, when a defendant requests assistance in discovering or obtaining jury selection information, the courts must balance the defendant's need for the requested information with the significant administrative burdens that may arise from the request and the complexities posed to the orderly functioning of Tennessee's criminal courts that could arise from repeated requests for the same information.

In balancing these interests and safeguarding the defendant's statutory and constitutional rights, we conclude that a defendant who makes a prima facie showing of a statutory or constitutional violation with regard to the preparation of lists of prospective jurors or the selection of jury venires or petit juries has the right to subpoena appropriate witnesses and documents. *See Buckingham v. State*, 540 S.W.2d 660, 665 (Tenn. Crim. App. 1976) (stating that "[a]ny accused would have the right, upon proper motion, to have the court inquire into any suspected irregularities [in selecting jury venires] . . . [and] had the right to present any witnesses or other evidence that he desired in order to support his position"); Ward, *Tennessee Criminal Trial Practice* § 20:3, at 542; *see also State v. Johnson*, 131 P.2d 173, 193 (Or. 2006). To find otherwise would be to render the statutory and constitutional protections regarding the process for selecting juries elusive and hollow.

Based on the record in this case, we have determined that Mr. Hester provided the trial court with enough evidence to establish a colorable claim that two of the three McMinn County jury commissioners were not qualified to serve when the Board of Jury Commissioners removed names of prospective jurors from the master list generated by the McMinn County Clerk's Office to form the jury venire at issue in this case. Mr. Hester's lawyer alleged in writing that Mr. Webb was "presumptively disqualified" from serving as a jury commissioner because he was also serving on the McMinn County Board of Equalization. He also alleged in writing that Ms. Adams was "presumptively disqualified" because she was "incapable of service due to her worsening mental status" and that, based on counsel's good faith belief, Ms. Adams's condition was "commonly known in the McMinn County Courthouse." These written allegations provided a sufficient substantive basis for denying the State's motion to quash the subpoenas issued to McMinn County's three jury commissioners.

---

[55](...continued)
satisfy the appearance of justice.'" (quoting *Offutt v. United States*, 348 U.S. 11, 13 (1954)).

-52-

**D.**

Our conclusion that Mr. Hester made a colorable claim that two of McMinn County's jury commissioners were not qualified to serve does not necessarily require us to find that the trial court erred by quashing the subpoenas to the jury commissioners or that the unresolved questions regarding the competency of the jury commissioners requires a reversal of Mr. Hester's conviction and sentence. The trial court's decision to quash the subpoenas may be upheld if there are defects in the subpoenas attributable to Mr. Hester. Likewise, Mr. Hester's conviction and sentence need not be reversed based on the incompetency of two of McMinn County's jury commissioners in the absence of evidence that Mr. Hester was actually prejudiced thereby.

**The Issuance and Service of the Subpoenas**

Mr. Hester filed many pretrial motions and set many of the motions for hearing on June 9, 2003. In preparation for this hearing, Mr. Hester caused subpoenas to be issued to many persons whose testimony was relevant to the substance of his motions. After the hearing was continued and rescheduled for September 9, 2003, Mr. Hester's lawyer again issued subpoenas to over sixty persons.

The issuance and service of the subpoenas became an issue at the September 9, 2003 hearing. With specific regard to the subpoenas issued to the three jury commissioners, the State filed a motion to quash, asserting, among other grounds, that "none of the subpoenas . . . were lawfully issued or served." At the hearing, the State presented an affidavit of the deputy clerk stating that "[n]o such subpoenas ever issued from the Circuit Clerks, nor did I receive any requests from Mr. Heinsman for such process." The State also argued that all of the disputed subpoenas had been "generated over the office copier of Mr. Heinsman's office and faxed through fax machines to these folks [the subpoenaed witnesses]."

In response to the State's motion, Mr. Heinsman stated that in the six capital cases he had tried, he had "asked the clerks of the courts if I could copy the subpoenas that they are required to issue in blank to attorneys, because of the volume that need to be issued, and in this case, because of the remoteness of my office from here." He also asserted that the deputy clerk had given him "permission to make final copies." Finally, Mr. Heinsman stated that "I have served subpoenas by fax, by mail, by phone, by just about every method calculated to provide actual notice, and I've never in any case had a motion to quash; not one." The trial court granted the State's motion to quash the subpoenas of the jury

commissioners without specifically addressing the State's arguments regarding the issuance and service of the subpoenas.[56]

Tenn. R. Crim. P. 17(d) provides that "[a] subpoena may order a person to produce the books, papers, documents, or other objects the subpoena designates." Subpoenas are "issued by a clerk or other authorized court officer, who shall sign it but otherwise leave it blank. The party requesting the subpoena shall fill in the blanks before the subpoena is served." Tenn. R. Crim. P. 17(a). Subpoenas "may be served by any person authorized to serve process, or the witness may acknowledge service in writing on the subpoena." Tenn. R. Crim. P. 17(f)(1). The person serving the subpoena "shall deliver or offer to deliver a copy of the subpoena to the person to whom it is directed or leave a copy with an adult occupant of the person's usual residence." Tenn. R. Crim. P. 17(f)(1).

A subpoena may be quashed or modified "if compliance would be unreasonable or oppressive." Tenn. R. Crim. P. 17(d)(2). Reviewing courts review a trial court's decision regarding a motion to quash using the "abuse of discretion" standard. *State v. Burrus*, 693 S.W.2d 926, 929 (Tenn. Crim. App. 1985); *see also State v. Huskey*, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *110 (Tenn. Crim. App. June 28, 2002), *perm. app. denied* (Tenn. Feb. 18, 2003).

The record reflects that there may very well be technical errors in the issuance and service of the subpoenas to the jury commissioners. However, the record is not substantially developed on these points because the trial court did not base its decision to quash Mr. Hester's subpoenas on these technical grounds. Additionally, the State has not relied on these potential defects as a basis for affirming the trial court's decision to quash the subpoena issued to the jury commissioners. In light of the state of the record and the State's reliance on other issues, we will turn our focus from considering whether the trial court abused its discretion by quashing the subpoenas to whether Mr. Hester demonstrated that he was prejudiced by the alleged disqualification of two of McMinn County's three jury commissioners.

### The Evidence of Prejudice

As a general matter, a defendant cannot successfully challenge an indictment or jury venire due to improper jury selection procedures without demonstrating either that he or she was prejudiced or that the improper procedures were the result of purposeful discrimination

---

[56]Addressing another motion to quash a different subpoena, the trial court expressed some reservations about Mr. Hester's approach to serving subpoenas but indicated that it was ruling on the subpoenas "as if they were served." The trial court directed, however, that going forward subpoenas could not be copies.

or fraud. *State v. Stephens*, 264 S.W.3d at 731; *see also State v. Reid*, 91 S.W.3d at 291 (appendix). Even assuming that Mr. Hester could have demonstrated that two of the three jury commissioners were not qualified to serve, he failed to articulate or support any showing that he was prejudiced as a result of two members of the Board of Jury Commissioners not being qualified for their positions.

We have already determined that Mr. Hester did not successfully demonstrate that the jury venire failed to include a fair cross-section of the community. The record also reflects that the jury commissioners excluded from the venire between fifty and one hundred other residents of McMinn County. While the jury commissioners themselves did not explain the basis for removing these persons from the jury venire, the Circuit Court Clerk explained that each of the jury commissioners received the list containing seven hundred "electronically generated" names and that the commissioners then removed "those persons whom they know to have died, removed themselves from the county or become mentally or physically disabled for jury service."

Removing from a jury venire the names of persons who have died, who no longer live in the county, or who are physically or mentally disabled so as to prevent jury service was legally permissible. Mr. Hester neither alleged nor proved that he was prejudiced by removing these persons from the jury venire. In the absence of any evidence in the record that the jury commissioners removed persons from the jury venire for improper purposes or that Mr. Hester was prejudiced by the removal of the persons, we decline to find that service of the jury commissioners, even if they were not qualified to serve, provides sufficient grounds to reverse and vacate Mr. Hester's conviction and sentence.

## XI.
### THE TRIAL COURT'S DECISION TO PERMIT THE STATE TO RECALL
### AGENT BARRY BRAKEBILL

Mr. Hester continues to take issue with the trial court's decision to permit the State to recall Agent Barry Brakebill of the Tennessee Bureau of Investigation. The State desired to recall Agent Brakebill to address an error regarding the time that a blood sample had been taken from Mr. Hester following the fire on December 14, 1999. Mr. Hester insists that the State should not have been permitted to present evidence contradicting the time listed on the paperwork accompanying the blood sample because he had not been notified of the inaccuracy prior to trial. The Court of Criminal Appeals found that the trial court did not err by permitting the State to recall Agent Brakebill. We agree with the Court of Criminal Appeals.

Agent Brakebill was one of the witnesses called by the State to testify about the investigation of the crimes committed on December 14, 1999. Part of this investigation

included a blood sample taken from Mr. Hester that showed no alcohol remaining in his system at the time the sample was taken. The State did not question Agent Brakebill about this sample during direct examination. When asked about this blood sample on cross-examination, Agent Brakebill seemed to suggest that he had witnessed the blood being drawn from Mr. Hester at the hospital on the night that Mr. Haney died. On redirect examination, Agent Brakebill testified that he had turned over the blood sample to the State Fire Marshal's office and that it was his understanding that test results were negative for alcohol. On recross, Agent Brakebill agreed that the afternoon of December 15, 1999 was almost a full day after Mr. Hester was arrested. When asked whether the sample that tested negative for alcohol "was taken almost a day after [Mr. Hester] was arrested," Agent Brakebill responded, "I'm not sure . . . . I would need . . . to see . . . the lab report."

Following Agent Brakebill's testimony, the State called Special Agent William Barker of the Tennessee Bomb and Arson Investigation Section. Once again, the State did not initially question Agent Barker about the blood sample taken from Mr. Hester. On cross-examination, Agent Barker testified that the writing on the paperwork accompanying the blood sample indicated that the sample had been taken at 12:45 p.m. on December 15, 1999, approximately seventeen hours after Mr. Hester was taken into custody. Agent Barker also testified that blood samples in DUI cases would not be taken after a defendant had a full night's sleep and had eaten lunch the next day. He declined to speculate on why the blood sample would not have been taken on the night that Mr. Hester was arrested. On redirect examination, Agent Barker testified that he was not present when the blood sample was taken.

The State then recalled Agent Brakebill. Mr. Hester did not object. Agent Brakebill testified that the paperwork accompanying the blood sample had been filled out partially by him and partially by Robin Smith, a nurse. He testified that (1) Ms. Smith had placed the time on the document, (2) he was present when the blood sample was taken, and (3) he recalled that the sample was drawn on the night that Mr. Hester was arrested. He also testified that he was not sure of the exact time when the sample was taken and that it could have been after midnight on December 15, 1999. Agent Brakebill testified that he was at home asleep at 12:45 p.m. on December 15, 1999 and that the blood sample could not have been drawn at 12:45 p.m. on December 15, 1999 because he was present when the sample was taken.

During a vigorous cross-examination, Agent Brakebill conceded that the papers accompanying the blood sample were serious documents that were important to the laboratories, chain of custody, and future trial proceedings. He also conceded that his only basis for refuting the time on the paperwork was his memory of an event that occurred more than five years earlier. Finally, Agent Brakebill conceded that he had never filed any document amending or correcting the incorrect date and time record on the paperwork that

accompanied the blood sample drawn from Mr. Hester. Agent Brakebill was excused following his cross-examination, and the State proceeded to call its next witness without objection or comment from the defense.

Tenn. R. App. P. 36(a) provides that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Mr. Hester took no action to apprise the trial court of his view that allowing the State to recall Agent Brakebill was error, nor did he attempt to strike Agent Brakebill's testimony, seek a continuance, or even move for a mistrial after the allegedly improper testimony was presented. Through his failure to raise any objection, Mr. Hester waived his right to challenge the trial court's decision to allow Agent Brakebill to testify and to Agent Brakebill's testimony itself.

Nevertheless, Tennessee's appellate courts "may take up an issue that has been waived if the issue constitutes a 'plain error' that affects the substantial rights of a party and consideration of the issue is necessary to do substantial justice." *Grindstaff v. State*, 297 S.W.3d 208, 219 n.12 (Tenn. 2009). This review for plain error is discretionary. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial. *State v. Bledsoe*, 226 S.W.3d 349, 354-55 (Tenn. 2007). Under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007).

Under Tennessee law, a trial court's decision to permit a witness to be recalled is a discretionary one. *State v. James*, 315 S.W.3d 440, 460 (Tenn. 2010). Agent Brakebill was recalled to address a matter that had arisen, not through the State's direct examination of Agents Brakebill and Barker, but instead through the cross-examination of these agents by Mr. Hester's lawyer. It appears from the direct examination of these agents that the State did not intend to refer to the negative results of the blood-alcohol test to prove Mr. Hester's guilt. Instead, the negative blood test results appear to have only become a matter of significant concern for the State after Mr. Hester challenged Agent Barker regarding the poor investigative techniques employed by Agent Brakebill in failing to administer the blood-alcohol test on the night of Mr. Hester's arrest.

At that point, the State pushed back by recalling Agent Brakebill to testify regarding his recollection that Mr. Hester's blood had been drawn on the evening of the arrest. During his renewed cross-examination of Agent Brakebill, Mr. Hester's lawyer was able (1) to criticize Agent Brakebill's competence for failing to correctly note the time that the blood was drawn or to catch an error by the nurse on an important criminal investigative record; (2) to challenge the reliability of Agent Brakebill's recollection about when the blood sample was drawn five years earlier; and (3) to call attention to the absence of any documentation corroborating Agent Brakebill's recollection that the blood sample had been taken on the night Mr. Hester was arrested.

Mr. Hester has failed to present this Court with any argument demonstrating that "a clear and unequivocal rule of law was breached" by the trial court in the exercise of its discretionary authority to allow the State to recall Agent Brakebill. Accordingly, we find that Mr. Hester has failed to carry his burden of demonstrating that the trial court committed plain error.

## XII.
### THE TRIAL COURT'S ALLEGED IMPROPER COMMENT ON THE EVIDENCE

Mr. Hester contends that the trial court erred by commenting on the strong kerosene smell emanating from an evidentiary exhibit. After careful study of the parties' briefs with regard to this issue, we are persuaded that the decision of the Court of Criminal Appeals on this issue should be affirmed. Moreover, because we find that the opinion of the Court of Criminal Appeals, *State v. Hester*, 2009 WL 275760, at *26-27, adequately states the facts and the law on this issue, we adopt this portion of the opinion as the opinion of this Court and include it as an appendix to this opinion.

## XIII.
### THE REASONABLE DOUBT INSTRUCTION

Mr. Hester takes issue with the trial court's instruction to the jury regarding reasonable doubt. In this instruction, the trial court described "reasonable doubt" as follows:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge. The State must prove every element of the crime charged beyond a reasonable doubt. Proof beyond a reasonable doubt does not mean proof

beyond all possible doubt. Possible doubt are doubts based purely upon speculation, not reasonable doubt. A reasonable doubt is a doubt based on reason and common sense. It may arise from the evidence, the lack of evidence, or the nature of the evidence. Proof beyond a reasonable doubt means proof that is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives.

Mr. Hester insists that this instruction is legally deficient because it excludes "possible doubt" from the reasonable doubt standard. Like the Court of Criminal Appeals, we find no error in the trial court's instruction. Similar instructions that do not include "possible doubt" have been approved by and are regularly used in many state and federal courts as part of their pattern jury instructions for defining "reasonable doubt" and are included in many model instructions prepared by various advisory boards.[57]

The "reasonable doubt" instruction that the trial court used in this case corresponds with Pattern Criminal Jury Instruction 1.03 (2009) approved by the United States Court of Appeals for the Sixth Circuit. With regard to "possible doubt," this instruction states: "[p]roof beyond a reasonable doubt does not mean proof beyond all possible doubt. Possible doubts or doubts based purely on speculation are not reasonable doubts. A reasonable doubt is a doubt based on reason and common sense." The United States Court of Appeals for the Sixth Circuit has repeatedly upheld the use of this instruction.[58] Similar language also has been repeatedly upheld against challenges mirroring the argument presented by Mr. Hester in the present case.[59] Accordingly, we find no constitutional error in the trial court's discussion of "possible doubt."

---

[57] *See, e.g.*, Model Crim. Jury Instr. 3rd Cir. 3.06 (2009); Model Crim. Jury Instr. 8th Cir. 3.11 (2007); Pattern Crim. Jury Instr. 10th Cir. 1.05 (2006); Model Crim. Jury Instr. 9th Cir. 3.5 (2003); Pattern Crim. Jury Instr. 11th Cir. BI 3 (2003); Pattern Crim. Jury Instr. 5th Cir. 1.05 (2001); Pattern Crim. Jury Instr. 1st Cir. 3.02 (1998); 1 Neb. Prac., NJI2d Crim. 2.0 (2008-2009 ed.); Federal Judicial Center, Pattern Crim. Jury Instr. 21 (1988).

[58] *See, e.g.*, *United States v. Hynes*, 467 F.3d 951, 957 (6th Cir. 2006); *United States v. Stewart*, 306 F.3d 295, 306-07 (6th Cir. 2002).

[59] *See, e.g.*, *State v. Hyde*, 921 P.2d 655, 681-82 (Ariz. 1996); *People v. Taylor*, 229 P.3d 12, 60 & nn.14-15 (Cal. 2010); *State v. Morant*, 701 A.2d 1, 12-13 (Conn. 1997); *State v. Hampton*, 959 S.W.2d 444, 451 (Mo. 1997).

## XIV.
### THE SUFFICIENCY OF THE EVIDENCE OF PREMEDITATION

Mr. Hester contends that the State's evidence was insufficient to establish that he acted with premeditation. After careful study of the parties' briefs with regard to the issue of premeditation, we are persuaded that the decision of the Court of Criminal Appeals on this issue should be affirmed. Moreover, because we find that the opinion of the Court of Criminal Appeals, *State v. Hester*, 2009 WL 275760, at *25-26, adequately states the facts and the law on this issue, we adopt this portion of the opinion as the opinion of this Court and include it as an appendix to this opinion.

## XV.
### THE TRIAL COURT'S EXCLUSION OF MITIGATION EVIDENCE DURING THE SENTENCING PHASE OF THE TRIAL

Mr. Hester takes issue with four of the trial court's decisions regarding the evidence he intended to introduce during the sentencing phase of the trial. This evidence related to (1) Ms. Hester's opposition to the death penalty, (2) a neighbor's opinion regarding the level of Mr. Hester's intoxication on the evening of December 14, 1999, (3) notes taken by nurses at Erlanger Medical Center regarding statements made by Ms. Hester after she was admitted for treatment, and (4) the opinion of a medical examiner regarding whether the manner in which Mr. Haney died suggested torture. The Court of Criminal Appeals found that the trial court did not commit reversible error with regard to the introduction of this evidence. We have determined that the Court of Criminal Appeals reached the correct result.

### A.

During the sentencing phase of the trial, Mr. Hester proposed to call Ms. Hester as a witness to testify that she did not believe in the death penalty and, therefore, that she did not believe that Mr. Hester should be punished by death. The trial court excluded this testimony based on the following reasoning:

> [N]umber one, it invades the province of the jury. Number two, she's not even in a position to speak for the Haney family . . . . I wouldn't let her say she wanted him hung up by the toes for what he did to her. That's the jury's province. Certainly, she couldn't speak what she thought ought to happen to him on behalf of the Haney family, and that's what you're really doing . . . . [N]obody's going to be able to recommend or tell their opinion of the death penalty or whether they're for it or against it or what they ought to do or whether they ought to have it or

not have it . . . -- that invades the province of the jury and the legislature has set out a very definite way of procedure to reach the death penalty, and it does not include the opinion of anybody, lay or expert. There's aggravating and mitigating circumstances . . . . I don't think this will qualify as an aggravating circumstance or a mitigating circumstance either one . . . . I noticed the Haney family has not stated what they want to happen, and if someone in the Haney family was to come in and say they wanted him to have the death penalty, I wouldn't let them do it. I'm certainly not going to let somebody outside the Haney family come in and say, "We don't want him to have it." That wouldn't be fair either.

The Court of Criminal Appeals agreed "with the trial court's characterization of the proposed testimony as essentially irrelevant to the jury's determination of the appropriate sentence for the murder of Mr. Haney." *State v. Hester*, 2009 WL 275760, at *31. In addition, the court noted that "the defendant failed to make a contemporaneous offer of proof regarding Ms. Hester's proposed testimony at trial. Accordingly, the defendant cannot demonstrate any prejudice resulting from the trial court's refusal to allow Ms. Hester's testimony, and he cannot prevail on this issue." *State v. Hester*, 2009 WL 275760, at *31.

In general, decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion. Accordingly, reviewing courts will not disturb these decisions on appeal unless the trial court has abused its discretion. *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010); *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). The Tennessee Rules of Evidence are too restrictive and unwieldy to be applied strictly in the arena of capital sentencing. *See*, *e.g.*, *State v. Sims*, 45 S.W.3d 1, 14 (Tenn. 2001); *see also* Tenn. Code Ann. § 39-13-204(c) (2003). Accordingly, the Tennessee Rules of Evidence "should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances." *State v. Sims*, 45 S.W.3d at 14.

Mr. Hester does not cite a single authority supporting his argument that a court must admit evidence that a surviving victim opposes the death penalty and, therefore, does not believe that the defendant should be executed for the murder of another deceased victim. Nor does our review of the case law suggest that such testimony is required to be admitted. To the contrary, such testimony is considered to be irrelevant, Wayne A. Logan, *Opining on Death: Witness Sentence Recommendations in Capital Trials*, 41 B.C. L. Rev. 517, 539

(2000), and courts have consistently held that such testimony is inadmissible.[60] Accordingly, we decline to find that the trial court abused its discretion by declining to permit Ms. Hester to testify about her philosophical opposition to the death penalty or her opinion that Mr. Hester should not receive the death penalty.

**B.**

At some point Jeffrey Coleman, a neighbor of Mr. Haney and Ms. Hester, gave a sworn statement that shortly before the murder, Mr. Hester "was drunk, I could not smell it, but I could tell by the way he was walking." Mr. Hester's lawyer attempted to cross-examine Agent Brakebill regarding Mr. Coleman's statement during the sentencing phase of the trial, but the trial court prevented him from doing so on the ground that Mr. Coleman's statement was hearsay.

On appeal, the Court of Criminal Appeals concluded that excluding Mr. Coleman's statement on hearsay grounds was error in the context of a capital sentencing hearing. However, noting that "the jury heard testimony from two other witnesses, Ms. Hester and her son-in-law, Tim Lynn, that the defendant was 'clearly intoxicated' and 'very drunk' just before the fire," the Court of Criminal Appeals concluded that the error was harmless beyond a reasonable doubt because the "excluded evidence was cumulative to testimony that the jury heard from two other witnesses, including the surviving victim." *State v. Hester*, 2009 WL 275760, at *32. The State does not dispute the Court of Criminal Appeals' conclusion that

---

[60]*See, e.g., United States v. Brown*, 441 F.3d 1330, 1351 & n.8 (11th Cir. 2006) (noting that victim's family may neither testify as to believing that the death penalty should be imposed nor that it should not); *Robison v. Maynard*, 943 F.2d 1216, 1217 (10th Cir. 1991) (determining that there is no support for the proposition that mitigation evidence is required to include testimony as to the opinion of the victim's family that the defendant should not receive the death penalty); *Dotch v. State*, ___ So.3d ___, 2010 WL 1260162, at *50-52 (Ala. Crim. App. 2010) (concluding the trial court did not err by excluding testimony from defendant's family as to their opinion that the defendant should receive life imprisonment instead of the death penalty); *Greene v. State*, 37 S.W.3d 579, 583-86 (Ark. 2001) (concluding that victim's wife's opinion that the defendant should not receive the death penalty was admissible neither as mitigation evidence nor as victim impact testimony); *State v. Trostle*, 951 P.2d 869, 887 (Ariz. 1997) (excluding evidence of the victim's family's opposition to defendant receiving the death penalty); *Campbell v. State*, 679 So. 2d 720, 725 (Fla. 1996) (finding testimony that murder victim had been opposed to capital punishment to be properly excluded); *Kaczmarek v. State*, 91 P.3d 16, 30-34 (Nev. 2004) (finding that opinions in opposition to the death penalty by the victim's family are neither admissible as mitigation evidence nor victim impact testimony); *State v. Barone*, 969 P.2d 1013, 1031-32 (Or. 1998) (concluding that evidence of victim's opposition to the death penalty was properly excluded); *State v. Gardner*, 789 P.2d 273, 286 (Utah 1989) (concluding that the opinion of a victim, victim's family, or victim's associates as to the death penalty and whether it should be applied to a defendant, even where those opinions are in opposition thereto, are inadmissible); *see also State v. Nesbit*, 978 S.W.2d 872, 888 n.8 (Tenn. 1998) (noting the inappropriateness of victim's family members testifying regarding the appropriate sentence).

the trial court erred by excluding Mr. Coleman's statement but insists that the Court of Criminal Appeals properly found that the trial court's error was harmless.

Because of the potential danger posed to the reliability of the sentencing determination, an erroneous exclusion of mitigation evidence in the sentencing phase of a capital trial is deemed to be a non-structural constitutional error. *See State v. Rodriguez,* 254 S.W.3d at 371; *State v. Thacker*, 164 S.W.3d 208, 224-25 (Tenn. 2005); *State v. Austin*, 87 S.W.3d 447, 459 (Tenn. 2002); *see also State v. Rimmer*, 250 S.W.3d at 24. Accordingly, the burden is upon the State to show that the error is harmless by demonstrating beyond a reasonable doubt that the error did not contribute to the verdict or sentence obtained. *State v. Rodriguez,* 254 S.W.3d at 371.

Mr. Coleman's statements regarding Mr. Hester's intoxication on the evening of December 14, 1999 differ from Mr. Lynn's testimony in only one way. Mr. Coleman testified that he could tell that Mr. Hester was intoxicated from the way that Mr. Hester was walking. Mr. Lynn's testimony about Mr. Hester's intoxication suggested that he could not tell Mr. Hester was intoxicated from how he was walking. In all other respects, Mr. Coleman's testimony is merely cumulative to that of Ms. Hester and Mr. Lynn.

The evidence that Mr. Hester was intoxicated when he set Mr. Haney on fire was ample and substantial. Ms. Hester testified that Mr. Hester "was very highly intoxicated and just real out of it . . . because he was so highly intoxicated . . . he was just mumbling. He couldn't, you know, just out of it, in other words, intoxicated." She also testified, however, that "[w]ithout a doubt . . . I know he realized what he was doing because . . . he done too many things . . . unplugging the smoke alarm, throwing the dog out in the yard . . . he was highly intoxicated but . . . I still believe he had enough mind to know what he was doing." The defense also elicited from Mr. Lynn testimony that shortly before the murder Mr. Hester had been "very drunk" and that he had been drinking a 32-ounce bottle of beer.

To the extent that Mr. Coleman's testimony concurred with others that Mr. Hester was drunk, it was merely cumulative and would not have affected the verdict. Insofar as it differs, we are persuaded beyond a reasonable doubt that admission of testimony that there was something in Mr. Hester's gait that suggested to Mr. Coleman that Mr. Hester was drunk would not have affected the jury's decision to impose the death penalty. Accordingly, we find any error in excluding this evidence to be harmless beyond a reasonable doubt.

## C.

During the sentencing phase of the trial, Mr. Hester attempted to introduce two pages from Erlanger Medical Center's lengthy records regarding Ms. Hester's treatment following the December 14, 1999 fire. These pages contained notes made by either Lynette Stewart

or Nadine Emerson, two of Erlanger's nurses who cared for Ms. Hester when she was first admitted to the hospital on December 14, 1999. These notes reflected that Ms. Hester purportedly stated that Mr. Hester had attempted to pull her out of the burning mobile home.

The trial court expressed skepticism about the reliability of these records because Ms. Hester would have been seriously injured and heavily medicated when the statements were made. After taking a recess to consider the matter, the trial court concluded that it would permit the evidence to be introduced through a proper witness. The trial court also stated that it would permit Mr. Hester to recall Ms. Hester for that purpose. Rather than pursuing the matter, Mr. Hester's lawyer informed the trial court that this evidence appeared to be "irrelevant" because Mr. Hester planned to testify.

On appeal, Mr. Hester argued that the trial court erred by excluding the notes. The Court of Criminal Appeals disposed of this argument in the following manner:

> Although the evidence was relevant, it was not presented through an appropriate witness. The record does not reflect that either the nurse or a proper record custodian was present to testify regarding the nurse's notes, and the defendant informed the trial court that he would not be calling Ms. Hester herself because she had already indicated she had no memory of the relevant time period. Further, the defendant made no offer of proof through any witness, and the Erlanger records were not made an exhibit to the record. As a result, the defendant cannot meet his burden of showing how he was prejudiced by the challenged ruling and is not entitled to relief on this claim.

*State v. Hester*, 2009 WL 275760 at *33.

Mr. Hester has not asserted that he tried to procure the appearance of Ms. Stewart, Ms. Emerson, or the official custodian of Erlanger's medical records. Nor has he claimed that the trial court or the State interfered with or prevented him from locating and subpoenaing these witnesses. Instead, he focuses his argument on his belief that it would have been futile to recall Ms. Hester because she would have been unable to recall whether or not she made the statement recorded in the notes and on defense counsel's distraction resulting from the defendant's sudden request to address the jury.[61]

---

[61] In his supplemental brief, Mr. Hester's lawyer states that he would have submitted the medical records if not for the distraction caused by his client's sudden interest in addressing the jury. He has not, however, explained how his client's conduct caused the trial court to commit error.

Whether recalling Ms. Hester would have been a purposeless endeavor is not material. Nor is any distraction Mr. Hester might have caused at this stage of the proceeding. The trial court afforded Mr. Hester several reasonable alternatives for admitting these recorded statements into evidence despite the fact that his lawyer did not have an appropriate witness at hand to do so.[62] Mr. Hester's lawyer failed to pursue any of these alternatives. We conclude that Mr. Hester "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of [the alleged] error." Tenn. R. App. P. 36(a). Accordingly, he is not entitled to relief on this issue.

## D.

Mr. Hester contends that the trial court erred by preventing him from questioning Dr. Ron Toolsie, the medical examiner, regarding whether the manner in which Mr. Haney died "suggests any torture." After careful study of the parties' briefs with regard to this issue, we are persuaded that the decision of the Court of Criminal Appeals on this issue should be affirmed. Moreover, because we find that the opinion of the Court of Criminal Appeals, *State v. Hester*, 2009 WL 275760, at *33-34, adequately states the facts and the law on this issue, we adopt this above stated portion of the opinion as the opinion of this Court and include it as an appendix to this opinion.

## XVI.
### THE REPLACEMENT OF A JUROR DURING THE SENTENCING PHASE OF THE TRIAL

Mr. Hester takes issues with the trial court's decision to replace a juror who became ill following the guilt phase of the trial with an alternative juror who had not participated in the guilt phase deliberations. The Court of Appeals found no fault with the trial court. We have determined that the trial court did not err by replacing the juror who became ill with an alternate juror.

## A.

On the evening of March 11, 2005, following the completion of the guilt phase of Mr. Hester's trial, one of the jurors informed the court officers that he was feeling ill. The trial court talked with the juror and then informed the lawyers that the juror suffered from diverticulosis that was causing him to have panic attacks. The trial court observed that the juror was "not in good shape right now." Accordingly, the trial court informed the lawyers

---

[62] In addressing the admissibility of these medical records, Mr. Hester failed to apprise the trial court that he had an affidavit from the custodian of the records. Consequently, the question of whether such an affidavit would be sufficient for admitting the records was not before the trial court.

that it was excusing the juror and that it intended to replace the stricken juror with one of the alternate jurors. The juror was subsequently transported to the emergency room by ambulance.

At the beginning of the proceedings the following morning, Mr. Hester's lawyer took issue with the actions that the trial court had taken at the close of proceedings the evening before. He argued that the mistrial was necessary because the alternate juror had not been one of the twelve jurors who had deliberated and returned a verdict during the guilt phase of the trial. The trial court declined to grant a mistrial. On appeal, the Court of Criminal Appeals concluded "that the trial court did not err in replacing the stricken juror with an alternate before the jury retired to deliberate the defendant's sentence in the penalty phase of his capital trial." *State v. Hester*, 2009 WL 275760, at *37. Before this Court, Mr. Hester contends that the trial court actions violated his rights under the Fifth,[63] Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Section 6 of the Tennessee Constitution, and Tennessee Rule of Criminal Procedure 24. We disagree.

Tenn. Code Ann. § 39-13-204(a) requires bifurcated trials in first degree murder cases where the State seeks the death penalty. Specifically, the statute provides that "[t]he separate sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt, subject to the provisions of subsection (k) relating to certain retrials on punishment." Tenn. Code Ann. § 39-13-204(a).[64]

With regard to the use of alternate jurors, Tenn. R. Crim. P. 24(f)(2)(B) states that

> [a]lternate jurors in the order in which they are called shall replace jurors who become unable or disqualified to perform their duties prior to the time the jury retires to consider its verdict. An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict.

As noted by the Court of Criminal Appeals, these

> provisions do not . . . speak directly to the use of alternate jurors in the context of a bifurcated capital trial. Further, our research

---

[63]Mr. Hester offers no express explanation of how the Fifth Amendment to the United States Constitution is applicable to his argument nor is a connection immediately apparent to this Court. We find this argument to be waived.

[64]Tenn. Code Ann. § 39-13-204(k) provides, in part, that "if the court finds error alone in the trial determining punishment, a new trial on the issue of punishment alone shall be held by a new jury empanelled for such purpose."

has revealed no Tennessee case addressing the use of alternate jurors during a capital trial after a determination of the defendant's guilt, but before sentencing deliberations have begun.

*State v. Hester*, 2009 WL 275760, at *36. For reasons addressed below, we have concluded that the trial court did not err by replacing the ill juror with an alternate juror following the conclusion of the guilt phase but prior to the beginning of sentencing deliberations.

**B.**

We first turn to Mr. Hester's contention that it is unconstitutional to replace one of the jurors who participated in the guilt phase deliberations of his trial with an alternate juror who did not. While other courts have declined to find such actions constitutionally impermissible,[65] Mr. Hester insists that our decision in *State v. Bobo*, 814 S.W.2d 353 (Tenn. 1991) requires us to reach a different result.

The substantive differences between the circumstances involved in *State v. Bobo* and the circumstances of this case undermine Mr. Hester's argument. The *Bobo* case did not involve a bifurcated trial. In *State v. Bobo*, the jury had already commenced its deliberations when the juror was replaced, and the alternate juror had already left the courthouse after being discharged by the trial court. *State v. Bobo*, 814 S.W.2d at 354-55. In addition, the trial court failed to instruct the jury to begin its deliberations anew after the alternate juror was seated. *State v. Bobo*, 814 S.W.2d at 355. Accordingly, this Court found that "without an explicit instruction to that effect from the trial judge, we cannot assume that the reconstituted jury panel started from the beginning." *State v. Bobo*, 814 S.W.2d at 356. Consequently, it was "not at all certain that the alternate juror . . . took part in all the deliberations," thereby depriving the defendants of their constitutional right to a trial by jury. *State v. Bobo*, 814 S.W.2d at 356.

The facts of Mr. Hester's case simply do not correspond with the circumstances that confronted this Court in *State v. Bobo*.[66] Accordingly, we decline to find that our holding in *State v. Bobo* requires us to hold that the trial court infringed on Mr. Hester's constitutional

---

[65]*See, e.g., Goff v. Bagley*, 601 F.3d 445, 468 (6th Cir. 2010); *State v. Garcia*, 226 P.3d 370, 385-86 (Ariz. 2010); *Shreeves v. United States*, 395 A.2d 774, 787 n.17 (D.C. 1978); *Jennings v. State*, 512 So. 2d 169, 172-73 (Fla. 1987); *Miller v. State*, 29 P.3d 1077, 1081-83 (Okla. Crim. App. 2001); *see also People v. Fields*, 673 P.2d 680, 693 n.9 (Cal. 1983); *State v. Moore*, 550 A.2d 117, 150-51 (N.J. 1988).

[66]Likewise, the circumstances of this case are not similar to the circumstances addressed in *State v. Cleveland*, 959 S.W.2d 548, 552 & n.3 (Tenn. 1997), where the jury included a juror who had missed a portion of the proceedings.

rights when it replaced an ill juror with an alternate juror before the jury began its deliberations following the sentencing phase of the trial.

## C.

The more complicated matter is whether the procedure utilized by the trial court in replacing an ill juror following the guilt phase but prior to the deliberations during the sentencing phase violated the Tennessee Rules of Criminal Procedure or the statutory provisions relating to capital sentencing. Other courts, both state and federal, that have considered this question with regard to similar language under their respective statutes and procedural rules have found substitution during the sentencing phase to be consistent with their applicable statutory and rule provisions.

Considering strikingly similar language both in its statute and its procedural rule,[67] the Wyoming Supreme Court found no violation when the trial court replaced a juror during the sentencing phase of a capital proceeding. The Court explained its rationale as follows:

> [I]t seems clear that the term "verdict" used in Rule 24(e) must be read in a broad sense to refer to a final jury decision on any matter specifically committed to it. Not only must it be read to refer to a determination of the defendant's guilt of a crime, but also to a jury's separate determination of a matter of the sort typically involved in bifurcated proceedings – such as a defendant's habitual criminal status or the propriety of the death penalty. We agree with the State that this was precisely the intent of the statute and, pursuant to such a view, a capital case jury may be said to retire to consider its verdict twice, once for the guilt phase and once for the sentencing phase, and alternate jurors are authorized to serve in sentencing phase deliberations

---

[67] *Compare* Wyo. Stat. Ann. § 6-2-102(b) (2009) ("In all other cases the sentencing hearing shall be conducted before the jury which determined the defendant's guilt . . . .") *with* Tenn. Code Ann. § 39-13-204(a) ("The separate sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt . . . ."). *Compare* Wyo. R. Crim. P. 24(e) (2003) ("Alternate jurors . . . shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. . . . An alternative juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.") *with* Tenn. R. Crim. P. 24(f)(2)(B) ("Alternate jurors in the order in which they are called shall replace jurors who become unable or disqualified to perform their duties prior to the time the jury retires to consider its verdict. An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict."). Wyoming Rule of Criminal Procedure 24(e) has subsequently been amended to expressly provide that "[a]n alternate juror who does not replace a regular juror may be discharged or retained after the jury retires to consider its verdict. When the jury retires to consider the verdict, the court in its discretion may retain the alternate jurors during deliberations."

even if they did not serve during the guilt phase, so long as the replacement is made before the jury retires to begin sentencing phase deliberations. The legislative intent of the statutory phrase "the jury which determined defendant's guilt" includes properly substituted alternates, and we find no error in denying the motion for a mistrial.

*Olsen v. State*, 67 P.3d 536, 606 (Wyo. 2003).

In a case with close factual parallels to the case before us, the Supreme Court of Ohio, interpreting language similar to the language of Tennessee's provisions,[68] also found no error in substituting an alternate juror prior to beginning the sentencing deliberations. Like the Wyoming Supreme Court, the Supreme Court of Ohio found no violation of Ohio's statutory capital sentencing provisions or its Rules of Criminal Procedure where an alternate juror is substituted for another juror after the guilt phase verdict but before deliberations begin in the sentencing phase. *State v. Hutton*, 559 N.E.2d 432, 443-45 (Ohio 1990).[69]

The Supreme Court of Missouri reached the same conclusion when it held:

[a]llowing juror replacement during penalty phase, but before the jury retires to deliberate, is entirely consistent with both the legislative purpose of preventing mistrials and the statutory

---

[68] Ohio's statutory capital provision provided for sentencing by the "the trial jury" while Ohio R. Crim. P. 24(F) (1988) provided that

[a]lternate jurors . . . shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties . . . . An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.

[69] The Ohio Rules of Criminal Procedure have been amended to more clearly address circumstances like those arising in the case before us. They now provide that

[t]he court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.

Ohio R. Crim. P. 24(G)(1). In addition, Ohio Rule of Criminal Procedure 24(G)(2) adds that in capital cases "any alternate juror shall continue to serve if more than one deliberation is required. If an alternate juror replaces a regular juror after a guilty verdict, the court shall instruct the alternate juror that the juror is bound by that verdict."

exception. This Court concludes that the legislature intended to afford the same protection against mistrials in bifurcated cases that it afforded in non-bifurcated cases; therefore, alternate jurors may properly serve in sentencing phase deliberations only. This conclusion, of course, is also entirely consistent with the practice of conducting penalty phase trials with completely new juries whenever the imposition of the death penalty is overturned on appeal.

*State v. Johnson*, 968 S.W.2d 123, 132 (Mo. 1998). The court has also found that the Missouri statutory scheme, "which requires that a first-degree murder defendant receive a guilt phase and a penalty phase 'before the same trier,' does not prohibit the use of an alternate juror before deliberations begin." *State v. Middleton*, 995 S.W.2d 443, 459-60 (Mo. 1999). The court did specify that substitution would be prohibited if the deliberations had already begun. *State v. Middleton*, 995 S.W.2d at 460; *State v. Johnson*, 968 S.W.2d at 132.

Federal courts have addressed comparable language under the Federal Death Penalty Act[70] and a previous version of Fed. R. Crim. P. 24(c).[71] Confronted by the replacement of a juror in a capital proceeding following the guilt phase but prior to deliberations in the sentencing phase, the United States Court of Appeals for the Seventh Circuit found that, under the existing statutory and procedural rules, "no provision [had been made] for the situation that occurred here, leaving it to the good sense of the judges to deal with." *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000). The Court noted that the alternate juror "had sat through the entire trial, which is the important thing." *United States v. Johnson*, 223 F.3d at 670. The United States Court of Appeals for the Eleventh Circuit agreed, noting that "[t]he trial court's retention of alternates was a wise decision and proved its worth by allowing the court to avoid possibly declaring a mistrial after a complex capital case had been

---

[70] 18 U.S.C. § 3593(b)(1) (2006) provides that the capital sentencing hearing will be held "before the jury that determined the defendant's guilt."

[71] *See* Fed. R. Crim. P. 24(c) (1998) (providing that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict"). Fed. R. Crim. P. 24(c)(3) has been amended and now provides that

> [t]he court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.

ably presented by both parties over the course of several weeks." *Battle v. United States*, 419 F.3d 1292, 1302 (11th Cir. 2005).[72]

Mr. Hester failed to address whether the trial court's actions were contrary to Tenn. Code Ann. § 39-13-204(a)[73] in his principal brief, supplemental brief, or reply brief. Accordingly, any argument that the trial court's actions were inconsistent with the requirement of the case being heard by the "same jury" pursuant to Tenn. Code Ann. § 39-13-204(a) have been waived.

We note that alternate jurors in Tennessee are selected in the same manner as the regular jurors and that they hear the same evidence presented during the guilt phase of the trial that the regular members of the jury hear. Given the substantial authority finding that statutory provisions similar to ours authorize the replacement of jurors with alternates during the sentencing phase of a capital proceeding, we have concluded that the trial court's decision to replace an ill juror with a non-discharged alternate juror does not appear to constitute a plain error under Tenn. Code Ann. § 39-13-204(a).

Finally, Mr. Hester argues that the trial court's replacement of the stricken juror with an alternate juror violated Tenn. R. Crim. P. 24(f)(2)(B). This rule states that

> [a]lternate jurors in the order in which they are called shall replace jurors who become unable or disqualified to perform their duties prior to the time the jury retires to consider its verdict. An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict.

By its own terms, this rule does not clearly apply to the replacement of a juror in the context of a bifurcated capital case. In the context of such proceedings, there are, as ably noted by our judicial colleagues on other state courts, essentially two verdicts – one for the guilt phase and one on the question of sentencing. We find no error in the trial court's decision, which ultimately was shown to be prudent, to not discharge all of the alternate jurors prior to the commencement of deliberations by the jury following the sentencing hearing.

---

[72] The United States Court of Appeals for the Eighth Circuit in *United States v. Honken*, 541 F.3d 1146, 1165-66 (8th Cir. 2008) went a step further, finding no error in replacing a juror with an alternate after deliberations had begun for the capital sentencing phase.

[73] Tenn. Code Ann. § 39-13-204(a) provides, in part, that "[t]he separate sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt, subject to the provisions of subsection (k) relating to certain retrials on punishment."

# XVII.
## MR. HESTER'S SENTENCES FOR ATTEMPTED FIRST DEGREE MURDER AND AGGRAVATED ARSON

Mr. Hester takes issue with the sentences he received for his two non-capital convictions on three grounds. First, he insists that the Court of Criminal Appeals erred by affirming sentences greater than the minimum fifteen-year sentences for these offenses. Second, he asserts that the Court of Criminal Appeals erred by affirming the trial court's decision to require that his non-capital sentences be served consecutively. Finally, he argues that the Court of Criminal Appeals erred by affirming the manner in which the trial court considered his mitigating evidence.

## A.

In addition to the death sentence Mr. Hester received for the murder of Mr. Haney, he received two non-capital sentences as a result of his convictions for attempted first degree murder and aggravated arson. The trial court sentenced Mr. Hester to twenty-five years in prison for the attempted first degree murder conviction and twenty years in prison for the aggravated arson conviction. The trial court also ordered these sentences to be served consecutively to each other and consecutively to the death sentence.

Mr. Hester argued in the Court of Criminal Appeals that the manner in which the trial court sentenced him for his non-capital convictions violated *Blakely v. Washington*, 542 U.S. 296 (2004) because the trial court based the sentences on enhancement factors that had neither been submitted to nor found by the jury. He also asserted that the trial court had erred by ordering consecutive sentencing and by failing to properly credit and weigh his mitigating evidence. The State conceded that the trial court ran afoul of *Blakely v. Washington* by relying on factors that were neither admitted by Mr. Hester nor found by the jury beyond a reasonable doubt. However, the State argued that the trial court's consideration of factors neither admitted by Mr. Hester nor found by the jury was harmless error because "no reasonable jury would have failed to find the facts beyond a reasonable doubt necessary to support each of these factors."

The Court of Criminal Appeals did not agree with the State's contention that the trial court's consideration of factors that were neither admitted by Mr. Hester nor found by the jury was harmless error. Noting that the applicable sentencing statutes required the imposition of a presumptive sentence "if there are no other enhancement or mitigating factors,"[74] the Court of Criminal Appeals decided to approach the non-capital sentences Mr.

---

[74]Tenn. Code Ann. § 40-35-210(c) (2003).

Hester received on the basis that no enhancement or mitigating factors were applicable.[75] Accordingly, the Court of Criminal Appeals affirmed Mr. Hester's twenty-year sentence for aggravated arson because it was the presumptive sentence for the offense. However, the Court of Criminal Appeals did not affirm Mr. Hester's twenty-five-year sentence for attempted first degree murder because it was greater than the presumptive sentence and because the trial court had considered "three impermissible enhancement factors." Instead, the Court of Criminal Appeals reduced Mr. Hester's sentence for attempted first degree murder from twenty-five years to twenty years – the presumptive sentence for attempted first degree murder. *State v. Hester*, 2009 WL 275760, at *43.

The Court of Criminal Appeals also determined that the trial court properly considered Mr. Hester's mitigating evidence. *State v. Hester*, 2009 WL 275760, at *43. Finally, the Court of Criminal Appeals found no error with regard to the trial court's decision to impose consecutive sentences for Mr. Hester's non-capital convictions. *State v. Hester*, 2009 WL 275760, at *44.

Both Mr. Hester and the State disagree with the manner in which the Court of Criminal Appeals addressed the issues regarding the non-capital sentences. Mr. Hester continues to take issue with any sentences greater than fifteen years and with being required to serve these sentences consecutively. The State has abandoned its argument that the trial court's consideration of enhancement factors that were neither admitted by Mr. Hester nor found by the jury was harmless error, and it has declined to defend the sentences for Mr. Hester's non-capital convictions. Instead, it asserts that these sentences should be vacated and that the case should be remanded for resentencing "with instructions to consider only the defendant's prior convictions as an enhancement factor in the absence of the defendant['s] stipulation to any others."

While the State does not directly address the Court of Criminal Appeals' decision regarding the manner in which the trial court weighed Mr. Hester's mitigating evidence, its assertion that the non-capital convictions should be vacated and that the case should be remanded for resentencing implicitly concedes that reconsideration of Mr. Hester's mitigating evidence is appropriate. The State also argues that Mr. Hester's briefing on the consecutive sentencing issue is so deficient that he has waived consideration of the issue.

---

[75]The Court of Criminal Appeals reasoned that no enhancement factors were applicable either because they had not been admitted or proved or because, in the case of Mr. Hester's prior convictions, the trial court had assigned little weight to the factor. With regard to the mitigating factors, the Court noted that the trial court "essentially found that the mitigating evidence carried little to no weight." *State v. Hester*, 2009 WL 275760, at *43.

**B.**

Prior to 2005, Tennessee's sentencing statutes established a sentencing range and a "presumptive sentence" for all classes of felonies other than capital murder. *State v. Banks*, 271 S.W.3d at 144. Under the sentencing procedures required by these statutes, a trial court could not increase a defendant's sentence above the presumptive sentence unless it found that enhancement factors existed. *State v. Banks*, 271 S.W.3d at 144. If the trial court determined that enhancement factors existed, it then had the authority to increase a defendant's sentence up to the maximum sentence provided for that range. *State v. Banks*, 271 S.W.3d at 144.

The United States Supreme Court's decision in *Blakely v. Washington* placed a constitutional cloud over the power of trial courts in Tennessee to sentence defendants beyond the statutory presumptive sentence based on facts not reflected in the jury's verdict. Accordingly, in 2005, the Tennessee General Assembly amended the sentencing statutes to make the statutory sentencing guidelines advisory and to remove the presumptive sentences for each class of felonies other than capital murder. *State v. Banks*, 271 S.W.3d at 144-45; *State v. Carter*, 254 S.W.3d 335, 342-43 (Tenn. 2008). The removal of the presumptive sentences and rendering the guidelines advisory cured the Sixth Amendment defect noted in *Blakely v. Washington* and enabled Tennessee's trial courts to sentence a defendant to any sentence within the applicable range as long as the length of the sentence is "consistent with the purposes and principles" of the sentencing statutes. *State v. Banks*, 271 S.W.3d at 145 (quoting Tenn. Code Ann. § 40-35-210(d) (2006)).

In revising Tennessee's sentencing provisions, the General Assembly authorized defendants, such as Mr. Hester, whose crimes were committed before June 7, 2005 but after July 1, 1982, to be sentenced under the new law by executing a waiver of their ex post facto protections.[76] Mr. Hester declined to execute this waiver. Accordingly, his sentencing should have been in accordance with the sentencing procedures established by the pre-2005 sentencing scheme subject to the limitations imposed by the Sixth Amendment.

**C.**

While it is not lost on us that the State has recommended that the sentences for Mr. Hester's non-capital convictions should be vacated and that the case be remanded for resentencing, we are not required to accept the State's concession or to follow its recommendation. *Harris v. State*, 301 S.W.3d 141, 145 (Tenn. 2010); *Barron v. State, Dep't of Human Servs.*, 184 S.W.3d 219, 223 (Tenn. 2006). While a remand may be an appropriate remedy to redress a trial court's error in sentencing, it is not the only remedy available to the appellate courts. The Criminal Sentencing Reform Act of 1989 expressly empowers the

---

[76] *See* Act of May 18, 2005, ch. 353, §§ 18, 22, 2005 Tenn. Pub. Acts 788, 796-97.

appellate courts to "direct the entry of an appropriate sentence" without remanding for resentencing. Tenn. Code Ann. § 40-35-401(c)(3) (2006). Under the circumstances of the present case, we have concluded that entry of appropriate sentences, rather than a remand for resentencing, is the proper remedy for the statutory and constitutional violations that occurred with regard to Mr. Hester's sentencing on his non-capital convictions.

When a defendant challenges a sentence on appeal, he or she bears the burden of showing that the sentence is improper. Tenn. Code Ann. § 40-35-401, sentencing comm'n cmts. Tennessee's appellate courts review challenges to the length, range, or manner of service of a sentence de novo with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d); *State v. Franklin*, 308 S.W.3d 799, 825 (Tenn. 2010). This presumption is conditioned, however, upon an affirmative showing that the trial court applied and considered the relevant facts and circumstances and adhered to the proper sentencing principles. *State v. Franklin*, 308 S.W.3d at 825; *State v. Carter*, 254 S.W.3d at 344-45; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Where a trial court fails to meet these requirements, an appellate court's review is de novo with no presumption of correctness. *State v. Franklin*, 308 S.W.3d at 825; *State v. Carter*, 254 S.W.3d at 345. As found by the Court of Criminal Appeals and conceded by the State, the trial court erred in sentencing Mr. Hester for his non-capital convictions. Accordingly, our review of the trial court's sentencing decisions with regard to Mr. Hester's non-capital convictions is de novo with no presumption of correctness.

For the purpose of this case, we find that Mr. Hester has carried his burden of demonstrating that his non-capital sentences were improper. The State has conceded that the trial court violated the Sixth Amendment by considering the enhancement factors included in Tenn. Code Ann. § 40-35-114(3)-(6), (10) (Supp. 1999). In light of the State's concession,[77] the balancing of the enhancing and mitigating factors in this case involves weighing Mr. Hester's mitigation evidence against his prior criminal history which includes numerous misdemeanor offenses and one felony theft conviction.

We have examined the portions of the record relevant to the sentences for Mr. Hester's two non-capital convictions. In light of the State's concessions, the evidence that

---

[77] As a general matter, Tennessee's appellate courts will only review issues that have been presented for review. Tenn. R. App. P. 13(b). While the courts may exercise their discretion to consider issues that are not raised by the parties, the appellate courts should exercise this discretion sparingly. Tenn. R. App. P. 13(b) advisory comm'n cmt. subdivision b. Given the complexity of the issue and the State's express concession that the trial court erred by considering the enhancement factors in Tenn. Code Ann. § 40-35-114(3)-(6), (10), we have determined that this is not the proper case to determine whether consideration of any of the enhancing factors relied on by the trial court, beyond the defendant's criminal history, would have been appropriate under the Sixth Amendment. Accordingly, our decision reflects no judgment on the merits of whether the State's concession accurately reflects the requirements of the Sixth Amendment.

informs our sentencing decision is limited to Mr. Hester's mitigating evidence and the evidence of Mr. Hester's prior criminal convictions. Based on our consideration of this evidence, we do not share the trial court's opinion regarding the insubstantiality of either Mr. Hester's mitigating evidence or the evidence regarding Mr. Hester's prior criminal convictions. Having considered the circumstances of the present case and the sentencing considerations set forth by the Tennessee General Assembly and having weighed the mitigating factors presented by Mr. Hester against the remaining enhancing factor, we have determined that weight and gravity of the factors is essentially in equipoise. Accordingly, consistent with Tenn. Code Ann. § 40-35-210(c) as it existed prior to its 2005 amendment, we have decided to impose twenty-year sentences on Mr. Hester for both of his aggravated arson and attempted first degree murder convictions.[78]

## D.

After careful study of the parties' briefs with regard to the issue of consecutive sentencing, we are persuaded that the decision of the Court of Criminal Appeals on this issue should be affirmed. Moreover, because we find that the opinion of the Court of Criminal Appeals, *State v. Hester*, 2009 WL 275760, at *44, adequately states the facts and the law on this issue, we adopt this above stated portion of the opinion as the opinion of this Court and include it as an appendix to this opinion. Accordingly, on remand, the trial court shall enter a revised judgment imposing on Mr. Hester consecutive twenty-year sentences for his convictions for attempted first degree murder and aggravated arson and directing that these sentences be served consecutively to his death sentence.

## XVIII.
### MR. HESTER'S DUE PROCESS CLAIMS

Mr. Hester mounts a due process attack on three fronts with regard to the manner in which the trial court conducted his trial. He asserts that the trial court infringed on his right to a fair trial by (1) undermining his ability to make an appropriate record by denying him compulsory process, (2) failing to recuse upon proper motion, and (3) declining to give him a hearing on his final motion for new trial.

## A.

Mr. Hester argued to the Court of Criminal Appeals that the trial court prevented him from making a meaningful record by denying his right to compulsory process with regard to literally hundreds of subpoenas sought in connection with his many pretrial motions. The

---

[78]Our independent consideration of Mr. Hester's mitigating evidence renders moot his arguments regarding the manner in which the trial court weighed and considered this evidence.

Court of Criminal Appeals was not persuaded that the trial court had either undermined Mr. Hester's ability to utilize compulsory process or his ability to make a meaningful record for purposes of appeal. The court also noted that Mr. Hester failed to support these arguments with proper citations to the record or to applicable legal authorities.

The briefs Mr. Hester has filed in this Court paint a dramatic picture of a big city lawyer who comes to a small town to represent an unpopular client facing the most serious of criminal sanctions. Despite the lawyer's best efforts to zealously represent his client, he is thwarted at practically every turn by an insular legal community that resists outsiders and by a cabal of local officials, including members of the District Attorney General's office, the Public Defender's office, the clerk's office, and even the court reporters, who are intent on preventing his client from receiving a fair trial.

These are serious, disquieting allegations that challenge the foundations of the criminal justice system in McMinn County. Were Mr. Hester's allegations substantiated, they would indelibly taint his trial. We have, however, reviewed the record in search of this substantiation and have not found it. What we have found are indications that the abrasive litigation strategy pursued by Mr. Hester's lead counsel caused great friction that resulted in conduct on all sides that did not meet the highest standards of civility and professionalism expected of legal professionals in capital proceedings.

Little would be gained by cataloguing all the lapses of professionalism by the various parties in this case. They did not deprive Mr. Hester of an essentially fair trial. Mr. Hester notes in his brief that "[d]efense counsel was appointed to do a job, not to look in the mirror and try to figure out how to be more popular in McMinn County. Attorneys are a sword, and a shield, and not required to make friends." True enough. Lawyers are expected to "zealously assert[] the[ir] client's position under the rules of the adversary system." Tenn. Sup. Ct. R. 8, Preamble (3). However, lawyers also have a "special responsibility for the quality of justice," and thus they are expected to "demonstrate respect for the legal system and for those who serve it," even when challenging the rectitude of official action. Tenn. Sup. Ct. R. 8, Preamble (2), (5).

This record does not substantiate Mr. Hester's allegations regarding a wholesale, arbitrary effort to undermine his lawyer's zealous representation by subverting his lawyer's efforts to obtain the evidence needed to present his defense. For all the reasons well explained by the Court of Criminal Appeals, Mr. Hester has not shown that reversible error was committed. Because we find that the opinion of the Court of Criminal Appeals, *State v. Hester*, 2009 WL 275760, at *10-12, adequately states the facts and the law on this issue, we adopt this portion of the opinion as the opinion of this Court and include it as an appendix to this opinion.

**B.**

Mr. Hester insists that the conduct of both trial judges who presided over this case was so prejudicial that it disqualified them. In his words, he argues that "[t]he caliber of improper commentary from the bench indicates a disregard for the institution of justice impaired to its keeper. Judge Wallace and Judge Ross both made inappropriate remarks and rulings necessitating recusal." The Court of Criminal Appeals found that neither trial judge's conduct provided a basis for requiring the judge to step aside.

Because Judge Ross recused himself almost two years prior to trial, there is little need to address Mr. Hester's argument that Judge Ross committed reversible error by failing to recuse himself. Accordingly, we are left to address Mr. Hester's argument that Judge Wallace, who replaced Judge Ross, should also have recused himself from the case. Because Mr. Hester never asked Judge Wallace to recuse himself, our review of this issue is limited to determining whether Judge Wallace committed plain error in failing to recuse himself sua sponte. *See Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009); *State v. Byington*, No. E2008-01762-CCA-R3-CD, 2009 WL 5173773, at *3 (Tenn. Crim. App. Dec. 30, 2009) (No Tenn. R. App. P. 11 application filed).

As a matter of custom and law, recusal decisions are made by the trial judge himself or herself. *See Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 239-40 (Tenn. 2010); *Bean v. Bailey*, 280 S.W.3d at 805. Unless the basis for recusal is one of the mandatory grounds in Article 6, Section 11 of the Tennessee Constitution or Tenn. Code Ann. § 17-2-101 (2009), these decisions are discretionary. *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). Appellate courts review discretionary recusal decisions using the "abuse of discretion" standard. *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d at 240; *Bean v. Bailey*, 280 S.W.3d at 805.

Pursuant to Tenn. Sup. Ct. R. 10, Canon 3(E)(1):

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> (b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served

-78-

during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it;

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent, or child wherever residing, or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;

(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

> (i) is a party to the proceeding, or an officer, director or trustee of a party;

> (ii) is acting as a lawyer in the proceeding;

> (iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

> (iv) is to the judge's knowledge likely to be a material witness in the proceeding.

This Court has held that a trial judge should grant a recusal motion when he or she "has any doubt as to his or her ability to preside impartially in the case or when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Bean v. Bailey*, 280 S.W.3d at 805 (citations omitted). Thus, even when a trial judge believes that he or she can act impartially, the judge should recuse himself or herself when the judge's impartiality might reasonably be questioned. *Bean v. Bailey*, 280 S.W.3d at 805. We have thoroughly reviewed the record of the proceedings after Judge Wallace replaced Judge Ross, and we find no basis for concluding that Judge Wallace committed plain error by failing to sua sponte recuse himself from Mr. Hester's case.

# C.

Mr. Hester argues that he is entitled to a new hearing on his motions for new trial with regard to his capital and non-capital convictions because the trial court did not provide him with a hearing on his motion for new trial related to his non-capital convictions. The Court of Criminal Appeals concluded that the manner in which the trial court considered Mr. Hester's motions for new trial was not reversible error. We agree.

Mr. Hester was convicted of first degree murder, attempted first degree murder, and aggravated arson on March 11, 2005. Following a capital sentencing hearing on March 12, 2005, he was sentenced to death for his first degree murder conviction. On August 12, 2005, Mr. Hester filed his first motion for a new trial. He filed an amended motion for new trial on October 17, 2005 and a second amended motion for new trial on November 3, 2005.

In response to Mr. Hester's seriatim new trial motions, the State moved to dismiss or to conform Mr. Hester's motions to Tenn. R. Crim. P. 47. Mr. Hester consented to striking his previous new trial motions as long as he was given "leave to re-file in a more organized and citable format." In an order filed on November 14, 2005, the trial court stated:

> [a]fter reviewing the amended motion for new trial, this court could not be clear on the specific nature of the exact claims other than that he was claiming everything was error. Accordingly, by 12/1/05 the defendant shall submit an amended motion which concisely states with clarity the errors alleged in the motion for new trial.

On December 1, 2005, Mr. Hester filed an "Abridged Motion for New Trial" in accordance with the trial court's order.

On February 16, 2006, the trial court conducted a sentencing hearing and entered judgments on Mr. Hester's non-capital convictions. On that same day, without objection, the trial court also conducted a hearing on Mr. Hester's abridged motion for new trial that focused on his capital conviction and sentence. During this hearing, Mr. Hester's lead counsel stated, "[g]iven the number of filings, . . . I don't really have any argument on my motion for new trial. I've put everything I think I want to say in writing."

The Court of Criminal Appeals's opinion describes what transpired in relation to the hearing on February 16, 2006:

> Both the trial court and defense counsel acknowledged that, following the hearing, Mr. Heinsman approached the trial judge

-80-

in chambers and an off-the-record discussion ensued. Neither the prosecutor nor the defendant himself was present. According to an affidavit submitted by defense counsel, the trial judge and the capital case attorney were present when counsel entered chambers to ask "about the timing of the second Motion for New Trial to be filed and the running of time for the Notice of Appeal." Counsel further states: "It was discussed that the Motion for New Trial would be filed and decided on the pleadings, but the defendant was not present for this conversation . . . and counsel did not and could not waive oral argument without his knowing consent."[79]

On March 17, 2006, Mr. Hester filed a motion for new trial addressing the issues relating to his non-capital convictions. Notwithstanding Mr. Heinman's earlier statements that an additional hearing would not be necessary, this motion contained a request for a hearing. The trial court did not conduct a hearing, and on May 22, 2006, filed an order addressing the issues relating to Mr. Hester's capital convictions that were the subject of the February 16, 2006 hearing and the issues relating to Mr. Hester's non-capital convictions that were contained in his March 17, 2006 motion.

The Court of Criminal Appeals's opinion describes what transpired following the entry of the May 22, 2006 order as follows:

On August 28, 2006, the trial court entered an order "clarifying the record for appeal." Referencing its off-the-record discussion with defense counsel regarding a hearing of the motion for new trial in the non-capital cases, the trial court stated:

Attorney Rich Heinsman then informed the court in chambers that he believed for the record he would need to file an additional motion for new trial related to the non-capital sentencing issues. The court asked if he would need a hearing on those matters and he said he would not. Of course, this matter was not recorded and his client was not present. The court permitted the defendant to file an additional motion for new trial to address the non-capital sentencing issues only and stated that a written order on the other

---

[79] *State v. Hester*, 2009 WL 275760, at *45 (alteration in original).

matters would not be entered separately to avoid any confusion on the date for the notice of appeal. The court then informed the state of the defendant's request and that Attorney Heinsman had indicated that a hearing would not be required on the matters.

The court further stated that the motion for new trial filed in March 2006 included matters that related to the trial and a request for an additional hearing. The court stated that in early to mid-April, Mr. Heinsman spoke to the capital case attorney regarding his desire to file additional pleadings and was informed that he had until May 1, 2006, to file anything further for the court's consideration. The court states that no written order was entered setting forth this deadline, but the court was aware that it was communicated to Mr. Heinsman, and no other pleadings were filed by the May 1 deadline. The court concluded its order as follows:

Although this court had permitted the defendant to file an amendment to the new trial motion to "make his record" by including his non-capital sentencing issues, such an amendment was not required to preserve the issues. The inclusion of issues other than the non-capital sentencing issues was outside the very lenient and extended deadline the court had set for such filings. The date for raising and arguing other matters had already passed. Accordingly, this court entered an order denying the motion for new trial without additional hearing on May 22, 2006.[80]

Mr. Hester does not deny that his lead counsel informed the trial court on February 16, 2006 that no hearing would be necessary with regard to his motion on non-capital offenses. However, he insists that the trial court erred by failing to hold a hearing after one was requested in his March 17, 2006 motion and that this error necessitates a remand for a hearing on all his motions for new trial.

---

[80] *State v. Hester*, 2009 WL 275760, at *45-46.

Assuming for the purpose of argument that the trial court erred by failing to hold a hearing on his March 17, 2006 motion for new trial,[81] Mr. Hester has failed to show any prejudice for two reasons. First, Mr. Hester has not pointed to any argument or evidence that he would have presented at a hearing that was not included in his motion. Second, the grounds in Mr. Hester's March 17, 2006 motion are moot or wholly non-meritorious.

Mr. Hester's motion addressed three general issues regarding his non-capital sentences: (1) the sentences imposed for attempted first degree murder and aggravated arson, (2) ordering those sentences to be served consecutively, and (3) the sufficiency of the evidence to support Mr. Hester's convictions for attempted first degree murder and aggravated arson. We have already addressed two of these issues on this appeal.[82] A sufficiency of the evidence argument with regard to his non-capital convictions is wholly non-meritorious. Nothing further can be gained by requiring the trial court to conduct a hearing on Mr. Hester's March 17, 2006 motion for new trial.

## XIX.
### THE ALLEGED CUMULATIVE EFFECT OF MULTIPLE ERRORS

In the event that we do not find that any of the errors he has raised are alone sufficient to warrant a reversal of his convictions and sentences, Mr. Hester insists that the cumulative effect of the many errors that were committed during the trial requires a reversal of both his capital conviction and sentence. While the concept of cumulative error is not unknown in

---

[81] After the trial concluded, the trial court announced that it would hear Mr. Hester's motion for new trial with regard to his capital conviction and sentence on the same day that it conducted a sentencing hearing on Mr. Hester's two non-capital convictions. Accordingly, Mr. Hester filed a motion for new trial relating to his capital conviction and sentence, as well as several amendments to the motion, before the hearing that was conducted on February 16, 2006. Less than thirty days following the hearing, and prior to the issuance of an order regarding his motion for new trial relating to his capital conviction and sentence, Mr. Hester filed another motion for new trial relating to his non-capital convictions and sentences. The bifurcation of the motion for new trial and the timing of Mr. Hester's filings implicate Tenn. R. Crim. P. 33, particularly as construed by this Court in *State v. Hatcher*, 310 S.W.3d 788, 799-804 (Tenn. 2010). By failing to object to the bifurcation of the new trial hearings or to the timing of Mr. Hester's filings relating to his motions for new trial, the State has waived any objections with regard to the filing or consideration of the motions for new trial or any amendments thereto. Accordingly, the issue of the propriety of the bifurcated new trial motion procedure in light of the requirements of Tenn. R. Crim. P. 33, as interpreted in *State v. Hatcher*, is not before us.

[82] We have addressed Mr. Hester's arguments regarding the sentences imposed for attempted first degree murder and aggravated arson and his contentions with regard to consecutive sentencing.

Tennessee jurisprudence,[83] it has not received the attention here that it has received in other states.

The United States Constitution protects a criminal defendant's right to a fair trial; it does not guarantee him or her a perfect trial. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). We have reached the same conclusion with regard to the Constitution of Tennessee. *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). It is the protection of the right to a fair trial that drives the existence of and application of the cumulative error doctrine in the context of criminal proceedings. *See*, *e.g.*, *United States v. Lopez*, 590 F.3d 1238, 1258 (11th Cir. 2009); *United States v. Castaldi*, 547 F.3d 699, 705 (7th Cir. 2008); *State v. Perry*, ___ P.3d ___, 2010 WL 2880156, at *20 (Idaho 2010); *State v. Lively*, 697 S.E.2d 117, 136 (W. Va. 2010). However, circumstances warranting the application of the cumulative error doctrine to reverse a conviction or sentence remain rare. *Vick v. State*, 863 S.W.2d 820, 825 (Ark. 1993); *State v. Magallanez*, 235 P.3d 460, 475 (Kan. 2010).

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. *See*, *e.g.*, *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000); *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990); *United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988); *State v. Perry*, ___ P.3d ___, 2010 WL 2880156, at *20; *State v. Duffy*, 967 P.2d 807, 816 (N.M. 1998). To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *State v. Odom*, 137 S.W.3d at 605 (appendix); *see State v. Guy*, 165 S.W.3d 651, 667 (Tenn. Crim. App. 2004); *State v. Mickens,* 123 S.W.3d 355, 397 (Tenn. Crim. App. 2003); *see also United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).

The United States Court of Appeals for the First Circuit provided the following useful general insight into the nature of the considerations regarding the aggregation of errors that deprive a defendant of a fair trial:

> Of necessity, claims under the cumulative error doctrine are *sui generis*. A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined

---

[83] *See*, *e.g.*, *State v. Bigbee*, 885 S.W.2d 797, 812, 817 (Tenn. 1994), *superseded by statute on related grounds*, Act of April 23, 1998, ch. 915, 1998 Tenn. Pub. Acts 646, 646, *as recognized in State v. Odom*, 137 S.W.3d at 580-81.

effect; how the [trial] court dealt with the errors as they arose (including the efficacy-or lack of efficacy-of any remedial efforts); and the strength of the [State's] case.  The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993) (citation omitted); *see also United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005); *Alvarez v. Boyd*, 225 F.3d at 825.

The errors committed in Mr. Hester's trial do not lend themselves to being aggregated to show that he failed to receive a fair trial in either the guilt or capital sentencing phase.[84] Accordingly, we find no basis on this record to conclude that cumulative error prevented Mr. Hester from having a fair trial.

## XX.
### THE REQUIREMENT THAT THE JURY AGREE UNANIMOUSLY TO A LIFE VERDICT

Mr. Hester argues that requiring the jury to agree unanimously upon a life verdict violates the United States Supreme Court's rulings in *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) and *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988).  This Court fully addressed and rejected this argument for reasons explained in detail in *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994).  Mr. Hester has not offered a persuasive argument showing that this decision was in error.

## XXI.
### THE FAILURE TO CHARGE AGGRAVATING CIRCUMSTANCES IN THE INDICTMENT

Mr. Hester argues that failure to charge the aggravating circumstances in a capital case in the indictment violates the Tennessee and Federal Constitutions.  This Court has

---

[84]Our decision in *State v. Bigbee* illustrates circumstances in which the cumulative effect of related errors was properly considered.  In that case, the trial court erroneously permitted the State to introduce evidence which later provided the factual basis for highly provocative improper arguments during the State's closing argument.  *State v. Bigbee*, 885 S.W.2d at 809-12.  Because of the relationship between the erroneous admission of the evidence and the improper arguments, this Court held that "[t]hough each of the errors . . . might have been harmless standing alone . . . considered cumulatively, the improper prosecutorial argument and the admission of irrelevant evidence affect the jury's sentencing determination to the defendant's prejudice."  *State v. Bigbee*, 885 S.W.2d at 812.

consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment. *See*, *e.g.*, *State v. Reid*, 164 S.W.3d 286, 312 (Tenn. 2005); *State v. Leach*, 148 S.W.3d 42, 59 (Tenn. 2004); *State v. Berry*, 141 S.W.3d 549, 562 (Tenn. 2004); *State v. Holton*, 126 S.W.3d 845, 862-63 (Tenn. 2004); *State v. Dellinger*, 79 S.W.3d at 467. Mr. Hester has not offered a persuasive argument showing that these prior decisions have been in error.

## XXII.
### THE ALLEGEDLY DISCRIMINATORY IMPOSITION OF THE DEATH PENALTY ON THE BASIS OF RACE, GENDER, AND GEOGRAPHY

Mr. Hester argues that the death penalty is being imposed in the State of Tennessee in a discriminatory matter on the basis of race, geography, and gender. This Court fully addressed and rejected this argument in *State v. Banks*, 271 S.W.3d at 155-58. Mr. Hester has neither addressed this decision nor offered a persuasive argument showing that this decision was in error.

## XXIII.
### THE PROCESS FOR ENSURING PROPORTIONALITY

Mr. Hester correctly asserts that states should provide meaningful appellate proportionality review of death sentences to ensure that the death penalty is not being arbitrarily and capriciously imposed. He argues that the review process currently used by Tennessee's appellate courts is inadequate because (1) the jury is not required to make written findings concerning mitigating circumstances, (2) the informational base for comparative review of first degree murder convictions is inadequate and incomplete, and (3) the courts' methodology for conducting comparative review is flawed. He also insists that the process fails to meet the standards required for due process.

While comparative proportionality review provides an important safeguard against arbitrary and capricious sentencing, it is not constitutionally required. *State v. Bland*, 958 S.W.2d 651, 663 (Tenn. 1997). The Tennessee General Assembly has directed the appellate courts to determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206(c)(1)(D). We have noted that the automatic review by this Court of every death sentence is an integral part of Tennessee's death penalty process. *State v. Pritchett*, 621 S.W.2d 127, 140 (Tenn. 1981).

There are no more serious cases that arrive at this Court's doorstep than death penalty cases. They involve crimes of the most serious impact, and they involve a penalty that is the most severe that can be imposed. Reviewing any death penalty appeal is given the utmost

attention and highest priority by each of the members of this Court. Mr. Hester's challenges to this Court's means and methods of reviewing the proportionality of a death sentence have been repeatedly rejected. *See*, *e.g.*, *State v. Rimmer*, 250 S.W.3d at 43 (appendix); *State v. Reid*, 91 S.W.3d at 286 n.9; *State v. Vann*, 976 S.W.2d 93, 118-19 (Tenn. 1998) (appendix); *State v. Keen*, 926 S.W.2d 727, 743-44 (Tenn. 1994).

The Tennessee General Assembly has provided that "[t]he Tennessee Supreme Court may promulgate rules as it deems appropriate to establish such procedures as are necessary to enable the reviewing courts to properly review the death sentence." Tenn. Code Ann. § 39-13-206(c)(2). We continue to find the review process to be a significant contributor to safeguarding against the arbitrary and capricious application of the death penalty. We also continue to find the existing procedures to be adequate to enable this Court to properly carry out its review in death penalty cases.

## XXIV.
### THE CONSTITUTIONALITY OF TENNESSEE'S LETHAL INJECTION PROTOCOL

Mr. Hester contends that Tennessee's utilization of the three drug protocol to implement lethal injection as a means of effectuating the death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution. As noted by Mr. Hester, this Court rejected the contention that Tennessee's use of the three drug protocol constitutes cruel and unusual punishment in *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 305-09 (Tenn. 2005).

Mr. Hester argues that the "Lancet study" warrants revisiting of this issue.[85] However, the United States Supreme Court has declined to give constitutional weight to the study's findings. *See Baze v. Rees*, 553 U.S. 35, 51 n.2 (2008) (plurality opinion).[86] In his separate

_____

[85]The "Lancet study" to which Mr. Hester refers is an article by Leonidas G. Koniaris and others titled *Inadequate Anaesthesia in Lethal Injection for Execution*, which was published in the British medical journal *The Lancet* in April 2005. *See* Jeremy Fogel, *In the Eye of the Storm: A Judge's Experience in Lethal-Injection Litigation*, 35 Fordham Urb. L.J. 735, 739 & n.26 (2008) ("Fogel"); Note, *A New Test for Evaluating Eighth Amendment Challenges to Lethal Injections*, 120 Harv. L. Rev. 1301, 1303 & n.18 (2007). The Lancet "study found that forty-three percent of the executed inmates whose autopsy records were reviewed had concentrations of sodium thiopental in their blood that were consistent with awareness." Fogel, 35 Fordham Urb. L.J. at 739. However, "[t]he Lancet study and its results . . . have proved controversial. [P]rominent medical researchers . . . [have] responded with a range of criticisms. The Lancet study's authors responded in turn." Deborah W. Denno, *The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty*, 76 Fordham L. Rev. 49, 104 & n.365 (2007) (citation omitted).

[86]After addressing some of the controversy surrounding the Lancet study, the plurality in *Baze v.*
(continued...)

concurring opinion, Justice Alito noted that the "evidence [cited in the study] regarding alleged defects in these protocols and the supposed advantages of alternatives is strikingly haphazard and unreliable." *Baze v. Rees*, 553 U.S. at 67 (Alito, J., concurring). Similarly, Justice Breyer noted in his opinion concurring in the judgment that "[t]he Lancet Study . . . may be seriously flawed" and that, based on the state of the scientific community's unresolved dispute, a non-expert judge "cannot give the Lancet Study significant weight." *Baze v. Rees*, 553 U.S. at 109-10 (Breyer, J., concurring). For similar reasons, a number of other courts, including the United States Court of Appeals for the Eighth Circuit,[87] the Florida Supreme Court,[88] the Indiana Supreme Court,[89] and the Alabama Court of Criminal Appeals,[90] have declined to give weight to the conclusions in the Lancet study. Based on these authorities, we find that Mr. Hester has not offered a persuasive argument for revisiting this Court's previous decisions upholding the constitutionality of Tennessee's lethal injection protocol.

## XXV.
### THE RIGHT TO LIFE CLAIM

Mr. Hester contends that the death penalty infringes upon his constitutional right to life because of the existence of less restrictive means to effectuate the state's interest. Courts "may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people." *Gregg v. Georgia*, 428 U.S. 153, 175 (1976) (plurality opinion); *State v. Lafferty*, 20 P.3d 342, 363-64 (Utah 2001). Accordingly, Mr. Hester's argument that the State's

---

[86](...continued)
*Rees* declared

> [w]e do not purport to take sides in this dispute. We cite it only to confirm that a "best practices" approach, calling for the weighing of relative risks without some measure of deference to a State's choice of execution procedures, would involve the courts in debatable matters far exceeding their expertise.

*Baze v. Rees*, 553 U.S. at 51 n.2 (plurality opinion).

[87]*Brown v. Crawford*, 408 F.3d 1027, 1027 (8th Cir. 2005).

[88]*See, e.g.*, *Rolling v. State*, 944 So. 2d 176, 179 (Fla. 2006); *Rutherford v. State*, 926 So. 2d 1100, 1113-14 (Fla. 2006); *Hill v. State*, 921 So. 2d 579, 582-83 (Fla. 2006).

[89]*Bieghler v. State*, 839 N.E.2d 691, 694-96 (Ind. 2005).

[90]*Gobble v. State*, ___ So.3d ___, 2010 WL 415250, at *43-44 (Ala. Crim. App. 2010).

failure to utilize the least restrictive means to achieve its interest renders his sentence unconstitutional is unavailing.

## XXVI.
### THE INTERNATIONAL LAW AND THE SUPREMACY CLAUSE CLAIM

Mr. Hester contends that his death sentence is unconstitutional under customary international law and pursuant to a variety of treaties to which the United States is bound. He offers no explanation of how any of the treaties or international norms render the State of Tennessee's application of the death penalty unconstitutional.

Tenn. R. App. 27(a)(7) requires that arguments contained in an appellant's brief must set forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on." It is not the responsibility of Tennessee's appellate courts to research or construct the parties' arguments for them. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006). A reviewing court may deem an issue waived when a party fails to develop an argument in support of its contention or merely constructs a skeletal argument. *Newcomb v. Kohler Co.*, 222 S.W.3d at 400-01; *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002); *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). We have concluded that Mr. Hester has waived this issue because he failed to offer any discussion regarding how the various treaties cited or international norms referenced in his brief render the application of the death penalty in his case unconstitutional. Furthermore, this Court has previously noted that "[t]he authorities appear to be universal that no customary or international law or international treaty prohibits a state from imposing the death penalty as a punishment for certain crimes." *State v. Odom*, 137 S.W.3d at 599 (appendix).

## XXVII.
### MR. HESTER'S ARGUMENT THAT THE CURRENT PROCESS FOR ADMINISTERING TENNESSEE'S CAPITAL PUNISHMENT STATUTES IS "BROKEN"

Mr. Hester contends that the current system of capital punishment in the State of Tennessee is fundamentally "broken." Accordingly, he invites this Court to begin dismantling the system by vacating his death sentence. Because this invitation reflects Mr. Hester's misunderstanding of the role of the courts, we respectfully decline.

Tennessee's courts should never hesitate to perform their constitutionally assigned role as a check and balance on the actions of the other branches of government. However, in performing this responsibility, Tennessee's courts must maintain appropriate respect for

the breathing room needed for a representative democracy to thrive. At the core of our representative democracy is the principle that the people are the ultimate sovereign. Therefore, the courts must give full effect to the will of the people, expressed through laws duly enacted by their elected representatives, subject only to the limitations imposed by the federal and state constitutions.

The people, through their elected representatives, are primarily responsible for establishing the public policy of this State. The Constitution of Tennessee does not empower us to sit as "Platonic guardians"[91] or as a super-legislature with the power to dismantle statutory systems because they do not meet our standards of desirable social policy. By accepting Mr. Hester's invitation to tear down Tennessee's system of capital punishment, we would be arrogating to ourselves power that is not ours to exercise. This we decline to do.

## XXVIII.
### CONSIDERATION OF THE MANDATORY REVIEW FACTORS IN TENN. CODE ANN. § 39-13-206 WITH REGARD TO MR. HESTER'S DEATH SENTENCE

When reviewing a conviction for first degree murder and an accompanying sentence of death, Tenn. Code Ann. § 39-13-206(c)(1) requires us to review the record to determine whether

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

---

[91] Since the days of Plato's *Republic*, elites have criticized democratic rule for its inefficiency and illogical decision-making. Judge Learned Hand has observed, however, that

[f]or myself it would be most irksome to be ruled by a bevy of Platonic guardians, even if I knew how to choose them, which I assuredly do not. If they were in charge I would miss the stimulus of living in a society where I have, at least theoretically, some part in the direction of public affairs.

Learned Hand, *The Bill of Rights* 73 (1958).

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

We have carefully reviewed the record in this case, and, as we will discuss more fully, we have determined that Mr. Hester's sentence was not imposed in an arbitrary fashion. We have also determined that the evidence supports the jury's findings that the State proved the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(5), (14) beyond a reasonable doubt and that these aggravating circumstances outweigh the mitigating circumstances offered by Mr. Hester. Finally, we have considered the nature of Mr. Hester's crime and all the evidence in the record concerning Mr. Hester as a person, and we have concluded that the sentence of death imposed by the jury in this case is neither excessive nor disproportionate to the penalties imposed for similar offenses or offenders.

**A.**

The jury that imposed Mr. Hester's sentence of death unanimously found that the State proved beyond a reasonable doubt that Mr. Hester was guilty of premeditated first degree murder. In addition, the jury determined that the State proved beyond a reasonable doubt that the manner in which the murder occurred supported the application of the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(5), (14). Our review of the record satisfies each of us that the trial and the sentencing hearing were conducted in a manner substantially consistent with the applicable statutory provisions and the rules of criminal procedure. Accordingly, we conclude that Mr. Hester's sentence of death was not imposed in an arbitrary fashion. *See*, *e.g.*, *State v. Young*, 196 S.W.3d 85, 115 (Tenn. 2006); *State v. Hugueley*, 185 S.W.3d 356, 380 (Tenn. 2006); *State v. Hall*, 958 S.W.2d 679, 702 (Tenn. 1997).

**B.**

The State presented evidence to establish the existence of three aggravating circumstances. The first, codified at Tenn. Code Ann. § 39-13-204(i)(3), is that "[t]he defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder." The second, codified at Tenn. Code Ann. § 39-13-204(i)(5), is that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." The third, codified at Tenn. Code Ann. § 39-13-204(i)(14), is that "[t]he victim of the murder was seventy (70) years of age or older."

The jury unanimously found that the State established two aggravating circumstances, those in Tenn. Code Ann. § 39-13-204(i)(5), (14), beyond a reasonable doubt. The jury also

unanimously found that the State had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and found that the appropriate punishment for Mr. Hester was death.

Tenn. Code Ann. § 39-13-204(i)(14) provides that "[t]he victim of the murder was seventy (70) years of age or older. . . ." constitutes an aggravating factor. The State offered the testimony of multiple witnesses and official documents to establish that Mr. Haney, who was born in 1922, was seventy years of age or older at the time of his death on December 14, 1999. Mr. Hester offered no evidence to the contrary. The evidence presented in this case supports the jury's unanimous finding of the aggravating circumstance that "[t]he victim of the murder was seventy (70) years of age or older . . . ."

With regard to the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(5), the State's proof showed that Mr. Hester (1) bound Mr. Haney, an elderly man with limited mobility, (2) told Mr. Haney repeatedly over a period of fifteen to twenty minutes that he was going to kill him, (3) doused Mr. Haney and his mobile home with kerosene, (4) set Mr. Haney and his mobile home on fire, and then (5) left Mr. Haney to die in the flames. Mr. Haney died, with his arms still tied behind his back, from smoke inhalation and the thermal burns he received in the fire. Mr. Haney was still alive when he caught on fire and began to burn. Given these facts, the State's evidence supports the jury's finding that the murder of Mr. Haney "was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." *See* 11 David L. Raybin, *Tennessee Practice: Criminal Practice and Procedure* § 32:20, at 267 n.4 (2008) (collecting prior cases in which this Court has found a murder to meet the Tenn. Code Ann. § 39-13-204(i)(5) aggravating circumstance requirement).

## C.

In carrying out our obligation under Tenn. Code Ann. § 39-13-206(c)(1)(C), we must determine whether a reasonable juror could find beyond a reasonable doubt that the aggravating circumstances established by the State outweigh the mitigating circumstances presented by the defendant. *State v. Rimmer*, 250 S.W.3d at 33-34; *State v. Stephenson*, 195 S.W.3d 574, 593-94 (Tenn. 2006). Following a detailed review of this record, we find that a reasonable jury could find, based on the evidence in this case, that the aggravating circumstances outweigh the mitigating circumstances.

Mr. Hester presented evidence relating to numerous mitigating circumstances both during the guilt and sentencing phases of the trial that were intended to present him in a sympathetic light. Based on his cross-examination of the State's witnesses and the testimony of his witnesses during the sentencing phase of the trial, Mr. Hester argued to the jury that:

(1)     He had experienced a religious conversion and baptism in prison;

(2)     He had freed himself from his alcohol addiction and had become a different person than he was when he murdered Mr. Haney;

(3)     He had been a diligent worker before the murder;

(4)     He had repeatedly and consistently helped those who could not afford plumbing and electrical services by providing work free of charge;

(5)     He had been under the influence of an extreme mental or emotional disturbance when the murder was committed;

(6)     His ability to appreciate the wrongfulness of his conduct was impaired by intoxication;

(7)     His father beat him as a child;

(8)     He received the worst beatings when he tried to defend his mother and siblings;

(9)     His father played Russian Roulette with him as a child by pulling the trigger of a gun placed against Mr. Hester's head;

(10)    He knew that his father sexually abused his sister;

(11)    He was raised in a house dominated by an oppressive and jealous father;

(12)    He was raised by a mother who suffered from extreme depression;

(13)    He did not receive adequate nutrition as a child;

(14)    He was introduced to alcohol as a baby even before he could walk;

(15)    He had a long history of substance abuse that was so severe that it required hospitalization;

(16)    His substance abuse had developed at a young age;

(17)    His father chased him from home when he was only twelve or thirteen years old; and

(18)    He eventually left home at a young age in order to avoid being a financial burden upon his family.

Mr. Hester also asserted residual doubt as a basis for mitigation.

The defense portrayed Mr. Hester as a person who never had a chance in life. He was abused as a child. He became addicted to alcohol at a young age and was unable to recover from his addiction. His father was domineering and abusive, and his mother was unable to provide him with emotional support or guidance. He was forced out of his home at a young age and was required to fend for himself as best he could. As an adult, Mr. Hester had a charitable heart for helping others when he was not intoxicated. However, he became a different person when he was intoxicated. With regard to Mr. Haney's murder, the defense tried to convince the jury that Mr. Hester had acted in a drunken, jealous rage at Ms. Hester, whom he still considered to be his wife, and Mr. Haney, who had proposed marriage to Ms. Hester.

For its part, the State presented evidence suggesting that Mr. Hester may not have actually suffered the level of abuse that the defense claimed. The State placed particular importance on the fact that Mr. Hester, on his own volition, moved to Texas to live with his father after his parents' second separation. The State also presented evidence that Mr. Hester's other siblings, including a sister who had been sexually abused by her father, had managed to grow up in the same house with the same parents without having become killers. In addition, the State elicited testimony challenging the authenticity of Mr. Hester's in-prison conversion. In its questioning of Mr. Hester's mitigation witnesses, the State elicited testimony that Mr. Hester is a strong-minded and independent person.

In arguing that the aggravators outweighed the mitigators, the State's argument placed the greatest emphasis upon the significant weight of the aggravators. Based on the evidence presented, a rational juror could have concluded that the aggravating circumstances -- "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death" and "[t]he victim of the murder was seventy (70) years of age or older . . . ." -- outweighed the various mitigating circumstances presented by Mr. Hester, particularly his history of abuse as a child, his history of substance abuse and intoxication on the day of the murder, and his emotional disturbance over a woman he considered to still be his wife having been proposed to by Mr. Haney.[92]

_____

[92]Testimony during the trial phase established the non-romantic nature of Mr. Haney and Ms. Hester's relationship and that the marriage proposal had been for purposes of enabling Ms. Hester to receive Mr. Haney's death benefits related to his pensions.

## D.

When this Court conducts the proportionality review required by Tenn. Code Ann. § 39-13-206(c)(1)(D), we do not function as a "super jury" that simply substitutes our judgment for the sentencing jury. *State v. Godsey,* 60 S.W.3d 759, 782 (Tenn. 2001). Rather, our task is to take a broader perspective than the jurors who sentenced Mr. Hester in order to determine whether his death sentence "is disproportionate to the sentences imposed for similar crimes and similar defendants." *State v. Thacker*, 164 S.W.3d at 232 (quoting *State v. Bland*, 958 S.W.2d at 664). In doing so, the pool of cases upon which we draw in conducting this analysis are "first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death." *State v. Rice*, 184 S.W.3d 646, 679 (Tenn. 2006).

No two defendants or their crimes are ever identical. Accordingly, the purpose of our review of other capital cases is not to identify cases that correspond precisely with the particulars of the one being analyzed. *State v. Copeland*, 226 S.W.3d 287, 306 (Tenn. 2007); *State v. Thacker*, 164 S.W.3d at 233. Instead, our task is to "identify and invalidate the aberrant death sentence." *State v. Thacker*, 164 S.W.3d at 233 (quoting *State v. Bland*, 958 S.W.2d at 665). A sentence is not disproportionate because other defendants have received a life sentence under similar circumstances. *State v. Carruthers*, 35 S.W.3d 516, 569 (Tenn. 2000). Rather, a death sentence will be excessive or disproportionate where "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *State v. Thacker*, 164 S.W.3d at 233 (quoting *State v. Bland*, 958 S.W.2d at 668); *accord State v. Godsey*, 60 S.W.3d at 782.

This Court uses "the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes." *State v. Copeland*, 226 S.W.3d at 305 (quoting *State v. Davis*, 141 S.W.3d 600, 619-620 (Tenn. 2004)). We examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved, and we compare this case with other cases in which the defendants were convicted of the same or similar crimes." *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002). Our approach does not employ a rigid, objective test. Rather, each member of the Court draws upon his or her experience and judgment in comparing the case being reviewed with other cases. *See State v. Bland*, 958 S.W.2d at 668.

When we conduct this comparison with regard to the nature of the crime, we generally consider

(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*State v. Rimmer*, 250 S.W.3d at 35; *see also State v. Rollins*, 188 S.W.3d 553, 575 (Tenn. 2006). With regard to the defendant, we generally compare the defendant's "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *State v. Rimmer*, 250 S.W.3d at 35; *see also State v. Rollins*, 188 S.W.3d at 575.

We first consider the nature of Mr. Hester's offense. Mr. Hester was intoxicated and angry because Ms. Hester would not loan him ten dollars to purchase more beer. He retaliated by tying up a frail elderly man who had taken him into his home to prevent him from becoming homeless. He told his victim repeatedly over a period of fifteen to twenty minutes that he was going to kill him. Then, he doused his victim with kerosene and set his victim and his victim's home on fire. Mr. Hester had numerous opportunities to consider what he was doing and to stop, but he did not.

Next we consider Mr. Hester himself. His mitigation witnesses present the sympathetic image of an abused child whose primary role model was a violent and abusive father. He was forced out of his home and became addicted to alcohol at a young age. His addiction to alcohol became so severe that it came to dominate his life. He was intoxicated when he set the fire that killed Mr. Haney and seriously injured Ms. Hester. Since his incarceration, he has rid himself of his alcohol addiction and has become a different and changed person after experiencing a religious conversion.

We find that the death sentence, as applied to Mr. Hester in this case, is neither excessive nor disproportionate when compared to defendants in other cases. The following are among the cases in which this Court determined that application of the death penalty was not disproportionate in light of other similar circumstances. In *State v. Hall*, 958 S.W.2d at 683-87, 696, 698-702, we affirmed the death sentence of an intoxicated man who set his girlfriend on fire because he was upset that they were separating. Similarly, in *State v. Henley*, 774 S.W.2d 908, 912, 918 (Tenn. 1989), we affirmed a death sentence for an intoxicated defendant who shot two persons, killing one, and then set a fire that caused the death of the other victim. Additionally, in *State v. Hodges*, 944 S.W.2d 346, 358 (Tenn. 1997), we affirmed a death sentence of a defendant who bound his victim's hands and feet,

left the victim to ponder his fate while the defendant ransacked his home, and then strangled his victim to death.

We have also concluded that the mitigating circumstances in this case do not carry a disproportionately heavier weight than the mitigating circumstances in other cases in which the death penalty has been approved. We have previously "observe[d] that the death penalty has been upheld in numerous cases where the defendant argued that the offense was mitigated by intoxication due to drugs or alcohol." *State v. Morris*, 24 S.W.3d 788, 801 (Tenn. 2000). We have also repeatedly found that a history of being abused and neglected as a child does not provide a basis for obviating a sentence of death imposed by a jury. *See*, *e.g.*, *State v. Rogers*, 188 S.W.3d 593, 619 (Tenn. 2006); *State v. Faulkner*, 154 S.W.3d 48, 63 (Tenn. 2005). Nor has religious conversion/spiritual growth been a basis for doing so. *See*, *e.g.*, *State v. Rimmer*, 250 S.W.3d at 34; *State v. Carter*, 114 S.W.3d 895, 908 (Tenn. 2003); *State v. Black,* 815 S.W.2d 166, 173 (Tenn. 1991). Simply stated, Mr. Hester's mitigation case does not place him outside the scope of those cases wherein the death penalty has been found to be appropriate.

Considering the aggravating and mitigating circumstances in this case in light of all the evidence in this case, we find that Mr. Hester's conviction and sentence are not "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *State v. Thacker*, 164 S.W.3d at 233 (quoting *State v. Bland*, 958 S.W.2d at 668); *accord State v. Godsey*, 60 S.W.3d at 782. Accordingly, we find the application of the death sentence in this case to be neither disproportionate nor excessive.

## XXIX.

In summary, we find that the Court of Criminal Appeals reached correct results with regard to the issues raised by Mr. Hester. We have conducted the statutorily prescribed proportionality review and have determined that the application of the death penalty in this case is not disproportionate. Therefore, we affirm Mr. Hester's convictions for first degree murder, attempted first degree murder, and aggravated arson, and we likewise affirm Mr. Hester's sentence of death and his two consecutive, twenty-year sentences for attempted first degree murder and aggravated arson. We remand the case to the trial court for further proceedings consistent with this opinion.

The sentence of death shall be carried out as provided by law on the 25th day of October, 2011, unless otherwise ordered by this Court or other proper authority. It appearing that H.R. Hester is indigent, the costs of his appeal are taxed to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE

**Appendix**
**(Excerpts from the Decision of the Court of Criminal Appeals)**

Court of Criminal Appeals of Tennessee, at Knoxville.

State of Tennessee
v.
H.R. Hester

No. E2006-01904-CCA-R3-DD.

Jan. 28, 2008 Session.

Feb. 5, 2009.

Direct Appeal from the Circuit Court for McMinn County, No. 00-115-117; Allen Wallace, Senior Judge.

Rich Heinsman and Lee Davis, Chattanooga, Tennessee, for the appellant, H.R. Hester.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; R. Steven Bebb (on appeal) and Jerry N. Estes (at trial), District Attorneys General; and William W. Reedy, Assistant District Attorney General, for the appellee, State of Tennessee.

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA McGEE OGLE, JJ., joined.

OPINION

**[VI.]**
**[MCMINN COUNTY'S USE OF A LIST OF ITS RESIDENTS POSSESSING DRIVER'S LICENSES AS THE SOURCE OF NAMES FOR ITS JURY VENIRES]**

Next, the defendant argues that the former statutory provisions governing the selection of jury lists were violated. More specifically, the defendant asserts that although a county that opted to use the electronic selection method of juror lists was permitted to use lists of licensed drivers, it could not rely on this source alone but was also statutorily required to use the tax records in the selection process pursuant to Tennessee Code Annotated section 22-2-302(d). That section provided:

(d) In any county of this state, if a majority of the circuit and criminal law judges and chancellors holding court in the county finds that the tax records and permanent registration records of the county, and records or lists of persons eighteen (18) years of age and older residing in the county who are licensed to drive, or other available and reliable sources, are so tabulated and arranged that names can be selected therefrom by mechanical or electronic means in such manner as to assure proportionate distribution of names selected without opportunity for the intervention of any human agency to select a particular name, then and in that event, such judges and chancellors may authorize the jury commission to obtain names for jury venires from such source and by such method.

(repealed 2009).[93]

In our view, the statute plainly authorized the selection of juror lists by electronic means from the "available and reliable sources" of the county, including lists of resident licensed drivers eighteen years or older, upon a finding that the manner of selection ensures the proportionate distribution of names. The defendant has cited no support for, and we disagree with, his construction of the statute to require rather than permit the examination of tax records in the selection process. Again, our supreme court has upheld the selection of jury venires based on drivers license rolls. *Mann*, 959 S.W.2d at 535; *see also State v. Wayne Joseph Burgess, Jr.*, No. M1999-02040-CCA-R3-CD, 2001 WL 43216, at **3-4 (Tenn. Crim. App. Jan. 18, 2001). This issue is unavailing to the defendant.

*State v. Hester*, 2009 WL 275760, at *16.

## [XII.]
### [THE TRIAL COURT'S ALLEGED IMPROPER COMMENT ON THE EVIDENCE]

The defendant complains that the trial judge made inappropriate comments about certain evidence in the presence of the jury that evinced an unquestionable bias against the defendant. He contends that the trial court's comments deprived him of a fair trial and necessitate a reversal of his convictions and the grant of a new trial.

The basis of the defendant's argument surrounds the introduction into evidence of the clothing and personal items obtained from the defendant the night of his arrest on December

---

[93] The revised Code provides that lists of potential jurors "shall be provided from licensed driver records or lists, tax records, or other available and reliable sources that are so tabulated and arranged that names can be selected by automated means ." Tenn. Code Ann. § 22-2-301(a) (Supp.2008).

14, 1999. Agent Brakebill testified that the evidence was sealed inside new paint cans where it remained until the cans were opened during the defendant's trial some six years later. After the items were filed as a collective exhibit to the record, the following exchange occurred:

THE COURT: Let's move them into evidence and put them back in the box. They're ...

GENERAL YOUNG: Okay.

A [Agent Brakebill]: Yeah. They're stinking pretty bad.

THE COURT: They're kind of choking me up. I don't know whether I'll-I think members of the jury too.

A [Agent Brakebill]: They've still got kerosene on them.

GENERAL YOUNG: Your Honor, we'll, we'll make it a collective exhibit number 11.

GENERAL YOUNG: Agent Brakebill, would you mind putting them back in the cans?

THE COURT: I can smell the kerosene. It's just ... (brief pause) ... we'll just put it all in the box. (Brief pause) Members of the jury, I'm putting these up pretty, I'm putting these up pretty quickly. If you want to see them later, now you'll have a chance to do it.

. . ..

THE COURT: They were closer to you all than there (sic) were to me and I was, I was getting choked up a little bit.

The defendant contends that the trial court's comments in the context of a trial in which he was charged with capital murder in the course of an aggravated arson were clearly biased against him and favorable to the State. The defendant concludes that the comments mandate a reversal of his conviction because they affected the way that the jury received the evidence and in turn, its verdict. The State responds that the defendant failed to make a contemporaneous objection to the trial court's comments and has therefore waived this issue. The State further submits that the defendant has failed to show any resulting prejudice and that it would be difficult to do so considering that his defense to the crimes was not that he did not commit them, but that he was intoxicated at the time. Lastly, the State contends that

the trial judge's remarks were simply an effort to spare the jurors and others in the courtroom from the kerosene fumes.

In Tennessee, judges are constitutionally prohibited from commenting upon the credibility of witnesses or the evidence in a case. See Tenn. Const. art. VI, § 9 (providing that "judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law"). "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 407 (Tenn.1989). Our supreme court has held, however, that "not every comment on the evidence made by a judge is grounds for a new trial." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 134 (Tenn.2004). The trial court's comments must be considered in the overall context of the case to determine whether they were prejudicial. Id. (citing *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn.1993)).

Initially, we note that the defendant offered no objection to the trial court's comments nor did he seek a curative instruction. See Tenn. R.App. P. 36; *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App.1997) ("If a party fails to request a curative instruction, or, if dissatisfied with the instruction given ... does not request a more complete instruction, the party effectively waives the issue for appellate purposes."). In any event, we have painstakingly reviewed the record. In our view, the trial court's comments were simply an attempt to explain to the jury the reason it directed that the exhibits in question be moved immediately from the area; that is, the exhibits were apparently emitting a strong, unpleasant kerosene odor. Accordingly, we conclude that the trial court's explanatory remarks cannot reasonably be construed as a comment on the weight or credibility of the evidence.

*State v. Hester*, 2009 WL 275760 at *26-27.

## [XIV.]
### [THE SUFFICIENCY OF THE EVIDENCE OF PREMEDITATION]

The defendant argues that the State's proof fails to establish the essential elements of premeditated first degree murder. Specifically, the defendant contends that the evidence showed that his intoxication and disturbed mental state left him unable to form the required intent to kill. The defendant submits that "all of the State's eyewitnesses who observed Defendant prior to the fire unequivocally testified that Defendant was clearly intoxicated." The defendant concludes that the evidence is insufficient as a matter of law to sustain the conviction for premeditated first degree murder.

A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt. On appeal, the defendant has the burden of illustrating why the

evidence is not sufficient to support the jury's verdict. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn.2005); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn.2000); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982). We are required to afford the State the strongest legitimate view of the evidence in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997). We may deem evidence sufficient when it allows any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979); *Bland*, 958 S.W.2d at 659.

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). In *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973), our supreme court stated: "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the state."

First degree murder is the premeditated and intentional killing of another. See Tenn. Code Ann. Sec. 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Id. § 39-13-202(d). "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. *Id.* Premeditation requires a previously formed design or intent to kill. *See State v. West*, 844 S.W.2d 144, 147 (Tenn.1992) (citing *McGill v. State*, 4 Tenn. Crim. App. 710, 720, 475 S.W.2d 223, 227 (1971)). It is the process "of thinking about a proposed killing before engaging in the homicidal conduct." *State v. Brown*, 836 S.W.2d 530, 541. "No specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan...." *Id.* at 543. Factors from which a jury may infer premeditation include the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, a declaration by the defendant of his intent to kill, and the making of preparations before the killing for the purpose of concealing the crime. *Bland*, 958 S.W.2d at 660. An established motive for the murder is another factor from which the jury may infer premeditation. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn.2004); *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn.1998).

Considering the evidence in the light most favorable to the State and drawing all reasonable inferences therefrom, the State's proof showed that the defendant was drinking beer in the early afternoon of December 14. Throughout the afternoon and early evening, he tried without success to obtain more beer or money to buy more beer. Riding home with Tim Lynn in the early afternoon, the defendant commented, referring to their wives, that the men

"should kill them, you know, get rid of them so we don't have to hear their bitching no more." When Ms. Hester refused to lend the defendant beer money and encouraged the defendant to lie down and stop drinking, he became "agitated" and left the trailer. The defendant returned and began banging on the doors until he gained entry.

Brandishing a small knife, the defendant ordered Ms. Hester and Mr. Haney to the front of the trailer and threatened to slit Mr. Haney's throat. When Ms. Hester tried to break away and call for help, the defendant grabbed her, pushed her down and put the knife to her throat. The defendant retrieved duct tape from the kitchen, ordered Mr. Haney to lie on his stomach, taped Mr. Haney's hands, ankles, and mouth, and instructed Mr. Haney to turn back over. The defendant bound Ms. Hester the same way, continuously announcing that all three of them were going to die that night. The defendant sat down at a dining table for about five minutes, smoked a cigarette and continued mumbling. He then went outside and returned with a jug of kerosene that he poured throughout the trailer, splashing some on the victims. He unplugged each fire alarm and released Ms. Hester's dog. The defendant attempted to light a fire, first with matches, then with a cigarette. When this did not work, he twisted a newspaper, ignited it, placed it next to the stove, and left.

This court concludes that there was overwhelming proof to support the jury's finding of premeditated first degree murder. The defendant places great emphasis on the testimony of Ms. Hester and Tim Lynn that the defendant had been drinking and was, in their opinions, intoxicated. The jury heard this testimony and further heard the testimony of Agent Brakebill, thoroughly challenged on cross-examination, that despite the estimation of these witnesses that the defendant was drunk, his blood sample taken in the hours after the fire revealed a negative result for alcohol. The defendant's challenge to the sufficiency of the evidence fails, and he is not entitled to relief on this issue.

*State v. Hester*, 2009 WL 275760 at *25-26.

## [XV.]
### [THE TRIAL COURT'S EXCLUSION OF MITIGATION EVIDENCE DURING THE SENTENCING PHASE OF THE TRIAL]

### [D.]

[T]he defendant argues that the trial court precluded defense counsel from questioning the medical examiner regarding whether the murder involved torture. The defendant's claim is based on the following line of questioning during defense counsel's cross-examination of the medical examiner regarding the nature of the injuries to the deceased victim.

Q [Mr. Heinsman]: Did you state to me ... that there is nothing about this methodology that suggests any torture?

A [Dr. Toolsie]: I-

GENERAL YOUNG: Your Honor, I'm going to object unless that is a new part of an ... expert in pathology's experience and training.

MR. HEINSMAN: Well, let me, let me back up. The State has filed ... an aggravating factor in this case alleging torture beyond that necessary to produce death.

Following a bench conference, the following exchange occurred:

THE COURT: Mr. Heinsman, you open the door, you've got a lot more to open. This doctor can only testify to what he found on that body. The jury could very well conclude that tying a man behind, arms behind his back, tying his mouth, and setting him on fire is in itself torture.

MR. HEINSMAN: I understand that.

THE COURT: So you're talking about one phase of death and the jury is thinking about another as far as-so I want to be very clear. He's a pathologist, so ... if he wants to testify that tying a man's hands behind his back and setting him on fire is torture, I'll let him do it.

MR. HEINSMAN: I'll object to that testimony, so I understand Your Honor's caution.

The defendant urges that he was "precluded from questioning the medical examiner about the lack of evidence of torture in this case" as a result of the trial court's "threat" that it would permit Dr. Toolsie to provide potentially damaging testimony if counsel persisted. Upon careful review of the record, we cannot agree with counsel's argument. In our view, the trial court did not preclude defense counsel from attempting to solicit the opinion of the medical examiner as to whether the "methodology" of the murder supported the State's allegation of torture as an aggravating factor. Instead, counsel apparently heeded the trial court's caution that continuing to question the witness as to whether the victim's death involved torture could lead to a damaging result if the witness believed that it did and so testified. The record reflects that defense counsel did not further pursue his line of questioning and that the defendant made no offer of proof regarding this matter. The defendant is not entitled to relief on this issue.

-104-

*State v. Hester*, 2009 WL 275760 at *33-34.


## [XVII.]
### [MR. HESTER'S SENTENCES FOR ATTEMPTED FIRST DEGREE MURDER AND AGGRAVATED ARSON]


### [D.]

The defendant also challenges the imposition of consecutive sentencing. His argument, in its entirety, is as follows: "The Trial Court further erred in ordering that all sentences in this case be served consecutively." We conclude that this issue is waived. *See* Tenn. Ct. Crim. App. R. 10(b) (providing that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Regardless, the defendant is not entitled to relief. The record reflects that the trial court ordered consecutive sentencing based on its finding that the defendant was on probation at the time of the conviction offenses. The decision whether to impose concurrent or consecutive sentences is addressed to the sound discretion of the trial court. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). One of the factors upon which the trial court may exercise its discretion to order consecutive sentencing is that the offenses for which the defendant is being sentenced were committed while on probation. *See* Tenn. Code Ann. § 40-35-115(b)(6). Furthermore, our supreme court has held that a trial court's imposition of consecutive sentences does not offend a defendant's Sixth Amendment right to a jury trial. *See State v. Allen*, 259 S.W.3d 671, 689-90 (Tenn. 2008). The trial court did not abuse its discretion in ordering that the aggravated arson and attempted first degree murder sentences be served consecutively to each other and to the first degree murder conviction.

*State v. Hester*, 2009 WL 275760, at *44.


## [XVIII.]
### [MR. HESTER'S DUE PROCESS CLAIMS]


### [A.]

The defendant essentially contends that he was denied compulsory process throughout the trial court proceedings, "the denial of which ripples through this case and infuses error into the entire proceeding." He seeks a new trial with the enhanced due process he asserts is required in the litigation of a capital case. Although the defendant challenges "most" of the trial court's rulings on the "hundreds" of pre-trial motions he filed, the gist of his argument is as follows:

By quashing nearly every subpoena issued by the defense to substantiate it's (sic) motions, and then denying every procedural motion and claim with little or no opportunity for argument or record-making, the court sidestepped the immortal, got the trial and the conviction, shifted the burdens, passed the buck, and lived to fight another day.

The State submits that the defendant has presented on appeal a litany of complaints without offering any citation to relevant supporting authority. The State addresses only the defendant's claim that the trial judge should have recused himself based on his inability to preside over the defendant's case with impartiality. To this alleged error, the State responds that the record does not reflect that the defendant ever moved the trial judge to recuse himself or that there was any basis for the judge's recusal.

In support of his claims, defense counsel points only to a letter counsel provided to the court summarizing the status of various motions in advance of motions hearings on September 9 and 10, 2003. The letter lists sixty-six motions and the related witnesses for whom the defense issued subpoenas. The defendant states that with the exception of five witnesses subpoenaed to testify regarding jury selection matters, all other subpoenas were quashed. The defendant asserts that the trial court erred in denying each motion on its merits and also in quashing the related evidentiary subpoenas. He does not further elaborate on the challenged rulings except to advise this court on its consideration of his due process claim. In this regard, counsel states: "It is important to read this [letter] with care, and to read the underlying motions, many of which were extensively briefed; with no witnesses to call once the subpoenas were quashed, the record contains very little evidence upon which to allege error."

In the next thirty pages of his brief, the defendant sets forth myriad rulings, events, and actions in his case that he contends together establish a lack of due process in the trial court proceedings at every turn. He asserts the denial of a preliminary hearing, denial of a pre-trial bond hearing, denials of discovery requests and evidence admission, denial of hearings, denial of his requests to address the court and request to proceed pro se, changes of counsel, changes of the trial judge, errors by the court, errors by the trial clerk, slow justice, a late death penalty notice, prosecutorial abuse, bias of the trial court, an obstinate court reporter, denial of ex parte hearings, denial of funding, improper commentary from the bench directed at defense counsel, and other matters. Counsel sets forth his disagreement with these and other aspects of his case with no citation to supporting authority, sporadic references to the record, and many conclusory allegations of error. Counsel states that lingering in each of these assignments of error "is the underlying inability to make a record for appeal because of the subpoenas that were quashed and the motions that were summarily

denied." In this regard, the only citations to authority are to cases recognizing and elaborating on the constitutional right to compulsory process in general.

[The Court of Criminal Appeals] has examined compulsory process in criminal proceedings as follows:

> The Sixth Amendment to the United States Constitution grants an accused a right to compulsory process for obtaining witnesses in his or her favor. *Faretta v. California*, 422 U.S. 806, 816, 95 S. Ct. 2525, 2532 (1975). However, a criminal defendant's right to compulsory process is not absolute; rather, the United States Constitution only prohibits a state from denying a defendant the ability to present testimony that is " 'relevant and material, and ... vital to the defense.' " *United States v. Valenzuela Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 3446 (1982) (quoting *Washington*, 388 U.S. at 16, 87 S. Ct. at 1922)) [ ... ] The Tennessee Constitution similarly affords a defendant facing criminal prosecution the right "to have compulsory process for obtaining witnesses in [the defendant's] favor." Tenn. Const. art. I, § 9. Moreover, like the United States Constitution, our state constitution only extends to a defendant a right to compulsory process "[i]f a prospective witness is or probably will be a material one.... The matter turns on whether the issuance of process would in fact be an abuse of process, and, if the Court finds such is the case the Court has power to prevent such abuse." *Bacon v. State*, 385 S.W.2d 107, 109 (Tenn.1964); *see also State v. Smith*, 639 S.W.2d 677, 680 (Tenn. Crim. App.1982) (" '[T]he constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible.' "); see also T.C.A. § 40-17-105 ("As provided by the Constitution of Tennessee, the accused, in all criminal prosecution has a right to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in the accused's favor.")
>
> . . .
>
> In reviewing a trial court's exercise of its power and duty to prevent the abuse of its process, appellate courts in Tennessee have generally applied an abuse of discretion standard. *See*, *e.g.*, *State v. Burrus*, 693 S.W.2d 926, 929 (Tenn. Crim. App.1985).

*State v. Frank Lee Tate*, No. W2004-01041-CCA-R3-CD, 2007 WL 570555, at * *12-13 (Tenn. Crim. App. Feb. 23, 2007) (some internal citations omitted), perm. app. denied (Tenn. June 18, 2007).

In this case, although the defendant makes numerous generalized allegations regarding what he perceives to be the trial court's systematic denial of compulsory process, he makes no specific arguments regarding these supposed abuses. Regarding the subpoenas addressed at the September 2003 motions hearing, the defendant has not adequately indicated what the proposed testimony of any of the excluded witnesses would have been, nor has he specifically argued how the exclusion of this testimony prejudiced him. Furthermore, our review of the transcript from the motions hearing indicates that the trial court allowed the defendant ample opportunity to argue in support of the motions he presented (and in support of the subpoenas he filed in connection with those motions), and that the trial court's quashing subpoenas and denying motions were not arbitrary or capricious, as the defendant suggests. In short, the defendant has not established that the trial court's denying his motions and quashing his subpoenas constituted an abuse of discretion that denied him compulsory process. The defendant is therefore denied relief on this issue.

*State v. Hester*, 2009 WL 275760, at *10-12.